# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | |
| **Plaintiff,** : | |
| : | **CIVIL ACTION** |
| : | **No.** |
| v. : | **0 3 - C - 1 4 2 7** |
| : | |
| HEARTLAND ADVISORS, INC., WILLIAM J. : | |
| NASGOVITZ, PAUL T. BESTE, JILAINE H. : | |
| BAUER, THOMAS J. CONLIN, GREG D. WINSTON, : | |
| KEVIN D. CLARK, KENNETH J. DELLA, HUGH F. : | |
| DENISON AND RAYMOND R. KRUEGER, : | **DEMAND FOR** |
| : | **JURY TRIAL** |
| **Defendants.** : | |
| : | |

## COMPLAINT

Plaintiff Securities and Exchange Commission, for its Complaint against Heartland Advisors, Inc., William J. Nasgovitz, Paul T. Beste, Jilaine H. Bauer, Thomas J. Conlin, Greg D. Winston, Kevin D. Clark, Kenneth J. Della, Hugh F. Denison and Raymond R. Krueger, alleges as follows:

## SUMMARY

1.     In slightly over two weeks, investors in municipal bond mutual funds managed by Heartland Advisors, Inc. lost approximately $93 million – losses that are directly attributable to the Defendants' fraudulent conduct.  Specifically, Heartland Advisors, Inc., through the conduct of William Nasgovitz, Paul Beste, Jilaine Bauer, Kevin Clark, Thomas Conlin and Greg Winston, misrepresented and omitted to state material facts in the offer and sale of shares of two of these funds regarding the risks of investing in the funds, the credit research performed on the bonds purchased and held by

the funds, the credit quality of the bonds held in the funds and the liquidity of the funds. Heartland Advisors, the above individuals and Kenneth Della also fraudulently priced bonds in these funds, with the result that the funds' shares were sold at incorrect per-share Net Asset Values ("NAVs"). A fund's NAV is a critical piece of information for any investor in that fund as it represents the closing "price" of each of the fund's shares. If the fund's daily NAV is overstated on a given day, investors who purchase shares of the fund on that day pay too much relative to the fund's actual assets, while shareholders redeeming their shares on that day receive more than they are entitled to relative to the fund's actual assets.

2.     As a result of the fraudulent pricing, from at least August 2000 until March 2001, investors in Heartland Advisors' High-Yield Municipal Bond Fund ("High-Yield Fund") and Short Duration High-Yield Municipal Fund ("Short Duration Fund") (collectively, "the Funds") purchased shares of the Funds at incorrect NAVs. As a further result of the fraudulent pricing, Heartland Advisors, Inc. was forced to radically devalue the bonds held in the Funds on September 28, 2000 ("September Devaluation") and again on October 13, 2000 ("October Devaluation") in order to generate sales of those bonds and keep the Funds solvent. While investors were kept in the dark, Nasgovitz tipped his friend, Raymond Krueger, about the Funds' problems prior to the September Devaluation, and Krueger liquidated his shares in one of the Funds. In addition, with knowledge of the Funds' continuing problems: Winston, a portfolio manager of the Funds, liquidated his shares in the Funds and tipped his family to do the same; Bauer liquidated her shares in one of the Funds; and Della liquidated his shares in the Funds and redeemed his father's shares in a related fund.

## JURISDICTION AND VENUE

3.    The Commission brings this action pursuant to the authority conferred on it by Sections 20(b) and 20(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§77t(b) and §77t(c)], Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78u(d) and 78u(e)], Section 42(d) of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. §80a-41(d)], and Section 209(d) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §80b-9(d)].

4.    This Court has jurisdiction over this matter pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], Section 27 of the Exchange Act [15 U.S.C. §78aa], 28 U.S.C. §1331, Section 44 of the Investment Company Act [15 U.S.C. §80a-43], and Section 214 of the Advisers Act [15 U.S.C. §80b-14].

5.    Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], Section 27 of the Exchange Act [15 U.S.C. §78aa], Section 44 of the Investment Company Act [15 U.S.C. §80a-43], and Section 214 of the Advisers Act [15 U.S.C. §80b-14]. Certain of the sales, transactions, acts, practices, and courses of business alleged herein occurred in the Eastern District of Wisconsin, and all Defendants can be found in, transact business in, and/or are inhabitants of the Eastern District of Wisconsin.

6.    Defendants have made use of the mails and of the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices and courses of business alleged herein in the Eastern District of Wisconsin.

7.    There is a reasonable likelihood that the Defendants will, unless enjoined, continue to engage in the transactions, acts, practices and courses of business set forth in

this Complaint, and transactions, acts, practices and courses of business similar in purport and object.

## RELEVANT INDIVIDUALS AND ENTITIES

8.     Heartland Advisors, Inc. ("Heartland Advisors") is a Wisconsin corporation that was, at all times relevant to this Complaint, dually registered with the Commission as an investment adviser and a broker-dealer. It maintains its principal place of business in Milwaukee, Wisconsin. At all times relevant to this Complaint, Heartland Advisors managed Heartland Group, Inc.'s mutual fund portfolio series, including the Funds, and was the principal underwriter and distributor of the Funds' shares.

9.     William J. Nasgovitz ("Nasgovitz") is 59 years old and resides in Milwaukee, Wisconsin. At all times relevant to this Complaint Nasgovitz was the President, Chief Executive Officer, and Chief Investment Officer of Heartland Advisors, and the President and a director of Heartland Group, Inc. In addition, he was the Chairperson of Heartland Advisors' Investment Policy Committee and a member of its Credit Committee.

10.     Paul T. Beste ("Beste") is 47 years old and resides in Brookfield, Wisconsin. At all times relevant to this Complaint Beste was the Chief Operating Officer and a Vice President of Heartland Advisors. In addition, at all times relevant to this Complaint, Beste was a Vice President of Heartland Group, Inc. At all times relevant to this Complaint, Beste was also a member of Heartland Advisors' Investment Policy Committee, Credit Committee and Pricing Committee, and was one of only four members of the Pricing Committee that could vote on matters affecting the Funds.

11. Jilaine H. Bauer ("Bauer") is 48 years old and resides in Mequon, Wisconsin. At all times relevant to this Complaint Bauer was the Secretary, General Counsel, Compliance Officer, and a Senior Vice President of Heartland Advisors, and a Vice President of Heartland Group, Inc. At all times relevant to this Complaint Bauer was also a member of Heartland Advisors' Credit Committee and Pricing Committee, and was one of only four members of the Pricing Committee that could vote on matters affecting the Funds. Throughout 2000 until approximately October 13, 2000, Bauer was also the Chairperson of the Pricing Committee.

12. Thomas J. Conlin ("Conlin") is 49 years old and resides in Wauwatosa, Wisconsin. From January 1997 until his resignation from Heartland Advisors on September 28, 2000, Conlin was a co-portfolio manager of the Funds and a Vice President of Heartland Advisors. Prior to his resignation, Conlin was also a member of Heartland Advisors' Credit Committee and a non-voting member of Heartland Advisors' Pricing Committee at all times relevant to this Complaint.

13. Greg D. Winston ("Winston") is 39 years old and resides in Sussex, Wisconsin. From January 1997 until March 2001, Winston was a co-portfolio manager of the Funds. He was a Vice President of Heartland Advisors from at least September 1998 to June 2001, a member of Heartland Advisors' Credit Committee, and an alternate, non-voting member of Heartland Advisors' Pricing Committee at all times relevant to this Complaint.

14. Kevin D. Clark ("Clark") is 40 years old and resides in Menomonee Falls, Wisconsin. Since 1993, Clark has been the Senior Vice President of Trading at Heartland Advisors. At all times relevant to this Complaint, Clark was also a member of Heartland

Advisors' Investment Policy Committee and Pricing Committee, and was one of only four members of the Pricing Committee that could vote on matters affecting the Funds.

15. Kenneth J. Della ("Della") is 40 years old and resides in Waukesha, Wisconsin. From September 1998 until February 2001, Della was the Senior Vice President and Treasurer of Heartland Advisors. At all times relevant to this Complaint Della was also a Vice President of Heartland Group. At all times relevant to this Complaint Della was a member of Heartland Advisors' Pricing Committee, and was one of only four members of that Committee that could vote on matters affecting the Funds.

16. Hugh F. Denison ("Denison") is 57 years old and resides in Whitefish Bay, Wisconsin. From 1988 to in or about November 2003, Denison was a member of Heartland Group, Inc.'s Board of Directors. From October 1988 until his retirement in April 1996, Denison was a Vice President and the Director of Equity Research at Heartland Advisors.

17. Raymond R. Krueger ("Krueger") is 56 years old and resides in Whitefish Bay, Wisconsin. Krueger is an attorney licensed to practice law in the state of Wisconsin. Krueger and Nasgovitz have been personal friends since the mid 1990s. Between 1997 and September 8, 2000, Krueger owned shares of Heartland Group, Inc.'s Short Duration Fund.

## OTHER RELEVANT ENTITIES

18. Heartland Holdings, Inc. ("Heartland Holdings") is the parent company of Heartland Advisors, Inc. As of the close of business on August 3, 2000, Heartland Advisors became a wholly owned subsidiary of Heartland Holdings. The reorganization

did not, however, result in a change of management or control of Heartland Advisors. Heartland Holdings is not registered with the Commission in any capacity.

19. Heartland Group, Inc. ("Heartland Group") is a Maryland corporation that has been registered with the Commission as an open-end, management investment company since 1987. It maintains its principal place of business in Milwaukee, Wisconsin. At all times relevant to this Complaint, Heartland Group offered several different series of mutual funds, including the Funds at issue in this Complaint. On March 21, 2001, the Commission obtained an order of permanent injunction and other equitable relief against Heartland Group for violations of Sections 30(b)(2), 30(e) and 30(g) of the Investment Company Act and Rules 30b2-1, 30d-1(a) and 30d-1(c) promulgated thereunder, which placed the Funds under the control of a third-party receiver.

20. Heartland Group's Short Duration Fund began operating on July 2, 1997. Its stated investment objective was a high level of federally tax-exempt current income with a low degree of share price fluctuation.

21. Heartland Group's High-Yield Fund began operating on July 2, 1997. Its stated investment objective was to maximize after-tax total returns by investing for a high level of federally tax-exempt current income.

22. The Funds invested primarily in non-rated, medium and lower quality municipal debt obligations, also known as municipal bonds. The majority of these bonds were below investment grade. The majority of the bonds held in the Funds were generally illiquid, and they were not traded on an exchange.

23.     Heartland Advisors' Pricing Committee was a committee within Heartland Advisors that included Beste, Bauer, Clark, Conlin, Winston and Della. The Pricing Committee had four voting members, Beste, Bauer, Clark and Della.

24.     The Pricing Committee was responsible for, among other things, administering the procedures established by Heartland Group's Board of Directors for valuing securities held by the Funds, including making fair value determinations in accordance with such procedures. In addition, the Pricing Committee was authorized and obligated to adjust the price of any bond in the Funds' portfolios that did not represent the fair value of that bond.

25.     Heartland Advisors' Investment Policy Committee was a committee within Heartland Advisors that included Nasgovitz, Beste and Clark. Nasgovitz chaired the Committee and appointed its members.     The Investment Policy Committee's responsibilities included, among other things, reviewing individual fund performance. The Investment Policy Committee had authority to, among other things, direct Heartland Advisors' portfolio managers to remedy anything that the Investment Policy Committee believed conflicted with a fund's stated investment objectives, the Committee's guidelines, or anything that was not in the best interest of a fund's investors.

26.     Heartland Advisors' Credit Committee was a committee within Heartland Advisors that included Nasgovitz, Beste, Bauer, Conlin and Winston.     The Credit Committee was responsible for, among other things, oversight of the creditworthiness of the bonds held by the Funds. The Credit Committee was required to create, review and enforce procedures for performing credit analysis on the Funds' bonds, and to perform periodic reviews of the Funds' below-investment-grade securities.

## MANAGEMENT AND PRICING OF THE FUNDS

27.     Heartland Group's Board of Directors delegated the day-to-day responsibility for operating and overseeing the Funds to Heartland Advisors.

28.     Heartland Group's Board of Directors approved a set of Policies and Procedures ("Pricing Procedures") that charged Heartland Advisors' Pricing Committee with, among other things, oversight of the valuation of the bonds held by the Funds. The Pricing Procedures required the Pricing Committee to value all debt securities held by the Funds at "fair value determined in good faith" ("fair value") due to the lack of readily available market quotations for those securities.

29.     Specifically, Heartland Advisors, the Funds' portfolio managers, Conlin and Winston, and Heartland Advisors' Pricing Committee, which included Beste, Bauer, Clark, and Della, were responsible for assuring that the Funds' bonds were priced at fair value.

30.     Heartland Advisors, in turn, used these bond prices to calculate the Funds' daily NAVs. It was also the obligation of Heartland Advisors, its portfolio managers and the Pricing Committee to insure that the Funds' daily NAVs were correct.

31.     Heartland Advisors calculated the Funds' NAVs on a daily basis on each day that the New York Stock Exchange was open for trading, and subsequently published the NAVs in the media.

32.     The Funds' daily NAVs represented the closing "price" of each of the Funds' shares. The Funds' daily NAVs were calculated by dividing the total assets of the Funds, including the securities held by the Funds, less any liabilities, by the total number of outstanding shares of the Funds.

33.     If the Funds' daily NAVs were overstated on a given day, shareholders purchasing new shares of the Funds on that day would pay too much relative to the Funds' actual assets, while shareholders redeeming their shares on that day would receive more than they were entitled to relative to the Funds' actual assets, thereby diluting the value of the remaining shareholders' shares.

34.     Although Heartland Group's Board of Directors delegated to Heartland Advisors the day-to-day pricing of the Funds' bonds, the Board had the ultimate obligation to ensure that the prices of the Funds' bonds reflected their fair values.

## **MISREPRESENTATIONS AND OMISSIONS REGARDING THE FUNDS**

35.     Beginning in at least March 2000, Heartland Advisors, Heartland Group's directors, and certain officers and employees of Heartland Advisors made material misrepresentations and omissions concerning the Funds in Commission filings and the Funds' promotional materials. These filings and promotional materials included, but were not limited to, the Funds' June 9, 2000 prospectus, an October 16, 2000 supplement to the June 9, 2000 prospectus, the Funds' Statement of Additional Information ("SAI"), and correspondence to the Funds' shareholders.

36.     Heartland Advisors, Nasgovitz, Conlin, Winston, Beste, and Bauer were integral in preparing the documents that contained these material misrepresentations and omissions. For example, Conlin and Winston, as co-portfolio managers of the Funds, were obligated as a matter of firm practice to review and approve the information Heartland Advisors published pertaining to the funds they managed, including the Funds. Nasgovitz was responsible for reviewing all of Heartland Advisors' published materials, including the Funds' June 9, 2000 prospectus and SAI. In Nasgovitz's absence, Beste

was responsible for conducting the final review of all shareholder marketing materials, including that related to the Funds. Moreover, Heartland Advisors' procedures required Beste to check the accuracy of the facts in the Funds' prospectus. Bauer, as Heartland Advisors' General Counsel and Compliance Officer, reviewed all of Heartland Advisors' prospectuses, statements of additional information, and sales literature prior to publication, including materials related to the Funds.

37. These material misrepresentations and omissions pertained to, among other things, the efforts Heartland Advisors undertook to manage the risks associated with investing in the Funds, the efforts Heartland Advisors and Heartland Group's directors undertook to assure the continued liquidity of the bonds in the Funds' portfolios, and Heartland Advisors' fraudulent pricing of those bonds.

38. For example, Heartland Advisors, Nasgovitz, Conlin, Winston, Beste, and Bauer misrepresented the efforts they undertook to minimize the risks associated with investing in the Funds. In the Funds' June 9, 2000 prospectus as supplemented as of October 16, 2000, these Defendants represented that they managed the risks associated with the Funds "through intensive credit research," pursuant to Heartland Advisors' proprietary method. They also represented in the same document that the Funds' would "never invest more than 20% of [their] total assets in debt obligations rated lower than B-by Standard and Poor's Rating Service ('S&P') or a comparable rating by another nationally recognized statistical rating organization."

39. Contrary to these statements in the prospectus and supplement, Heartland Advisors did not conduct "intensive credit research" into the bonds in the Funds' portfolios, as it represented. To the contrary, Heartland Advisors' fixed income research

department was severely understaffed and had failed in many cases to do research on the bonds in the Funds' portfolios for months at a time.

40.     Heartland Advisors also invested "more than 20% of its total assets in debt obligations rated lower than B- by Standard and Poor's Rating Service ('S&P') or a comparable rating by another nationally recognized statistical rating organization," contrary to its representations. The majority of the bonds in the Funds' portfolios were not rated by Standard and Poor's or any other nationally recognized statistical rating organization. Instead, they were assigned ratings by Heartland Advisors itself.

41.     In another example of the misrepresentations and omissions, in the Funds' SAI, which was incorporated into the Funds' June 9, 2000 prospectus, as supplemented on October 16, 2000, Heartland Advisors, Nasgovitz and Denison expressly represented that, among other things, they continuously monitored the issuers of the bonds held in the Funds' portfolios to "assure [the] continued liquidity of [such] bonds so that the funds could meet redemption requests."

42.     Contrary to this representation in the Funds' SAI, as of at least August 2000, Heartland Advisors, Nasgovitz and Denison knew or recklessly failed to know that the majority of the bonds in the Funds' portfolios were illiquid, that the Funds could not meet shareholder redemption requests through the sale of those bonds, and that, as a result, the Funds had been forced to borrow millions of dollars to meet shareholder redemption requests. Moreover, as of at least September 2000, these Defendants knew or were reckless is not knowing that the lack of liquidity threatened the Funds with the possibility of having to suspend redemptions of the Funds' shares.

43.     For example, Conlin told Nasgovitz and Denison at an August 10, 2000 Board of Directors meeting that "management of the [High Yield Fund's] portfolio had been hampered by significant net redemptions and the absence of subscriptions providing new cash flow," and that "rebalancing of the portfolios had been difficult due to negative cash flows caused by net redemptions over an extended period." At the same meeting, Conlin told Nasgovitz and Denison that "there was some liquidity risk because a material percentage of the [High Yield Fund's] portfolio consisted of defaulted or watch list securities and significant borrowing." Conlin also told Nasgovitz and Denison that "it was possible that year-end tax loss selling would bring additional liquidity pressures."

44.     Also at the August 10, 2000 Board of Directors meeting, Conlin told Nasgovitz and Denison that he would "be selling securities to reduce [the High Yield Fund's] outstanding loans" to cure the Funds' cash crisis, and that "the bonds [in the High Yield Fund] should be able to be sold in a week in the ordinary course."

45.     At the next Board of Directors meeting on September 11, 2000, however, Nasgovitz and Denison learned that, even given an entire month to do so, Heartland Advisors failed to sell enough bonds from the Funds to solve the Funds' cash flow crisis, contrary to Conlin's representation on August 10, 2000. By that time, Nasgovitz and Denison also knew that Conlin, who had personally promised to sell bonds from the Funds to raise the cash necessary to ensure the Funds' liquidity, had resigned from Heartland Advisors.

## FRAUDULENT PRICING OF THE FUNDS' BONDS
## AND MISTATEMENT OF THE FUNDS' NAVs

46.     From at least March 2000 until March 2001, Heartland Advisors and certain of its officers and employees manipulated the prices of certain bonds in the

Funds' portfolios and refused or failed to price other bonds in the portfolios at their fair values. As a result, the Funds' NAVs were false from at least March 2000 until March 2001.

## A.    "Smoothing" of Bond-Price Decreases

47.    Beginning in March 2000, Heartland Advisors, through Conlin and Winston, began manipulating the prices of the bonds held in the Funds' portfolios. Specifically, beginning on March 7, 2000 and continuing through at least July 2000, Conlin and Winston "smoothed", or gradually reduced the prices of, certain bonds held in the Funds in concert with the Funds' third-party pricing service.

48.    For example, between March 7, 2000 and May 8, 2000, Conlin and Winston, in concert with the Funds' third-party pricing service, smoothed downward the prices of six bonds held in the Funds. On March 7, 2000, these bonds' prices ranged from approximately 87 per cent of par value to 98 per cent of par value. Beginning on that day, and continuing through at least May 8, 2000, Conlin and Winston smoothed the carrying values of those six bonds downward by lowering their prices in increments of .5 per cent of par value per day, until the bonds' carrying values reached 80 per cent of par value.

49.    These smoothed prices were not determined in accordance with fair value principles. Rather than lower the prices of the bonds all at once to accurately reflect their fair values, Conlin and Winston, in concert with the Funds' third-party pricing service, lowered the prices gradually in order to falsely maintain the appearance of stability of the Funds' NAVs.

50.     The prices of the bonds that Conlin and Winston smoothed downward did not represent the fair value of those bonds. As a result, from March 7, 2000 through at least September 28, 2000, the NAVs of the Funds, which incorporated these smoothed bond prices, were materially false.

51.     Also as a result of Conlin's and Winston's smoothing of the Funds' bond prices, from March 7, 2000 through at least September 28, 2000, shareholders of the Funds purchased and redeemed shares of the Funds at materially false NAVs.

**B.      Fraudulent Overvaluation of the Funds' Bond Prices**

52.     Beginning at least as early as August 2000 and continuing through October 13, 2000, Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, Clark and Della fraudulently overvalued the bonds held in the Funds' portfolios. Among other things, during that period, each of these Defendants learned that the prices of many of the bonds were inflated, but they failed to act to correct those prices to ensure that the prices reflected the bonds' fair values.

53.     For example, on August 29, 2000, Beste sent an e-mail to Nasgovitz stating that the Funds' should "expect to take a 20% haircut," or discount, to the prices of the Funds' bonds in order to sell them. Shortly thereafter, on September 18, 2000, Clark sent an e-mail to Nasgovitz, Beste and Bauer and informed them that, in the course of trying to sell bonds from the Funds' portfolios, he had received indications of interest from buyers at levels 30%-50% below those at which Heartland Advisors was pricing the bonds.

54.     On September 20, 2000, Beste admitted in an e-mail to Nasgovitz and Bauer that he knew the Bonds were overvalued. Beste stated that Conlin, one of the

Funds' portfolio managers, was "unwilling to take action required in the market since he does not agree with the discount required to sell non-rated bonds in todays [sic] market." Beste also noted the reason for Conlin's refusal to discount the Funds' bonds in order to sell them, namely, that it would "have an impact on performance" of the Funds [i.e. lower the Funds' NAVs].

55.     By at least August 2000, Beste knew that the bonds in the Funds were overvalued and threatened the Funds' survival. On August 28, 2000, he sent an e-mail to Nasgovitz entitled "Muni," in which he admitted, "We can not wait for the melt down to begin before we act. This is going to get worse before it gets better and time is working against us."

56.     Likewise, by at least September 18, 2000, Clark knew that Heartland Advisors' fraudulent overvaluation of the bonds would ultimately result in the Funds' collapse. In an e-mail dated September 18, 2000, summarizing a discussion between Clark, Beste and Bauer, Clark stated that "I believe we are potentially days away from a literal meltdown in these funds, a couple of weeks at the most. At the very least we probably need to look at pricing which will probably be the beginning of the avalanche. . . ."

57.     The fraudulent overvaluation of the bonds in the Funds' portfolios continued up until the October Devaluation. A former Heartland Advisors analyst who was promoted to co-portfolio manager for the Funds after Conlin's departure confirmed this fact in an e-mail to Bauer and Winston on October 12, 2000. In that e-mail, he stated that, "[d]uring today's Pricing Committee meeting, it was determined that the prices provided by Interactive Data Corp. f/k/a Muller [the Funds' third-part pricing service]

would be used to value the High-Yield Municipal Bond Fund and the Short Duration High-Yield Municipal Fund. I would like to go on record stating that these prices do not reflect the value of the bonds held in the fund."

58.     Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, Clark and Della caused the Funds' bonds to be overvalued, and each of these Defendants failed to correct the prices of the Funds' bonds.

59.     To the contrary, Nasgovitz, Beste, Bauer, Clark and Winston tried to cover up their pricing fraud. For example, on September 28, 2000, Bauer sent an e-mail entitled "Muni Records" to Nasgovitz, Beste, Clark, and Winston, recommending that they eliminate documents relating to the Funds. In her e-mail, Bauer urged these Defendants to "eliminate on a regular basis any other material in your files," including "a diary, research file notes or miscellaneous material involving discussions relating to portfolio securities, underlying credits and valuation issues."

60.     As a result of the conduct described above, from at least August 2000 through October 13, 2000, the Funds' daily NAVs were materially inflated due to the fraudulent overvaluation of the Funds' bonds. Because the daily NAVs were inflated, shareholders of the Funds purchased and redeemed shares of the Funds at materially inflated NAVs during that time period.

## C.     The Sham Sale of Bonds to the State of Wisconsin Investment Board

61.     In an effort to cover up the Funds' cash flow crisis, Heartland Advisors, through Beste, arranged to transfer some of the most illiquid bonds in the Funds' portfolios to the State of Wisconsin Investment Board ("SWIB") in return for cash.

62. Heartland Advisors represented that this transfer was a sale. In fact, the SWIB transaction was structured as a short-term loan and designed to allow Heartland Advisors to move illiquid bonds out of the Funds' portfolios and, at the same time, raise cash to meet shareholder redemption requests.

63. Beste negotiated the SWIB transaction. SWIB informed Beste that it would loan the Funds $8,347,085 in return for a package of bonds under terms that included the following: (1) Heartland Advisors would continue to manage the bonds for SWIB even after the SWIB transaction was complete; (2) SWIB was entitled to "put" (give) the bonds back to Heartland Holdings at a 20% guaranteed annual rate of return; and (3) Heartland Holdings and Nasgovitz would personally guarantee the promised return. Without these terms, SWIB would not have gone forward with the loan.

64. In order to meet SWIB's terms, Beste lowered the prices of the bonds involved in the SWIB transaction by approximately 50% immediately before the transaction. These prices did not, however, represent the fair value of those bonds. Instead, Beste set the prices in order to consummate the SWIB transaction without regard for the bonds' fair value.

65. Moreover, Beste misrepresented the origin of the purported sale prices to both SWIB and the Funds' third-party pricing service. Beste told the Funds' third-party pricing service that the prices for the Bonds involved in the SWIB transaction were determined by SWIB. He told SWIB, however, that the prices for the bonds were determined by the Funds' third-party pricing service. In fact, Beste determined the prices of the bonds.

**D.** **The September Devaluation**

66.    As a result, on September 28, 2000 the value of the bonds held in the High-Yield Fund dropped by 8.2%, while the value of those in the Short Duration Fund dropped by 2.1%. Accordingly, the High-Yield Fund's NAV dropped from $8.75 to $8.03, while the Short Duration Fund's NAV dropped from $9.10 to $8.91.

67.    Heartland Advisors misrepresented the reason for the September Devaluation in a letter to shareholder dated October 10, 2000. That letter, which Nasgovitz signed and Bauer reviewed, stated, in part, that "The recent decline in share price on September 28 was primarily due to the pricing service's decision to make sizeable adjustments to the valuations of a number of securities in the Fund's portfolios – many of which were in the healthcare-related sectors where the Fund has been heavily weighted." This explanation for the September 28, 2000 devaluation was false.

68.    The real reason for the Funds' devaluation that day was that Beste arbitrarily reduced the prices of the bonds involved in the SWIB transaction in order to consummate the transaction. This resulted in lower valuations of those bonds on September 28, 2000, which in turn caused the Funds' NAVs to drop on that day by 8.2% in the High-Yield Fund and 2.1% in the Short Duration Fund.

**E.** **The October Devaluation**

69.    On October 13, 2000, Heartland Advisors faced the prospect of not having sufficient cash to meet redemption requests from the Funds' shareholders. As a result, Heartland Advisors' Pricing Committee radically lowered the prices of the bonds in the Funds' portfolios in order to generate sales and thereby raise cash to meet redemption requests.

70.     On October 13, 2000, the Pricing Committee instructed Winston and others to provide their best estimate of the fair values of the bonds held in the Funds' portfolios, which they proceeded to do. To these valuations, however, the Pricing Committee applied additional, across-the-board "haircuts", or reductions, of 50% to the bonds held in the High Yield Fund and 33% to the bonds held in the Short Duration Fund.

71.     The levels to which the Pricing Committee lowered the bonds' prices as a result of these wholesale, across-the-board haircuts did not represent the bonds' fair values. In fact, the Pricing Committee never endeavored to price the bonds at fair value on October 13, 2000. Instead, these across-the-board price haircuts were determined by the Funds' need to sell bonds and thereby raise cash to meet shareholder redemption requests. This urgent need to sell bonds, in turn, was caused by Heartland Advisors' failure to sell bonds in the preceding months because the bonds were fraudulently overvalued.

72.     Heartland Advisors, Nasgovitz, Beste, Bauer, Winston, Clark and Della caused the improper October Devaluation. None of these Defendants, however, corrected the materially incorrect prices for the Funds' bonds that resulted when the Pricing Committee applied an across-the-board haircut to those prices.

73.     As a result of the conduct described above, the Funds' NAVs were incorrect from October 13, 2000 to March 21, 2001, because they were based on incorrect prices for the bonds held in the Funds' portfolios. Furthermore, the shareholders of the Funds who purchased and redeemed shares of the Funds during that time period did so at materially incorrect NAVs.

74. After the October Devaluation, Heartland Advisors, Nasgovitz, Beste, Bauer, and Winston misrepresented the reasons for the October Devaluation to shareholders. In a supplement to the Funds' prospectus dated October 16, 2000, Heartland Advisors represented that the reason for the October 13, 2000 devaluation was a "current lack of liquidity in the high-yield municipal bond markets generally, and because of credit quality concerns and a lack of market makers, market bids, and representative market transactions in the specific types of securities held by the Funds. . . ."

75. This disclosure was false. The real cause of the October Devaluation was not what Heartland Advisors described in the October 16, 2000 supplement. Instead, as Nasgovitz admitted during a meeting with members of Heartland Advisors' public relations firm on or about November 11, 2000, the October Devaluation was caused by "illiquid securities coupled with redemptions. The portfolio was not structured properly to withstand credit risk . . . ."

## INSIDER TRADING

76. Between September 8, 2000 and October 10, 2000, Defendants Krueger, Bauer, Winston and Della sold their shares of the Short Duration Fund or the High Yield Fund or both while in possession of, and/or using, material, nonpublic information concerning the Funds. During the same time period Della sold his father's shares of Heartland Group's Taxable Short Duration Fund while in possession of, and/or using, material, nonpublic information concerning the Funds. On September 8, 2000, and September 29, 2000, respectively, Defendants Nasgovitz and Winston conveyed material, nonpublic information concerning the Funds to individuals not employed by Heartland

Advisors who then sold their shares in one or both of the Funds while in possession of, and/or using, the material, nonpublic information.

77. At all times relevant to this Complaint, Heartland Advisors had written procedures prohibiting the misuse of nonpublic information obtained through the course of employment at Heartland Advisors. These procedures expressly provided that any Heartland employee who became aware of material nonpublic information should not trade for a personal or client's account, recommend transactions in the security, or disclose (tip) the information to others.

78. At all times relevant to this Complaint, Nasgovitz, Bauer, Winston, and Della were aware of these procedures.

A. **Nasgovitz and Krueger**

79. Krueger and Nasgovitz were friends from at least the mid 1990s until at least in or around October 2001. For example, in the mid 1990s, Krueger, Nasgovitz, and their wives vacationed together in New York. Similarly, in or around October 2001, Krueger attended Nasgovitz's daughter's wedding reception at Nasgovitz's house in Santa Barbara, California.

80. Krueger began investing in Heartland Group's Funds in 1997. As of the morning of September 8, 2000, Krueger owned 2,767.791 shares of the Short Duration Fund, as well as shares of Heartland Group's Firstar Money Market Fund, Heartland Value Plus Fund, and Heartland Value Fund.

81. On September 8, 2000, Nasgovitz possessed material, nonpublic information concerning the Funds, including but not limited to the following: the impending transfer of bonds from the Funds to SWIB; the Funds' continuing cash flow

22

crisis; the Funds' materially false NAVs; Heartland Advisors' failure to sell bonds at the inflated prices Heartland Advisors assigned to them; and Heartland Advisors' failure to accurately price the bonds in the Funds' portfolios.

82.     On September 8, 2000, Krueger and Nasgovitz had lunch together at Louisa's restaurant in Milwaukee, Wisconsin.    Their lunch meeting began at approximately 11:45 a.m. and lasted approximately one hour.  This was the only meeting between Krueger and Nasgovitz in 2000.  During their lunch meeting on September 8, 2000, Nasgovitz conveyed material, nonpublic information to Krueger concerning the Short Duration Fund.

83.     During their lunch meeting, Krueger and Nasgovitz discussed Krueger's investments in the Heartland Group Funds.  According to Nasgovitz, the discussion included Krueger's investment in the Short Duration Fund.

84.     Immediately after lunch, Krueger and Nasgovitz returned to Heartland Advisors' offices together.   At 1:44 p.m., while at Heartland Advisors' offices and approximately one hour after his lunch meeting with Nasgovitz, Krueger sold all of his shares in the Short Duration Fund while in possession of, and/or using, the material, nonpublic information Nasgovitz conveyed to Krueger at their lunch meeting.  At the same time, Krueger placed an order to sell all of his son's shares in the Short Duration Fund, however his son did not own any shares of the Funds at the time.

85.     Krueger did not, however, sell any shares he held in Heartland Group's Firstar Money Market Fund, Heartland Value Plus Fund, or Heartland Value Fund when he liquidated his shares in the Short Duration Fund on September 8, 2000.

86.     Nasgovitz knew or had reason to know that the information he conveyed to Krueger pertaining to the Short Duration Fund was nonpublic.

87.     Krueger knew or had reason to know that Nasgovitz had access to and possessed nonpublic information concerning the Short Duration Fund in the course of his employment at Heartland Advisors and Heartland Group.

88.     Krueger knew or had reason to know that it was improper for Nasgovitz to convey to Krueger nonpublic information he obtained in the course of his employment at Heartland Advisors and Heartland Group.

89.     As a result of his sale on September 8, 2000, Krueger avoided losses of approximately $11,900.

**B.      Bauer**

90.     Bauer simultaneously held multiple positions at Heartland Advisors in the months preceding the October Devaluation. Between August 2000 and October 13, 2000, she was Heartland Advisors' General Counsel and Compliance Officer, the Chairperson of its Pricing Committee, and one of its Senior Vice Presidents. In addition, Nasgovitz placed Bauer on Heartland Advisors' Credit Committee in July 2000.

91.     Furthermore, at all times relevant to this Complaint, Bauer was one of only four members of Heartland Advisors' Pricing Committee that could vote on matters affecting the Funds.

92.     Because of the multiple positions she held, Bauer possessed extensive nonpublic information concerning the Funds immediately before she sold her shares of the Short Duration Fund on October 3, 2000. Specifically, Bauer knew that the bonds in the Short Duration Fund's portfolio were overvalued. She also knew that, beginning in at

least September 2000, the Funds were involved in a cash flow crisis, that Heartland Advisors could not raise enough money from the sale of bonds to meet shareholder redemption requests in the Funds, and that Heartland Advisors was considering suspending redemptions in the Funds as a means of solving these problems.

93.     For example, on September 18, 2000, Clark e-mailed Bauer and informed her that he had received offers to buy bonds from the Funds at levels 30%-50% below those at which Heartland Advisors was pricing the bonds. On September 20, 2000, Beste e-mailed Bauer and told her that the Funds would be "required" to take a "discount" in order "to sell non-rated bonds in today's market." Thus, Bauer knew that the bonds in the Short Duration Fund's portfolio were overvalued.

94.     As a further example, on September 27, 2000, Bauer knew that Heartland Advisors was using all of its cash to pay redemptions in the Funds, and that, as a result, Heartland Advisors could not actively manage the Funds. However, she instructed Heartland Advisors' shareholder services representatives not to tell this information to the Funds' shareholders.

95.     Before she sold her shares in the Short Duration Fund, Bauer also knew the specific schedule of investments in the Short Duration Fund, the default percentage for the Funds, as well as the reasons for the September Devaluation.

96.     Moreover, Bauer knew that the SWIB transaction would not solve the Funds' liquidity crisis. For example, prior to the SWIB transaction, Clark informed Bauer in an e-mail that the SWIB transaction was a "very short-term solution" that would impair Heartland Advisors' ability to resolve the Funds' cash flow crisis.

97.     Furthermore, Nasgovitz sent an e-mail to Bauer and others before the SWIB transaction stating that the SWIB transaction would "entail lower prices for the securities and will result in losses for . . . [the] Funds." Bauer also knew prior to the SWIB transaction that Heartland Advisors was considering asking the SEC for permission to suspend redemptions in the Funds if the SWIB transaction resulted in continued redemptions.

98.     The foregoing information and other information Bauer possessed concerning the Funds as of October 3, 2000 was material and nonpublic.

99.     On the morning of October 3, 2000, Bauer owned 4,976.156 shares of the Short Duration Fund. At 7:05 a.m. on October 3, 2000, Bauer sold all of her shares in the Short Duration Fund while in possession of, and/or using, the material, nonpublic information she possessed concerning the Funds.

100.    As a result of her sale on October 3, 2000, Bauer avoided losses of approximately $20,000.

## C.     Winston

101.    Between January 1997 and March 2001, Winston was a co-portfolio manager of the Funds. He was also an alternate member of Heartland Advisors' Pricing Committee and regularly attended meetings of the Pricing Committee throughout September and October 2000. From at least September 1998 to June 2001, he was a Vice President of Heartland Advisors. As such, Winston possessed extensive, nonpublic information concerning the Funds immediately before the October Devaluation.

102.    For example, as a co-portfolio manager for the Funds, Winston knew that, beginning in at least August 2000, the Funds were unable to sell sufficient bonds at the

prices assigned to them by Heartland Advisors to meet shareholder redemption requests. He therefore also knew that the prices of those bonds were materially overvalued, and that, as a result, the Funds' NAVs were materially inflated.

103.    Moreover, on September 28, 2000, the day before Winston liquidated his shares of the Funds, representatives of Heartland Advisors' third-party pricing service informed Winston that they intended to mark down the prices of certain bonds in the Funds that day. At the same time, the pricing service informed Winston that it was going to look at additional bonds held in the Funds to determine if there needed to be further devaluations due to "pricing concerns."

104.    Furthermore, at 7:59 a.m. on September 28, 2000, Nasgovitz sent an e-mail to Winston and others stating that the SWIB transaction, planned for September 29, 2000, would "entail lower prices for the securities and will result in losses for . . . [the] Funds."

105.    The foregoing information and other information Winston possessed concerning the Funds as of September 29, 2000 was material and nonpublic.

106.    At 11:30 a.m. on September 29, 2000, Winston sold 2,815.315 shares of the Short Duration Fund and 609.434 shares of the High Yield Fund while in possession of, and/or using, the material, nonpublic information he possessed concerning the Funds.

107.    As a result of his sales on September 29, 2000, Winston avoided losses of approximately $21,000.

108.    On September 28, 2000, the day before Winston liquidated his shares in the Funds, he conveyed material, nonpublic information to his parents concerning the

Funds. Also on that day, Winston conveyed, through his wife, material, nonpublic information concerning the Funds to his wife's parents.

109. In addition, Winston's mother contacted her parents (Winston's grandparents) and advised them to liquidate their shares in Heartland Group's Taxable Short Duration Fund. The Taxable Short Duration Fund held some of the same bonds as the Funds.

110. As a result, Winston's parents sold all of their shares of the Short Duration Fund on September 29, 2000. Also on September 29, 2000, Winston's in-laws sold all of their shares in the Short Duration Fund and High Yield Fund. In addition, Winston's mother had authority to execute transactions in her parents' Heartland Advisors' account. On September 29, 2000, Winston's mother also sold all of her parents' shares in the Taxable Short Duration Fund.

111. Winston's parents and Winston's in-laws made these sales while in possession of, and/or using, the material, nonpublic information concerning the Funds or the Taxable Short Duration Fund, conveyed to them by Winston directly or through his wife on September 28, 2000.

112. Winston knew or had reason to know that the information he conveyed to his parents and to his in-laws pertaining to the Funds was material and nonpublic.

113. As a result of their sale on September 29, 2000, Winston's parents avoided losses of approximately $24,500.

114. As a result of their sale on September 29, 2000, Winston's grandparents avoided losses of approximately $1,200 in the Taxable Short Duration Fund.

115. As a result of their sale on September 29, 2000, Winston's in-laws avoided losses of approximately $2,080.

116. Winston is liable for all of the losses avoided for himself and his family members.

**D.    Della**

117. From September 1998 until February 2001 Della was a Senior Vice President and the Treasurer of Heartland Advisors. In addition, at all times relevant to this Complaint, Della was one of only four members of Heartland Advisors' Pricing Committee that could vote on matters affecting the Funds.

118. In the weeks before the October Devaluation, he was also the fund accounting group's representative on the Pricing Committee and Heartland Advisors' conduit between that group and the Pricing Committee.

119. As such, Della possessed extensive, nonpublic information concerning the Funds immediately before the October Devaluation. For example, on or around October 10, 2000, Della received an illiquid security list summarizing the illiquid securities in the Funds as of October 9, 2000. This list showed that the Short Duration Fund contained approximately 59.4% illiquid securities and the High Yield Fund contained approximately 73.8% illiquid securities as of October 9, 2000. These figures represented a dramatic increase over the figures contained in the previous list that had appeared only ten days earlier.

120. Moreover, as one of only four voting members of the Pricing Committee, Della knew that, beginning in at least September 2000, the Funds were unable to sell sufficient bonds at the prices assigned to them by Heartland Advisors to meet shareholder

redemption requests. He therefore also knew or recklessly failed to know that the prices of those bonds were overstated, and that, as a result, the Funds' NAVs were inflated.

121. The foregoing information and other information Della possessed concerning the Funds as of October 10, 2000 was material and nonpublic.

122. On the morning of October 10, 2000, Della owned 147.62 shares of the Short Duration Fund and 194.37 shares of the High Yield Fund. At 6:05 p.m. on October 10, 2000, Della sold all of his shares in both Funds while in possession of, and/or using, the material, nonpublic information he possessed concerning the Funds.

123. On October 10, 2000, Della was the registered representative for his father's account at Heartland Advisors, and as such had authority to execute transactions in his father's account.

124. On October 10, 2000, the same day Della liquidated his own shares in the Funds, he sold 1,948.71 of his father's shares in Heartland Group's Taxable Short Duration Fund. The Taxable Short Duration Fund held some of the same bonds as the Funds. Della executed this sale while in possession of, and/or using, the material, nonpublic information he possessed concerning the Funds and the Taxable Short Duration Fund.

125. As a result of Della's sale of his shares on October 10, 2000, Della avoided losses of approximately $1,600. As a result of Della's sales of his father's shares on October 10, 2000, Della's father avoided losses of approximately $1,100.

126. Della is liable for all of the losses avoided for himself and his father.

## DEFENDANTS' ILL-GOTTEN GAINS

127.    All Defendants received ill-gotten gains and were therefore unjustly enriched as a result of the conduct described above.

128.    As a result of the conduct described above in paragraphs 46 through 51, Heartland Advisors, Conlin and Winston were unjustly enriched in the amount of all fees or bonuses they received from advisory services they provided to the Funds from March 7, 2000 through August 2000.  As a result of the same conduct, Conlin and Winston were also unjustly enriched in the amount of all salaries they received from March 7, 2000 to August 2000.

129.    As a result of the conduct described above in paragraphs 52 through 60 and 69 through 75, Heartland Advisors, Nasgovitz, Conlin, Winston, Beste, Bauer, Clark, and Della were unjustly enriched in the amount of all fees or bonuses they received from advisory services they provided to the Funds from August 2000 through March 2001.  As a result of the same conduct, Nasgovitz, Conlin, Winston, Beste, Bauer, Clark, and Della were also unjustly enriched in the amount of any salaries they received from August 2000 through March 2001.

130.    As a result of the conduct described above in paragraphs 35 through 45, Denison was unjustly enriched in the amount of all fees he received from services he provided as a director of Funds from at least August 2000 through March 21, 2000.

131.    In addition, as a result of the conduct described above in paragraphs 90 through 100, Bauer was unjustly enriched in the amount of approximately $20,000 when she sold her shares in the Short Duration Fund on October 3, 2000.

132. As a result of the conduct described above in paragraphs 101 through 116, Winston was unjustly enriched in the amount of approximately $21,000 when he sold his shares in the Short Duration Fund and High Yield Fund on September 29, 2000.

133. As a result of the conduct described above in paragraphs 117 through 126, Della was unjustly enriched in the amount of approximately $1,600 when he sold his shares in the Short Duration Fund and High Yield Fund on October 10, 2000.

134. As a result of the conduct described above in paragraphs 79 through 89, Krueger was unjustly enriched in the amount of approximately $11,900 when he sold his shares in the Short Duration Fund on September 8, 2000.

## COUNT I

### FRAUD IN THE OFFER OR SALE OF SECURITIES

#### VIOLATIONS OF SECTION 17(a)(1) OF THE SECURITIES ACT (AGAINST DEFENDANTS HEARTLAND ADVISORS, NASGOVITZ, BESTE, BAUER, CONLIN, WINSTON, CLARK, DELLA AND KRUEGER)

135. Plaintiff realleges and incorporates herein by reference paragraphs 27 through 126 of this Complaint.

136. By reason of the activities described above in paragraph 135, Defendants Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, Clark, Della and Krueger, in the offer and sale of securities, by the use of the means and instrumentalities of transportation and communication in interstate commerce and by the use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud.

137. Defendants Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, Clark, Della and Krueger knew or were reckless in not knowing of the activities described in paragraph 135, above.

138. By reason of the activities described in paragraph 135, above, Defendants Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, Clark, Della and Krueger violated Section 17(a)(1) of the Securities Act [15 U.S.C. §77q(a)(1)].

## COUNT II

## FRAUD IN THE OFFER OR SALE OF SECURITIES

VIOLATIONS OF SECTIONS 17(a)(2) AND 17(a)(3) OF THE SECURITIES ACT
(AGAINST ALL DEFENDANTS)

139. Plaintiff realleges and incorporates herein by reference paragraphs 27 through 126 of this Complaint.

140. By reason of the activities described above in paragraph 139, Defendants Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, Clark, Della, Denison and Krueger, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce and by the use of the mails, directly and indirectly, obtained money and property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in transactions, practices and courses of business which operated as a fraud and deceit upon investors and prospective investors.

141. By reason of the activities described in paragraph 139 above, Defendants Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, Clark, Della, Denison and Krueger violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §77q(a)(2) and (3)].

## COUNT III

## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER (AGAINST DEFENDANTS HEARTLAND ADVISORS, NASGOVITZ, BESTE, BAUER, CONLIN, WINSTON, CLARK, DELLA AND KRUEGER)

142.    Plaintiff realleges and incorporates herein by reference paragraphs 27 through 126 of this Complaint.

143.    By reason of the activities described above in paragraph 142, Defendants Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, Clark, Della and Krueger, in connection with the purchase and sale of securities, and by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated and would operate as a fraud and deceit.

144.    Defendants Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, Clark, Della and Krueger knew or were reckless in not knowing of the activities described in paragraph 142, above.

145.    By reason of the activities described in paragraph 142 above, Defendants Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, Clark, Della and Krueger violated Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.

## COUNT IV

## FRAUD IN CONNECTION WITH CONDUCT AS AN INVESTMENT ADVISER

### VIOLATIONS OF SECTION 206(1) OF THE ADVISERS ACT
### (AGAINST DEFENDANT HEARTLAND ADVISORS)

146.    Plaintiff realleges and incorporates herein by reference paragraphs 27 through 75 of this Complaint.

147.    By reason of the activities described above in paragraph 146, Defendant Heartland Advisors, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, while acting as an investment adviser, employed devices, schemes, and artifices to defraud advisory clients or prospective advisory clients.

148.    Defendant Heartland Advisors knew or was reckless in not knowing of the activities described in paragraph 146, above.

149.    By reason of the activities described in paragraph 146 above, Defendant Heartland Advisors violated Section 206(1) of the Advisers Act [15 U.S.C. §80b-6(1)].

## COUNT V

## FRAUD IN CONNECTION WITH CONDUCT AS AN INVESTMENT ADVISER

### VIOLATIONS OF SECTION 206(2) OF THE ADVISERS ACT
### (AGAINST DEFENDANT HEARTLAND ADVISORS)

150.    Plaintiff realleges and incorporates herein by reference paragraphs 27 through 75 of this Complaint.

151.    By reason of the activities described above in paragraph 150, Defendant Heartland Advisors, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, while acting as an investment adviser,

engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon advisory clients or prospective advisory clients.

152. By reason of the activities described in paragraph 150 above, Defendant Heartland Advisors violated Section 206(2) of the Advisers Act [15 U.S.C. §80b-6(2)].

### COUNT VI

### AIDING AND ABETTING FRAUD IN CONNECTION WITH CONDUCT AS AN INVESTMENT ADVISER

AIDING AND ABETTING VIOLATIONS OF
SECTIONS 206(1) AND 206(2) OF THE ADVISERS ACT
(AGAINST DEFENDANTS NASGOVITZ, BESTE, BAUER,
CONLIN, WINSTON, CLARK, AND DELLA)

153. Plaintiff realleges and incorporates herein by reference paragraphs 27 through 75 of this Complaint.

154. As set forth more fully above in paragraph 153, Defendant Heartland Advisors violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1) and 80b-6(2)].

155. By reason of the activities described above in paragraph 153, Defendants Nasgovitz, Beste, Bauer, Conlin, Winston, Clark, and Della knowingly and substantially assisted Defendant Heartland Advisors' violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1) and 80b-6(2)], and thereby aided and abetted Heartland Advisors' violations of those provisions of the federal securities laws.

36

## COUNT VII

## MISTATEMENTS AND OMISSIONS IN REQUIRED INVESTMENT COMPANY FILINGS, RECORDS AND OTHER DOCUMENTS

### VIOLATIONS OF SECTION 34(b) OF THE INVESTMENT COMPANY ACT (AGAINST DEFENDANTS HEARTLAND ADVISORS, NASGOVITZ, BESTE, BAUER, CONLIN, WINSTON, AND CLARK)

156. Plaintiff realleges and incorporates herein by reference paragraphs 27 through 75 of this Complaint.

157. By reason of the activities described above in paragraph 156, Defendants Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, and Clark made untrue statements of material fact in registration statements, reports, accounts, records, and other documents filed or transmitted under the Investment Company Act, or the keeping of which is required under the record-keeping provisions of the Investment Company Act, or have omitted facts necessary to prevent the statements made in those documents from being materially misleading. Specifically, among other things, Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, and Clark misrepresented or omitted to state necessary facts concerning: the Funds' NAVs, the prices of the bonds held in the Funds' portfolios, the reasons for the September Devaluation and October Devaluation, the efforts Heartland Advisors undertook to manage the risks associated with investing in the Funds, and Heartland Advisors' and the Funds' Board of Directors' efforts to maintain the liquidity of the bonds in the Funds' portfolios so that the Funds could meet shareholder redemption requests.

158. By reason of the activities described in paragraph 156 above, Defendants Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, and Clark violated Section 34(b) of the Investment Company Act [15 U.S.C. §§80a-33(b)].

## COUNT VIII

## BREACH OF FIDUCIARY DUTY INVOLVING PERSONAL MISCONDUCT IN RESPECT OF A REGISTERED INVESTMENT COMPANY

### VIOLATIONS OF SECTION 36(a) OF THE INVESTMENT COMPANY ACT (AGAINST DEFENDANTS HEARTLAND ADVISORS, NASGOVITZ, BESTE, BAUER, CONLIN, WINSTON, CLARK, DENISON AND DELLA)

159.    Plaintiff realleges and incorporates herein by reference paragraphs 27 through 126 of this Complaint.

160.    By reason of the activities described above in paragraph 159, Defendants Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, Clark, Denison and Della, directly and indirectly, engaged in acts and practices constituting a breach of fiduciary duty involving personal misconduct in respect of Heartland Group, Inc., a registered investment company for which Defendants Nasgovitz, Beste, Bauer, Conlin, Winston, Clark, Denison and Della served as officers, employees and/or directors, and for which Defendant Heartland Advisors served as the investment adviser.

161.    Defendants Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, Clark, Denison and Della knew or were reckless in not knowing of the activities described in paragraph 159, above.

162.    By reason of the activities described in paragraph 159 above, Defendants Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, Clark, Denison and Della violated Section 36(a) of the Investment Company Act [§80a-35(a)].

## COUNT IX

## FAILURE TO ACCURATELY COMPUTE NAV

### VIOLATIONS OF RULE 22c-1 PROMULGATED UNDER SECTION 22(c) OF THE INVESTMENT COMPANY ACT (AGAINST HEARTLAND ADVISORS)

163.    Plaintiff realleges and incorporates herein by reference paragraphs 27 through 75 of this Complaint.

164.    By reason of the activities described above in paragraph 163, Defendant Heartland Advisors, a principal underwriter and dealer of Heartland Group, Inc.'s redeemable securities, sold, redeemed, or repurchased Heartland Group, Inc.'s redeemable securities at a price that was not based on the current Net Asset Value of those securities.

165.    By reason of the activities described in paragraph 163 above, Defendant Heartland Advisors violated Rule 22c-1(a) promulgated under Section 22(c) of the Investment Company Act [17 C.F.R. §270.22c-1(a)].

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, the United States Securities and Exchange Commission, respectfully requests that this Court:

A.    Find that Defendants Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, Clark, Della, Denison and Krueger committed the violations alleged in this Complaint;

B.    Permanently enjoin Defendant Heartland Advisors, its agents, servants, employees, and attorneys, and those persons in active concert or participation with it who receive actual notice of the injunction by personal service or otherwise, and each of them,

from violating Section 17(a) of the Securities Act [15 U.S.C. §77(q)(a)], Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder, Section 206 of the Advisers Act [15 U.S.C. §80b-6], Sections 34(b) and 36(a) of the Investment Company Act [15 U.S.C. §§80a-33(b) and 80a-35(a)], and Rule 22c-1(a) promulgated under Section 22(c) of the Investment Company Act [17 C.F.R. §270.22c-1(a)];

C.     Permanently enjoin Defendants Nasgovitz, Beste, Bauer, Conlin, Winston, and Clark, their agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from: (1) violating Section 17(a) of the Securities Act [15 U.S.C. §77(q)(a)], Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder, and Sections 34(b) and 36(a) of the Investment Company Act [15 U.S.C. §§80a-33(b) and 80a-35(a)]; and (2) from aiding and abetting violations of Section 206 of the Advisers Act [15 U.S.C. §80b-6];

D.     Permanently enjoin Defendant Della, his agents, servants, employees, and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from: (1) violating Section 17(a) of the Securities Act [15 U.S.C. §77(q)(a)], Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder, and Section 36(a) of the Investment Company Act [15 U.S.C. § 80a-35(a)]; and (2) from aiding and abetting violations of Section 206 of the Advisers Act [15 U.S.C. §80b-6];

E.     Permanently enjoin Defendant Denison, his agents, servants, employees, and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§77(q)(a)(2) and 77(q)(a)(3)] and Section 36(a) of the Investment Company Act [15 U.S.C. § 80a-35(a)];

F.     Permanently enjoin Defendant Krueger, his agents, servants, employees, and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77(q)(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder;

G.     Order Defendants Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, Clark, Della, Denison and Krueger to disgorge all ill-gotten gains received by them as a result of the wrongful conduct set forth in this Complaint, including prejudgment interest;

H.     Order Defendants Heartland Advisors, Nasgovitz, Beste, Bauer, Conlin, Winston, Clark, Della, Denison and Krueger to pay an appropriate civil penalty for the wrongful conduct set forth in this Complaint, pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§78u(d)(3) and 78u-1], Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)], and Section 42(e) of the Investment Company Act [15 U.S.C. §80a-41(e)]; and

I.     Grant such additional relief as this Court deems appropriate.

Respectfully submitted,

Gregory P. von Schaumburg, IL Bar No. 3127782
Susan M. Weis, IL Bar No. 6211578
David S. Slovick, IL Bar No. 6257290
Faye Hizon Nybo, IL Bar No. 6275129
Paul N. Mensheha, IL Bar No. 6280613
Attorneys for Plaintiff
United States Securities and Exchange Commission
175 West Jackson Blvd., 9th Floor
Chicago, Illinois 60604
Telephone:     (312) 353-7390
Facsimile:      (312) 353-7398

Dated: December 11, 2003