## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF WISCONSIN

_____

SECURITIES AND EXCHANGE
COMMISSION,

                  Plaintiff,

      vs.                                Case No. 03-C-1427

HEARTLAND ADVISORS, INC., et al.,

                  Defendants.

_____

### DEFENDANT JILAINE H. BAUER'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

_____

### INTRODUCTION

After a lengthy official investigation before filing this lawsuit, two years of discovery after filing, and more than 140 investigation and litigation depositions (including five separate depositions of Ms. Bauer over a period of nearly five years), the Commission's insider trading case against Ms. Bauer boils down to one argument: She must have known. With no evidence that Ms. Bauer actually believed any Heartland mutual fund to be under-priced when she traded on October 3, 2000, the Commission resorts to innuendo and speculation to try to establish that Ms. Bauer foresaw what others with access to the same information did not.

This lawsuit, filed by the Securities and Exchange Commission more than five years ago, originally asserted a panoply of negligence, breach of fiduciary

duty, fraud, and aiding and abetting allegations against eleven defendants, including Heartland Advisors, Inc., several of its current and former employees, and one of its clients. Among those claims was an accusation of insider trading against five of those defendants.

Two defendants, William Nasgovitz and Raymond Krueger, moved in September 2005 to dismiss the insider trading claims against them, arguing that the Commission could not establish a reasonable inference that Mr. Nasgovitz had disclosed material non-public information to Mr. Krueger before Mr. Krueger redeemed shares in a Heartland fund. This Court granted that motion, finding that "the SEC has not proffered any evidence to demonstrate a genuine issue of material fact entitling it to a trial on its insider trading claim against defendants Nasgovitz and Krueger." *SEC v. Heartland Advisors, Inc.*, Case No. 03-C-1427, 2006 WL 2547090, at *11 (E.D. Wis. Aug. 31, 2006).

Shortly thereafter, the Commission agreed with the defendants to attempt to resolve this lawsuit. After a year of discussions, including two mediation sessions, the Commission issued an agreed upon administrative order finding most of the defendants responsible for negligent conduct in connection with the pricing of the High-Yield and Short Duration Funds. *In re Heartland Advisors, Inc. et al.*, IA Release No. 2698, IC Release No. 28136 (Jan. 25, 2008). This was followed by a stipulation to this Court seeking dismissal of all claims against the settling defendants.

Ms. Bauer was unable to reach a settlement with the Commission. Accordingly, the Commission continues to press its clams against her, including a claim for insider trading under 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, based on a redemption of fund shares that Ms. Bauer made on October 3, 2000.

There is no evidence that Ms. Bauer possessed material, nonpublic information when she redeemed her shares on October 3. The Commission predicates its claim on a theory that Ms. Bauer knew Heartland's Short Duration Fund was overpriced when she redeemed her shares, but there is no evidence to establish this. Moreover, it is undisputed that Ms. Bauer had legitimate reasons to redeem her shares at that time.

As a matter of law, the Commission cannot prove its insider trading case against Ms. Bauer. Accordingly, the Court should grant summary judgment dismissing that claim.

## UNDISPUTED FACTS

Ms. Bauer was General Counsel and Chief Compliance Officer of Heartland Advisors, Inc. ("HAI") from 1998 until November 2002. (Defendant Jilaine H. Bauer's Proposed Findings of Fact In Support of Motion for Summary Judgment ("Proposed Findings") at ¶ 1.)[1] Before that, she was employed for eighteen years by Stein Roe & Farnham in Chicago, Illinois, most recently as its

---

[1] Tab 1 at 49:10-19, 52:9-11, 75:21-76:8; Tab 19 at ¶ 1. Evidentiary materials supporting the Proposed Findings are filed herewith and compiled as tabbed exhibits. This brief cites to the Exhibits To Jilaine H. Bauer's Proposed Findings Of Fact In Support Of Motion For Summary Judgment as "Tab ___ at ____."

Case 2:03-cv-01427-CNC   Filed 05/03/08   Page 3 of 42   Document 401

General Counsel and Chief Compliance Officer.  (Id. at ¶ 2.)[2]  Ms. Bauer has a

Bachelor of Science degree in psychology and a law degree, but she has no

finance or other business degree and has no experience as a municipal bond

portfolio manager, credit research analyst, or trader.  (Id. at ¶¶ 7-8.)[3]  At HAI,

Ms. Bauer did not engage in or oversee investment management activities.  (Id. at

¶ 9.)[4]

A respected compliance professional in the securities industry for many

years, Ms. Bauer is a former designated representative to the Board of Governors

of the Investment Advisers Association, and a former member of various standing

committees of the Investment Company Institute.  (Id. at ¶ 3.)[5]  She maintained

securities licenses for most of her career before leaving HAI, and was registered in

good standing at all times with no formal or informal complaints ever filed against

her.  (Id. at ¶ 5.)[6]  With the exception of this lawsuit, Mr. Bauer has never been

named in any lawsuit or administrative proceeding of any kind.  (Id. at ¶ 6.)[7]

<u>**The Municipal Bond Funds**</u>

In the year 2000, HAI managed, among other mutual funds, two high-yield

municipal bond funds that are the subject of this lawsuit: the Heartland High-Yield

Municipal Bond Fund (the "High-Yield Fund") and the Short Duration High-Yield

---

[2] Tab 1 at 43:18-44:4; Tab 19 at ¶ 2.

[3] Tab 1 at 41:4-1; Tab 4 at 229:20 230:21.

[4] Tab 19 at ¶ 7.

[5] Tab 1 at 41:12 42:17.

[6] Tab 19 at ¶ 5.

[7] Id. at ¶ 6.

Municipal Fund (the "Short Duration Fund") (collectively, the "Funds"). (Id. at ¶ 12.)[8]

The Short Duration fund was suggested for investors with short term investment needs, because it sought to minimize share price fluctuation by maintaining short portfolio duration. (Id. at ¶ 13.)[9] Ms. Bauer owned shares in that fund until October 3, 2000. (Id. at ¶ 12.)[10]

The Funds were managed until the end of September 2000 by Thomas Conlin and Greg Winston. (Id. at ¶ 15.)[11] Mr. Conlin had 22 years experience as a municipal bond credit analyst and municipal bond mutual fund portfolio manager. (Id. at ¶ 16.)[12] Mr. Winston had 12 years experience as a municipal bond credit analyst and trader and municipal bond mutual fund portfolio manager. (Id. at ¶ 17.)[13]

The team that took over management of the Funds at the beginning of October was less experienced in dealing with municipal bond mutual funds. While Mr. Winston stayed on as a co-portfolio manager, Phil Fiskow and Derek Pawlak replaced Mr. Conlin. (Id. at ¶ 18.)[14] Mr. Fiskow had worked for a number of years in various positions with investment responsibilities, principally at

---

[8] Tab 1 at 33; 116:1-12; Tab 22 at ¶¶ 2, 8; Tab 19 at ¶ 10.

[9] Tab 40 at IM 00296-97.

[10] Tab 1 at 116:1-12; Tab 22 at ¶¶ 2, 8; Tab 19 at ¶ 10.

[11] Tab 22 at ¶ 12-13.

[12] Tab 72.

[13] Tab 73 at W 00000.004-00000.012.

[14] Tab 42 at HAI 000201-02.

insurance companies, but he had no experience with mutual funds. (Id. at ¶ 20.)[15] Mr. Pawlak had spent five years in another firm's underwriting department, working on prospectuses and Blue Sky registrations, before joining Heartland as a credit analyst. (Id. at ¶ 19.)[16] Before October 2000, Mr. Pawlak did not have experience as a portfolio manager or trader. (Id.)

### The High-Yield Municipal Bond Market

The Commission's chairman has recognized that the municipal bond market lacks many of the systemic protections that are present in many other sectors of the U.S. capital markets. (Id. at ¶ 22.)[17] While the securities laws provide for detailed registration and disclosure by publicly traded companies, those requirements do not apply to issuers of municipal bonds. (Id.) Therefore, disclosure about municipal bonds is less comprehensive and more elusive. (Id.)

Because there is little available information, and trading activity is limited, pricing of municipal bonds is difficult. Price differences between successive trades in the same bond can be significant, and very large price changes in a single day are not uncommon for municipal bonds. (Id. at ¶¶ 24-25.)[18]

As a result, valuing mutual funds that hold high-yield municipal bonds is quite difficult. Mutual fund prices are not governed by supply and demand and set

---

[15] Tab 9 at 10:4 11:8; Tab 75 at F 0000.003-F 0000.011.

[16] Tab 74; Tab 16 at 17:9-20:14.

[17] Tab 71.

[18] Tab 21 at 26-29.

by the market.[19]  Instead, mutual funds must set prices by calculating the current

net asset value of its portfolio securities.  (Id. at ¶ 27.)[20]  Net asset value is

calculated by valuing each asset owned by the fund, adding the values together,

subtracting any liabilities, and then dividing the value of the portfolio by the

number of shares outstanding.  (Id. at ¶ 28.)[21]

Determining the value of portfolio securities can be challenging.  For

holdings such as high-yield municipal bonds, for which market quotations are not

readily available, "value" is defined as fair value determined in good faith by a

fund's Board of Directors.  (Id. at ¶ 29.)[22]  The statutes and regulations do not

define "fair value," and the Commission has provided little guidance regarding

how to fair value securities in markets where there is little or no information and

market quotations are not readily available.  (Id. at ¶¶ 30-31.)[23]  As a general rule,

though, the Commission believes that fair value is the amount that a mutual fund

might reasonably expect to receive for a security in a current sale.  (Id. at ¶ 32.)[24]

The process of fair valuing securities is inherently subjective.  (Id.)

---

[19] Open-end mutual funds such as the Short Duration Fund do not trade on an exchange.  (Id. at ¶ 26; Tab 20 at 7-8.)  Instead, shareholders conduct their transactions with the funds themselves, which issue as many shares as there is demand for in a give day and redeem unwanted shares.  (Id.)

[20] Tab 24.

[21] Tab 20 at 7.

[22] Tab 25.

[23] Tab 19 at ¶ 12; Tab 26, Tab 28 at HAI 015578-015585; Tab 29 at BAU 000022-BAU 000033.

[24] Tab 26-27.

## Heartland's Pricing Committee

Ms. Bauer chaired Heartland's Pricing Committee from 1998 until early 2001. (Id. at ¶ 33.)[25] The Funds' Board delegated the task of overseeing Fund pricing to the Committee. (Id.) Ms. Bauer chaired regular quarterly meetings to review pricing information, scheduled special meetings to consider pricing of individual securities, prepared and maintained meeting minutes, and voted on pricing actions from time to time. (Id. at ¶ 34.)[26] However she did not review carrying values of the Funds' portfolio securities on a daily basis. (Id. at ¶ 41.)[27] She never provided the Funds' pricing service with information, nor participated in any substantive discussions with the pricing service about valuations they provided. (Id.) Ms. Bauer did not review credit files maintained by portfolio managers or credit analysts until after October 13, or have access to a Bloomberg terminal or other software applications used by analysts. (Id. at ¶ 42.)[28]

Heartland's Board had established Pricing Procedures that governed how the Pricing Committee executed its duties. (Id. at ¶ 35.)[29] Those procedures specified that values established by the Funds' pricing service, Muller Financial Corporation, should be used to fair value the Funds' holdings, because market quotations were not readily available. (Id.) The use of independent pricing

---

[25] Tab 1 at 78:12-16; Tab 44 at HAI 015573.

[26] Tab 1 at 78:16-79:1; Tab 19 at ¶ 13.

[27] Tab 4 at 211:9-25; Tab 19 at ¶ 14.

[28] Tab 19 at ¶ 15.

[29] Tab 45 at HAI 031152-57 (Section I.A.).

services such as Muller is common among municipal bond funds. (Id. at ¶ 43.)[30]

Muller was well regarded, and it represented to Heartland that it used a comprehensive process to value municipal securities. (Id. at ¶ 44-46.)[31]

A portfolio manager was required to "challenge" any Muller valuation if, after discussions with Muller, he did not believe it represented fair value. (Id. at ¶ 37.)[32] In that case, the portfolio manager was to submit the security to the Pricing Committee to make a fair value determination. (Id.) The Pricing Procedures included a non-exclusive list of factors to consider in making fair value determinations, but none of those were related to attributes of the mutual fund itself such as loan balances or projected redemption activity. (Id. at ¶ 39.)[33]

### September 2000 Bond Sales Activities

In mid-August 2000, Mr. Conlin announced that he intended to resign at the end of September. (Id. at ¶ 52.)[34] After that, Paul Beste moved to the fixed income area to become more involved and to develop a better understanding of how the markets were functioning. (Id. at ¶ 53.)[35] Before that time, Mr. Beste had played more of a high level oversight role in the Funds. (Id.)

Beste enlisted the help of Kevin Clark, an equities portfolio manager, to help solicit bids directly from non-traditional buyers without using the services of

---

[30] Tab 21 at 22-24.

[31] Tab 48 at FRA 0000682-685; Tab 4 at 173:24-176:22.

[32] Tab 45 at HAI 031152-57 (Section I.C.).

[33] Tab 45 at HAI 031152-57 (Section IV.D..).

[34] Tab 8 at 55:4 – 56:19; 59:2-7.

[35] Tab 5 at 184:2-18.

a dealer.  (Id. at ¶ 54.)[36]  Those efforts supplemented, but did not replace, the portfolio managers' sales through traditional brokers.  (Id.)

In the course of this work, Mr. Clark received a bid for some bonds from a "vulture fund" that was 30%-50% below the bonds' carrying value.  (Id. at ¶ 55.)[37] Mr. Clark considered this a throwaway bid, and the bid was rejected by the portfolio managers.  (Id.)  However Mr. Clark wrote an e-mail discussing the bid, (Id. at ¶¶ 59-60),[38] which followed an earlier e-mail expressing considerable concern about the High-Yield Fund's liquidity, (Id. at ¶¶ 56-58).[39]  In the earlier e-mail, addressed to Mr. Nasgovitz, Mr. Clark opined that the High-Yield Fund was on the verge of a meltdown, and that Heartland should look at pricing.  (Id. at ¶ 58.)[40]  Around this time, Mr. Beste wrote an e-mail opining that the Funds would have to take a discount to sell bonds "in today's market."  (Id. at ¶ 61.)[41]

Mr. Clark did not mean to express that the Funds could not meet redemptions in the regular course of business.  (Id. at ¶ 64.)[42]  He was concerned about the imminent departure of Mr. Conlin, which he thought might create a "run

---

[36] Tab 22 at ¶ 14; Tab 5 at 216:1-23; Tab 6 at 155:1 – 156:12; 159:8-23.

[37] Tab 6 at 173:3 – 176:3.

[38] Tab 55 at HAI 31033.

[39] Tab 36 at HAI 66366-67;  HAI 66370-71; Tab 4 at 187:22-190:22, 192:23-193:23, 194:13-195:7, 198:4-199:7, 199:9-13; Tab 19 at ¶ 17; Tab 53; Tab 6 at 91:14-92:23.

[40] Tab 53 at HAI 031266, HAI 0143767.

[41] Tab 57 at HAI 74605.

[42] Tab 6 at 117:8-20.

on the funds." (Id. at ¶ 65.)[43] The "meltdown" scenario referred to the possibility that Mr. Conlin would depart earlier than agreed. (Id. at ¶ 66.)[44]

Ms. Bauer knew that portfolio managers did not automatically recommend carrying prices based on bids received. (Id. at ¶ 67.)[45] Instead, they considered various factors, including the source of the bid and the size of the transaction. (Id.) Nevertheless, Ms. Bauer repeatedly told Mr. Beste, Mr. Clark, and others that, if they believed discounts were necessary or the Funds were nearing a melt down, the Pricing Committee should examine carrying values right away. (Id. at ¶¶ 67, 69.)[46] Those individuals never suggested lowering carrying prices, leading Ms. Bauer to conclude that Mr. Clark's remarks were an exaggeration to get Mr. Nasgovitz's attention. (Id. at ¶ 69.)[47]

Ms. Bauer's belief was buttressed by the knowledge that the Funds' portfolio managers disagreed with the "bid wanted" strategy that Mr. Clark and Mr. Beste were using to try to sell bonds. (Id. at ¶¶ 71, 74.)[48] Mr. Conlin believed the strategy would "destroy the marketplace," (Id. at ¶ 72,)[49] and Mr. Winston believed the efforts "muddied the waters" and made accurate bond valuation more

---

[43] Tab 6 at 118:10-21.

[44] Tab 6 at 123:25-124:4.

[45] Tab 3 at 337:8-341:25, 361:22-362:7.

[46] Tab 3 at 337:8-343:7, 361:22-362:7.

[47] Tab 3 at 341:16-343:7.

[48] Tab 19 at ¶ 16; Tab 56.

[49] Tab 8 at 111:24-114:9.

difficult, (Id. at ¶ 73).[50]  This called into question the usefulness of the bid Mr. Clark received.

Moreover, Mr. Beste had recently compared Muller's work to that of comparable pricing services, and determined that Muller's values were more reliable than those established by its competitors.  (Id. at ¶¶ 49-50, 76.)[51]  He also had compared sale prices of all securities sold by the Short Duration Fund from January 1, 2000 to August 18, 2000 with their carrying values, and determined that sale prices were very close to carrying prices.  (Id. at ¶ 51.)[52]  Knowledge of these facts, (Id. at ¶¶ 75-76),[53] made it was reasonable to conclude that the vulture bid did not accurately reflect the current marketplace.

### The SWIB Transaction and the September 28 Markdown

In 2000, the Funds owned a group of non-performing securities referred to as the "Heritage bonds."  (Id. at ¶ 78.)[54]  At a meeting of the Funds' Board on September 11, 2000, Mr. Beste proposed to sell the bonds to the State of Wisconsin Investment Board ("SWIB").  (Id. at ¶ 79.)[55]  Mr. Beste stated that the sale would be at the value of the bonds as determined by Muller on the date of the sale.  (Id.)  SWIB would obtain a put entitling it to sell the bonds to HAI's parent company (but not to the Funds themselves) after two years at a guaranteed price.

---

[50] Tab 18 at 246:3-22.

[51] Tab 30 at HAI 015628-29; Tab 31 at JH 00377-78; Tab 51 at HAI 74265-66; Tab 52 at HAI 000102.

[52] Tab 51 at HAI 74265-66.

[53] Tab 31 at JH 00377-78.

[54] Tab 36 at HAI 66366-67.

[55] Tab 36 at HAI 66370-71.

(Id.)  Ms. Bauer was not involved in structuring this transaction, but she did not perceive private transactions as unusual.  (Id. at ¶¶ 80-82.)[56]

The SWIB transaction closed on September 29, 2000, using carrying values Ms. Bauer understood to have been provided by Muller on September 28.  (Id. at ¶ 83.)[57]  Those values were substantially lower than carrying values from the previous day.  (Id. at ¶ 84.)[58]  Some bonds were marked down by as much as 50%, which caused the NAVs of the Short Duration Fund and the High-Yield Fund to decline by approximately 2% and 8%, respectively.  (Id.)  This markdown was substantial enough that it prompted the Assistant Regional Director of the Commission's Chicago office, who read about it in the newspaper, to call Ms. Bauer on September 29 for an explanation.  (Id.)

While the September 28 markdown was large, it was not unexpected and did not cause Ms. Bauer to question the carrying values for other bonds owned by the Funds.  (Id. at ¶ 85.)[59]  Although increased redemptions were still possible after Mr. Conlin's departure, Ms. Bauer believed the Funds were in much better shape to handle them after the SWIB transaction.  (Id. at ¶ 86.)[60]  Moreover, on September 28, Mr. Beste told the Pricing Committee that he had asked Muller if the markdowns they anticipated making that day to bonds in the Funds would be

---

[56] Tab 4 at 187:22-190:12, 192:23-193:23, 194:13-195:7, 199:9-13; Tab 19 at ¶ 17.

[57] Tab 4 at 198:4-199:7.

[58] Tab 4 at 200:3-201:5, Tab 10 at 85:6-86:9.

[59] Tab 4 at 201:7-203:8.

[60] Tab 1 at 110:5-111:4.

representative of mark downs of other securities with similar characteristics, and Muller said they expected they would be. (Id. at ¶ 87.)[61]

### The September 28 Board Meeting

At a special meeting of the Board of Directors on September 28, Mr. Nasgovitz told the Board that HAI had a plan to address the problems the Funds had been experiencing in recent months. (Id. at ¶ 88.)[62] HAI had been subsidizing the Funds' dividend, but Mr. Beste told the Board that this no longer would be necessary since most of the Funds' non-performing bonds were being sold to SWIB. (Id.) The Board discussed the likelihood of markdowns to Fund holdings, which Ms. Bauer understood to refer to the markdowns expected from Muller that day. (Id. at ¶ 89.)[63]

The Board further discussed strategies for dealing with increased redemptions upon the announcement of Mr. Conlin's resignation that day. Mr. Nasgovitz outlined various possibilities including, as a last resort, suspending redemptions in the fund. (Id.) Ms. Bauer's understanding was that the Board was not actually considering this option. (Id.)

Indeed, at least one of the directors viewed the September 28 Board meeting as a "good news meeting" because Mr. Fiskow had been hired, the department was running well, underperforming stocks had been sold, and liquidity

---

[61] Tab 32 at HAI 015790-91.

[62] Tab 37 at HAI 66372-75.

[63] Tab 37 at HAI 66372-75; Tab 19 at ¶¶ 18-19.

REINHART\2300791

14

was improved.  (Id. at ¶ 90.)[64]  Heartland's September 28 press release, and

internal e-mails circulated by Mr. Nasgovitz, expressed optimism about the Funds.

(Id. at ¶¶ 91-92.)[65]

### Ms. Bauer's Precautions Against Insider Trading

Ms. Bauer was mindful of HAI's policies on insider trading and personal

trading, and discussed them with employees on a regular basis.  (Id. at ¶ 93.)[66]  On

September 15, 2000, she distributed to all employees a revised copy of HAI's

Code of Ethics that included both policies, and asked employees to read them

because they were required to follow them in their daily activities.  (Id.)

Upon learning in August that Mr. Conlin planned to resign from Heartland,

Ms. Bauer restricted herself and others who knew about the impending resignation

from trading in the funds that Mr. Conlin managed.  (Id. at ¶ 94.)[67]  On the

morning of Thursday, September 28, HAI informed employees of Mr. Conlin's

resignation, and that Phil Fiskow was being hired to replace him.  (Id. at ¶ 95.)[68]

Ms. Bauer restricted all employees from trading in the Funds until the changes

were publicly announced later that day.  (Id.)

---

[64] Tab 17 at 156:8-158:13.

[65] Tab 62 at EDL 0000584-85; Tab 64 at AS 00134.

[66] Tab 19 at ¶ 20; Tab 54 at TH 0017-18.

[67] Tab 1 at 163:25-167:23.

[68] Tab 77 at SJK 0002.

After the close of business on September 28, Ms. Bauer lifted the trading restriction. (Id. at ¶ 96.)[69] She informed the Funds' Board and Fund counsel, as well as Mr. Nasgovitz and Mr. Beste, of this decision, and was not counseled against it. (Id.) Notably, there was particular disincentive to take action during this period that might be perceived as inappropriate, since the Commission had made inquiries in late September into Fund operations in light of the September 28 markdown. (Id. at ¶¶ 97-98.)[70]

### Ms. Bauer's October 3 Redemption

Ms. Bauer had purchased shares of the Short Duration Fund at various times during 1998 and 1999. (Id. at ¶ 99.)[71] The money that Ms. Bauer invested in the Short Duration Fund was a backup for savings in a money market fund. (Id. at ¶ 100.)[72] It was intended to be invested for the short term and used to pay large year-end expenses such as school tuition and property taxes. (Id.)

Ms. Bauer made one redemption of approximately $11,000 in December 1998. (Id. at ¶ 101.)[73] She did not make a redemption at the end of 1999, because she had sold her interest in HAI in September of that year and so had extra cash available. (Id.)

---

[69] Tab 63 at HAI 00040; Tab 19 at ¶ 21.

[70] Tab 4 at 120:18-121:22; Tab 67 at HAI 0000371-72; Tab 68 at HAI 0000373-79.

[71] Tab 19 at ¶ 22; Tabs 49-50.

[72] Tab 1 at 116:1-117:6, 130:19-25.

[73] Tab 19 at ¶¶ 23-24; Tab 49 at HAI 0088058; Tab 4 at 1:18-13:24.

By the beginning of October 2000, Ms. Bauer expected to shortly resign from HAI and move to San Francisco to take a new job. She had interviewed twice in person and spoken several times by telephone with the General Counsel of Loomis Sayles, Sandy Tichenor, about a legal position in Loomis' San Francisco office. (Id. at ¶ 102.)[74] Ms. Bauer had known Ms. Tichenor for several years through their mutual service on the Board of Governors of the Investment Advisers Association. (Id.) During their second meeting, in San Francisco, Ms. Bauer interviewed with several people including the firm's CEO. (Id.) Ms. Bauer looked at houses with a realtor during this trip, and looked at schools in the Bay area. (Id.)

In late September, Ms. Tichenor provided Ms. Bauer with compensation and benefits information, including information about base salary, bonus, tax-deferred contribution, up to $50,000 in moving expenses, and a $100,000 signing bonus. (Id. at ¶ 103.)[75] Ms. Bauer told Ms. Tichenor this package was acceptable to her. (Id.)

Ms. Tichenor asked whether Ms. Bauer would like to meet Loomis' Boston legal staff, and they discussed dates in late October and early November for that meeting and a final meeting in San Francisco. (Id. at ¶ 104.)[76] Ms. Bauer expected to receive a formal offer at the final meeting, however she understood

---

[74] Tab at 131:1-133:24; Tab 19 at ¶ 25.

[75] Tab 19 at ¶ 26; Tab 46.

[76] Tab 1 at 137:1-139:18; Tab 19 at ¶ 27.

Ms. Tichenor to have the authority to hire her and considered these steps to be formalities. (Id.) As a result, Ms. Bauer believed she would be resigning shortly and moving to San Francisco. (Id.)

Following her late September conversation with Ms. Tichenor, Ms. Bauer began to make plans to resign from HAI and move to San Francisco. (Id. at ¶ 105.)[77] That weekend she met with a realtor at her home to discuss listing it. (Id.) She also gathered information about communities and schools in the Bay Area. (Id.)

Ms. Bauer knew that the cost of living was much higher in San Francisco than in Milwaukee, and that she likely would have to make a large down payment on a house and possibly carry two mortgages for a period of time. (Id. at ¶ 106.)[78] She also expected, based on her move from Chicago a few years earlier, that moving expenses could be higher than she would be reimbursed for. (Id. at ¶ 107.)[79] Moreover, Ms. Bauer expected to forfeit her annual 30% bonus, as well as her annual employee retirement contribution and any non-vested amounts in her retirement account, if she resigned before the end of the year. (Id.)

Accordingly, Ms. Bauer believed that she would need to use her savings invested in the Short Duration Fund to finance the transition.[80]

---

[77] Tab 19 at ¶ 28; Tab 47.

[78] Tab 19 at ¶ 29.

[79] Tab 19 ¶ 30.

[80] Ultimately, Ms. Bauer did not go to work for Loomis Sayles. (Id. at ¶ 108; Tab 19 at ¶ 31; Tab 1 at 134:11-135:9; Tab 3 at 374:7-25.) At first, her anticipated final visits were postponed because of an announcement that Loomis' parent company was going to be acquired. (Id.) Then, when Ms. Bauer

There was reason for Ms. Bauer to withdraw her investment in the Short Duration Fund promptly. That fund's published NAV had declined by thirty-nine cents from June 30 through the end of September 2000, of which nineteen cents was in September. (Id. at ¶¶ 109-111.)[81] Ms. Bauer was not comfortable with the Fund's price volatility. (Id. at ¶ 109.)[82]

Nevertheless, on October 3 the nonpublic indicators of the Short Duration Fund's stability were positive and better than before, not only from Ms. Bauer's perspective but from the view of any reasonable person. (Id. at ¶ 114.)[83]

Ms. Bauer knew that HAI had hired a new portfolio manager, that arrangements had been made for other managers to stay on, and she understood from Mr. Nasgovitz that the possibility of selling the Short Duration Fund to another sponsor was not being actively considered. (Id. at ¶ 115.)[84] The Short Duration Fund's investment in defaulted securities, permitted by the prospectus, had declined from 6.2% to 4.1% of net assets, and illiquid securities as a percentage of assets also had declined to well below the 15% limit in the prospectus. (Id. at ¶¶ 116-117.)[85] Most significantly, Ms. Bauer knew that the Short Duration Fund's outstanding borrowings were completely paid off by

learned that she was being investigated by the Commission for insider trading, she withdrew her name from consideration. (Id.)

[81] Tab 19 at ¶¶ 32-33; Tab 1 at 124:4-9, 171:17-173:1; Tab 76; Tab 58 at SJK 001.

[82] Tab 19 at ¶ 32; Tab 1 at 124:4-9, 171:17-173:1.

[83] Tab 19 at ¶ 35.

[84] Tab 4 at 262:2-24; Tab 19 at ¶ 36.

[85] Tab 40 at IM 00297, 325; Tab 59 at HAI 082623; Tab 61 at HAI 014708; Tab 65 at LS 01913; Tab 66 at JH 01849; Tab 19 at ¶¶ 37-38.

October 2, and that the fund could borrow up to 33% of its assets if it needed to do so.  (Id. at ¶ 118.)[86]  The Funds' credit line had just been renewed in the ordinary course of business.  (Id.)

However, after having been restricted from redeeming her shares for almost six weeks, Ms. Bauer was concerned that she may be restricted again if another portfolio manager left, if HAI decided to reconsider selling or merging the Funds, or if Ms. Bauer learned material information in her role on the credit committee.  (Id. at ¶ 113.)[87]  If restricted, Ms. Bauer believed she could be prevented from redeeming her shares for as long as the information remained nonpublic, even if she resigned from Heartland.  (Id.)

Therefore, Ms. Bauer decided to close her account.  (Id.)  She did so at 7:00 a.m. on October 3, 2000 by placing a call to a tape recorded line at Heartland.  (Id. at ¶ 119.)[88]  Her shares were redeemed at the NAV for that day, and she received $44,267.15.  (Id.)

### Events Preceding October 13 Markdown

Phil Fiskow took over as lead portfolio manager of the Funds on Monday, October 2.  (Id. at ¶ 120.)[89]  Ms. Bauer had not participated in interviewing him,

---

[86] Tab 19 at ¶ 39; Tab 40 at IM 00324; Tab 60 at HAI 015390.

[87] Tab 1 at 124:4-125:8, 163:25-167:23; Tab 19 at ¶ 34.

[88] Tab 1 at 123:11-17; Tab 19 at ¶ 40.

[89] Tab 69 at IM 06579.

and was not aware of his insurance company background before he started work. (Id. at ¶¶ 20-21.)[90]

Mr. Fiskow expressed optimism about the Funds in early October. (Id. at 120.)[91] However, on Wednesday, October 11 the High-Yield Fund sold a bond for 10% lower than its carrying value. (Id. at ¶ 121.)[92] Although this was not out of line in the high-yield municipal bond business, (id. at ¶ 25),[93] Ms. Bauer understood that Mr. Fiskow concluded from this sale that the market for the bonds held by the Funds had become dysfunctional, (id. at ¶ 122).[94] Around that time, Mr. Fiskow told Ms. Bauer that he was going to expand the Funds' watch list and illiquid lists considerably. (Id. at ¶¶ 123-124.)[95]

Ms. Bauer called a special Board meeting on October 12 to discuss these developments. (Id. at ¶ 124.)[96] At the meeting, Mr. Fiskow described events that had occurred that week. (Id. at ¶ 125.)[97] He characterized the market for the Fund's securities as illiquid, and estimated that the Funds' securities may be worth 70% of their carrying value. (Id. at ¶¶ 125-126.)[98] This was a more concrete and dire estimate than Mr. Beste and Mr. Clark had made in September.

---

[90] Tab 19 ¶ 11; Tab 9 at 10:4-11:8; Tab 75 at F 0000.003 – F 0000.011.

[91] Tab 69 at IM 06579.

[92] Tab 9 at 55:10-56:16.

[93] Tab 21 at 29.

[94] Tab 4 at 208:18-210:5.

[95] Tab 2 at 79:13-80:15, 81:3-83:7; Tab 19 at ¶ 41; Tab 38 at HAI 66376-84

[96] Tab 2 at 81:3-83:7; Tab 19 at ¶ 41; Tab 38 at HAI 66376-84.

[97] Tab 38 at HAI 66376-77.

[98] Tab 38 at HAI 66376-77, HAI 66381-82.

The Board requested that the Commission be contacted to inquire about the possibility of suspending redemptions, but also directed the Pricing Committee to establish a fair value for the Funds' portfolio securities. (Id. at ¶¶ 126-127.)[99]

The Pricing Committee was unable to conclude on October 12 that there was enough information to deviate from Muller's valuations. (Id. at ¶¶ 128-129.)[100] The next day, however, the Pricing Committee decided to fair value the Funds' bonds using a novel, multi-step process. The first step was a "fair value" judgment by the portfolio managers, using Muller values and other criteria. (Id. at ¶ 135.)[101] However, the Pricing Committee applied an across-the-board "haircut" to these values, reducing the total value of the High-Yield Fund by approximately 50%, and of the Short Duration Fund by approximately 33%. (Id. at ¶ 136.)[102]

The haircut was a novel process, which the Pricing Committee employed notwithstanding concerns expressed by the portfolio managers. (Id. at ¶ 143.)[103] Later, the Funds' auditor would not complete its 2000 audit of the Funds because it saw no basis for the October 13 markdown, which it believed was not based in evidence. (Id. at ¶ 145.)[104]

---

[99] Tab 38 at HAI 66381-82, HAI 66384.

[100] Tab 5 at 90:5-91:8; Tab 2 at 222:1-223:9; Tab 33 at HAI 015763.

[101] Tab 22 at ¶ 70; Tab 34 at HAI 015759.

[102] Tab 22 at ¶ 70; Tab 34 at HAI 0157760.

[103] Tab 34 at HAI 015759-60.

[104] Tab 19 at ¶ 44.

Ms. Bauer did not participate in devising the "haircut," nor did she vote on its use, because she was on telephone calls and in meetings with Fund counsel, HAI's outside counsel, and the Commission during most of the day. (Id. at ¶ 137.)[105] This type of haircut was never used or discussed previously by the Pricing Committee, and Ms. Bauer did not know what caused the Pricing Committee to use it on October 13, nor how it was determined. (Id. at ¶ 139.)[106]

## ARGUMENT

The undisputed facts establish that Ms. Bauer did not believe the Short Duration Fund was overpriced when she redeemed her shares on October 3, and that she did not foresee the subsequent markdown later that month. Accordingly, the Commission must hang its hat on creating an *inference* that Ms. Bauer believed the Fund was mispriced. The Commission cannot reasonably create such an inference.

## I.    SUMMARY JUDGMENT IS APPROPRIATE WHERE, AS HERE, THERE IS NO GENUINE ISSUE OF MATERIAL FACT.

Ms. Bauer is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The mere

---

[105] Tab 34 at HAI 015759; Tab 19 at ¶ 42.

[106] Tab 4 at 226:12-228:5, Tab 19 at ¶ 43.

existence of some factual dispute will not defeat a summary judgment motion.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Only a *genuine* issue of material fact warrants a denial. *Id.*; *see also Solar v. Kawasaki Motor Corps., USA*, 221 F. Supp. 2d 967, 970 (E.D. Wis. 2002). Whether an issue of material fact is genuine necessarily requires a "quantitative determination of sufficiency of the evidence." *Sampson Invs. v. Sampson*, 111 F. Supp. 2d 1064, 1068-69 (E.D. Wis. 2000) (quotation omitted).

## II.  THE INSIDER TRADING CLAIM RELIES ON A FINDING THAT MS. BAUER KNEW THE SHORT DURATION FUND WAS PRICED INCORRECTLY.

The Commission's insider trading allegations against Ms. Bauer are based squarely on the theory that Ms. Bauer knew the Short Duration Fund was underpriced when she redeemed her shares on October 3, 2000. In its Amended Complaint, the Commission alleges that Ms. Bauer "knew that the bonds in the Short Duration Fund's portfolio were overvalued." (Amd. Compl. at ¶ 92.)[107] The Commission bases these allegations largely on e-mails from Heartland employees regarding offers they had received for bonds held by the Funds and markdowns that could be necessary to sell bonds. (*Id.* at ¶¶ 93, 97.)

---

[107] The Commission also alleges that Ms. Bauer was aware of material nonpublic information such as the schedule of investments in the Short Duration Fund, the percentage of defaulted securities in the Fund, the structure of the SWIB transaction, and the fact that the funds were in net redemptions. (Amd. Compl. at ¶¶ 92-97 (Exhibits to Proposed Findings at Tab 22); The Securities and Exchange Commission's Answers to Jilaine Bauer's First Set of Interrogatories, at Response 2 (Exhibits to Proposed Findings at Tab 23).) But these allegations are red herrings. They are not relevant to the Commission's mispricing theory and do not independently support a claim for insider trading in mutual fund shares. In any case, the Commission cannot produce evidence to support these allegations. (Bauer Aff. at ¶ 35 (Exhibits to Proposed Findings at Tab 19).)

The Commission's focus on Ms. Bauer's alleged knowledge of mispricing is necessary. Traditional insider trading theory dictates that Section 10(b) and Rule 10b-5 are violated when an insider trades on the basis of *material*, nonpublic information. *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997). The only nonpublic information that plausibly can give rise to a claim for insider trading in mutual funds is information that fund prices are incorrect.

## A. Information About Mutual Funds Typically Is Not Material.

Cases alleging improper trading in mutual funds are rare, and counsel for Ms. Bauer is not aware of any other case brought under Section 10(b) or Rule 10b-5 alleging insider trading in mutual fund shares.[108] The reason for this is clear. Mutual funds do not present the sort of opportunity for insider trading that securities in publicly-held companies present.

Open-end mutual funds such as the Short Duration Fund do not trade on an exchange. Shareholders simply conduct their transactions with the investment company that owns the funds. The investment company issues as many shares as there is demand for in a given day, and redeems unwanted shares.

Accordingly, a mutual fund's share price is not determined by supply and demand fueled by market reaction to publicly disseminated information, but simply by dividing the net value of the fund's holdings by the number of

---

[108] A number of recent Commission actions allege that mutual funds have allowed favored shareholders to place orders after the trading day has closed and fund prices are established, a scenario not alleged here. *See, e.g., In re Strong Capital Mgmt., Inc.*, Investment Advisers Act Release No. 2239 (May 20, 2004); *In re Mass. Fin. Servs. Co.*, Investment Advisers Act Release No. 2213 (Feb. 5, 2004); *In re James Patrick Connelly, Jr..*, Investment Advisers Act Release No. 2183 (Oct. 16, 2003).

outstanding shares in the funds in a procedure dictated by law. *See In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208, 2006 WL 1008138, at *9 (S.D.N.Y. Apr. 18, 2006).

Inside information about the management of mutual funds typically is not material to shareholders. *See* Mercer E. Bullard, *Insider Trading in Mutual Funds*, 84 Or. L. Rev. 821, 823-26 (2005). Information is material only if it is both "extraordinary in nature" and "reasonably certain to have a substantial effect on the market price of a security..." *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 166 (2d Cir. 1980) (alleged tip was immaterial as a matter of law because it was not "reasonably certain to have a substantial effect on the market price"); *see also Byelick v. Vivadelli*, 79 F. Supp. 2d 610, 618 (E.D. Va. 1999) (granting summary judgment on Section 10(b) claim premised on nondisclosure of licensing agreement to shareholder selling his stock to the defendant insider because the agreement could not have had a substantial effect on the value of the company and was therefore immaterial) (*quoting SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968)); *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir. 1988) (noting that "a datum that would have only a small effect on the price is not material, while a datum with the potential for a larger effect is").

Courts further recognize that "the share price of a mutual fund is not affected by alleged misrepresentations or omissions" because it "is determined by the value of all underlying securities it holds at a given time." *See In re Van Wagoner Funds, Inc.*, 382 F. Supp. 2d 1173, 1188 (N.D. Cal. 2004); *see also*

*Clark v. Nevis Capital Mgmt., LLC*, No. 04 CIV. 2702, 2005 WL 488641, at *18 (S.D.N.Y. Mar. 2, 2005). Therefore, courts consistently hold as a matter of law that information about mutual fund management is not material.

For example, in *In re Smith Barney Fund Transfer Agent Litigation*, No. 05 Civ. 7583, 2007 WL 2809600 (S.D.N.Y. Sept. 26, 2007) (slip op.), the district court dismissed a securities fraud claim under Section 10(b) and Rule 10b-5. The plaintiffs alleged that a family of mutual funds failed to disclose how its contracts with two transfer agents, including its own affiliate agent, were structured, and how fees were allocated between those agents. *Id.* at *1. The court held the plaintiffs had failed to plead a material misrepresentation because "[t]he allocation of—or motivation behind—the fee arrangement is immaterial to a decision to purchase fund shares because it could have no effect on share price." Id. at *3 (quotation omitted).

The district court also dismissed a securities fraud claim involving mutual funds in *In re Morgan Stanley and Van Kampen Mutual Fund Securities Litigation*, No. 03 Civ. 8208, 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006). There, the court held that small incentive payments to brokers were immaterial as a matter of law, citing with approval case law noting that such fees are not part of the transaction price. *Id.* at *8. In going on to rule that the plaintiffs had failed to plead loss causation, the court held that "[t]he allocation of the fees is immaterial, because it could have no effect on share price." *Id.* at *9.

**B.      Historically, the Commission Has Not Been Significantly
Concerned About Insider Trading In Mutual Fund Shares.**

The Commission has long held the view that information about mutual fund

operations does not raise the fraud concern presented by nonpublic information

about shares in publicly held operating companies.  Notably, Regulation FD

prohibits selective disclosure by issuers of material, nonpublic information, 17

C.F.R. § 243.100-243.103, but specifically excludes open-end mutual funds from

its coverage, 17 C.F.R. § 243.101(b).  Because such funds "are not permitted to

sell, redeem or repurchase their securities except at a price based on their

securities' net asset value" the SEC "believe[s] that Regulation FD would offer

little additional protection to investors in these types of investment companies and

therefore should be excluded from its coverage...."  *Selective Disclosure and*

*Insider Trading*, 64 Fed. Reg. 72,590; 72,597 (Dec. 28, 1999).

Similarly, Rule 17j-1, which requires disclosure of mutual fund insiders'

securities transactions, explicitly excepts from its dictates transactions in shares

issued by open-end mutual funds.  17 C.F.R. § 270.17j-1(a)(4)(iii).  The rule is

concerned with self-dealing by fund management to the detriment of fund

shareholders, but recognizes that "shares of open-end funds would appear to

present little opportunity for the type of improper trading that Rule 17j-1 is

intended to cover."  *Prevention of Certain Unlawful Activities With Respect to*

*Registered Investment Companies*, 45 Fed. Reg. 73,915, 73,919 (Nov. 7, 1980);

*see also Personal Investment Activities Of Investment Company Personnel and*

*Codes of Ethics of Investment Companies and Their Investment Advisors and Principal Underwriters*, 60 Fed. Reg. 47,844; 47,844; 47,849 (Sept. 14, 1995).

Not until 2004 did the Commission adopt Rule 204A-1, which requires disclosure of (but does not prohibit) securities holdings and transactions by employees of registered investment advisers, including transactions in shares of mutual funds they manage. 17 C.F.R. § 275.204A-1(a)(3). Addressing recent market timing and late trading cases involving mutual funds, the proposing release for that rule called into question the assumption that mutual fund trading provides little opportunity for abuse. *See Investment Advisor Codes of Ethics*, 69 Fed. Reg. 4,040, 4,040-41 (Jan. 27, 2004). Nevertheless, Rule 204A-1 and its related releases place their focus on breaches of fiduciary duty. They do not suggest that the Rule was adopted out of concern about classical insider trading in mutual fund shares. *Id.*; *see also Investment Advisor Codes of Ethics*, 69 Fed. Reg. 41,696, 41,696-97 & n. 3 (July 9, 2004).

Rule 204A-1 does not place so-called insider trading in mutual funds within the bailiwick of Section 10(b) and Rule 10b-5, and the Rule was not adopted until nearly four years after the events at issue here. Nothing in existing case law or Commission guidance indicates that—absent knowledge the Heartland Funds were mispriced (*see* Section III, *infra*)—Ms. Bauer should have refrained from making an otherwise legitimate redemption.

III.   **THE COMMISSION CANNOT ESTABLISH THAT MS. BAUER BELIEVED THE SHORT DURATION FUND WAS MISPRICED.**

While the insider trading case against Ms. Bauer relies on a theory that Ms. Bauer knew the Short Duration Fund was overpriced when she redeemed her shares on October 3, 2000, the Commission can offer no direct evidence of that. There is not a single document stating that Ms. Bauer believed the fund to be priced incorrectly, nor is there any testimony that she held that belief. There are no documents, and certainly no documents that Ms. Bauer saw before October 3, containing alternative "correct" valuations for the Short Duration Fund.

The Commission's case rises, and ultimately falls, on circumstantial evidence. But while circumstantial evidence may support a party's position, "[i]t is never enough to present evidence that would require the jury to engage in speculation or conjecture." *Solar*, 221 F. Supp. 2d at 971. Only reasonable and justifiable inferences to be drawn from the evidence may be made in the nonmoving party's favor. *Anderson*, 477 U.S. at 255; *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991). A "plausible scenario" without reasonably probative proof in the record should not defeat summary judgment. *Swanson v. Leggett & Platt, Inc.*, 154 F.3d 730, 733 (7th Cir. 1998). Even where "the probabilities are at best evenly balanced," the court must enter judgment for the defendant. *Solar*, 221 F. Supp. 2d at 971. In the context of insider trading cases:

> Courts stress that the SEC may not base insider trading actions on strained inferences and speculation. The summary judgment tool

> filters out cases in which plaintiffs rely entirely upon conclusory
> assertions and speculative allegations to state a claim for relief. . . .
> [R]eliance on pure speculation is unacceptable. Plaintiffs are
> required to garner either direct or circumstantial evidence to
> [support] their legal claims."

*SEC v. Truong*, 98 F. Supp. 2d 1086, 1098 (N.D. Cal. 2000) (citations omitted).

The Commission offers three types of circumstantial evidence to claim that Ms. Bauer knew the Short Duration Fund was overpriced on October 3. First, it relies on mid-September e-mails indicating that the Funds may have to sell some bonds below carrying price. Second, the Commission points to various indicators that it asserts alerted Ms. Bauer to the overpricing of the Short Duration Fund. Third, the Commission relies on hindsight to argue that because the value of the Short Duration Fund was marked down by approximately 33% on October 13, Ms. Bauer must have known the fund was overpriced ten days earlier.

A careful examination of the facts belies much of the Commission's story, and even the allegations for which there is evidence do not create a reasonable inference that Ms. Bauer knew the Short Duration Fund to be overpriced. The Commission's claim that Ms. Bauer possessed material, nonpublic information at the time of her October 3 redemption is based entirely on the "pure speculation" and "metaphysical doubt."[109]

---

[109] Moreover, the SEC's insider trading claim against Ms. Bauer should be subject to outright dismissal under the Supreme Court's recent decision in *Bell Atlantic Corporation v. Twombly*, 127 S. Ct. 1955 (2007), which set forth a new "plausibility" standard to govern pleading claims in federal court. Under *Twombly*, a complaint should be dismissed where the plaintiff alleges facts that can just as easily reflect plausible legal conduct as they might imply illegal conduct. *Id.* at 1965-66. *Twombly* involved an antitrust lawsuit, which the Court noted is similar to securities fraud lawsuits in complexity, expensive discovery, and "in terrorem increment of the settlement value" for even largely groundless claims. *Id.* at 1966; *see also Cordova v. Lehman Bros., Inc.*, 526 F. Supp. 2d 1305, 1320 (S.D. Fla. 2007) (applying *Twombly* to

### A. The September E-mails Do Not Establish That the Short Duration Fund Was Mispriced on October 3.

The Commission points to three September 2000 e-mails indicating that the Funds could be required to mark down bonds in order to sell them, and theorizes that this caused Ms. Bauer to believe on October 3 that the Short Duration Fund was overpriced. The facts do not bear this out, because the information they contained was preliminary and inconclusive.

On September 18, Kevin Clark wrote an e-mail expressing concern about the municipal bond funds, noting that he had received offers from vulture funds to buy bonds at 30% to 50% below carrying price. This e-mail followed up on one Mr. Clark had drafted earlier in September stating that the High-Yield Fund (in which Ms. Bauer did not own shares) was days away from a "meltdown." Similarly, on September 20, Paul Beste wrote an e-mail opining that the Funds would have to take a discount to sell bonds "in today's market."

### 1. The Actual Evidence.

The undisputed evidence demonstrates that these e-mails did not cause Ms. Bauer to conclude that the Short Duration Fund was mispriced. She was aware that the vulture bids had been rejected, and had no information that indicated that recent sales diverged significantly from carrying values. Ms. Bauer also was aware that there was disagreement within Heartland about the strategy

---

securities claim). If filed today, the Commission's insider trading claim against Ms. Bauer would fail on the pleadings because the allegations are consistent with lawful conduct and only raise a "mere possibility" of insider trading.

that Mr. Beste and Mr. Clark were following in their attempt to sell bonds, calling into question the validity of the information that effort was producing.

Ms. Bauer repeatedly asked Mr. Clark and Mr. Beste, as well as the Funds' portfolio managers, whether they believed the Pricing Committee should review the values set by Muller. Each time she was told to "hold off." When the Pricing Committee did meet, on September 20, it decided not to vary from Muller values. Heartland had conducted due diligence during the period and determined that the Muller values were reliable.

Ms. Bauer's viewpoint concurred with the e-mails' authors themselves. Mr. Clark never believed before October 13 that either the High-Yield or Short Duration Fund was in danger of being unable to meet redemptions in the ordinary course of business. The "melt down" scenario he described in his e-mail was the possibility that Mr. Conlin would resign earlier than agreed—a scenario that never occurred. Mr. Beste stated at the September 20 Pricing Committee meeting his belief that Muller values were reliable. Moreover, Bill Nasgovitz and others expressed more optimistic opinions about the Funds' prospects.

### 2. Two Individuals' Preliminary Opinions Were Not Material and So Create No Inference.

Mr. Beste and Mr. Clark's statements did not make clear which bonds might have to be marked down, how much that would affect overall NAV, what a "melt down" might entail, or how these forces might impact the Funds' NAVs. These are exactly the type of preliminary opinion that courts find immaterial. *See, e.g.,*

*Searls v. Glasser*, 64 F.3d 1061, 1067 (7th Cir. 1995) (affirming summary

judgment because indefinite, tentative projections were immaterial as a matter of

law); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 292 (7th Cir. 1981)

(affirming directed verdict because defendants had no duty to disclose internal

projections of net income that contradicted defendants' earnings estimates

provided to the market); *In re Oracle Corp. Derivative Litig.*, 867 A.2d 904 (Del.

Ch. 2004).

Moreover, Mr. Beste's and Mr. Clark's preliminary opinions did not deviate

from the Funds' actual performance. Published NAVs declined throughout

September. On September 28, before Ms. Bauer lifted a trading restriction that

had applied to her and others for as long as six weeks, various bonds in the Funds

were marked down by as much as 50%. This caused the overall values of the

High-Yield and Short Duration Funds to drop by 8% and 2%, respectively. The

drop was significant enough to prompt an inquiry from the Commission's Chicago

regional office, and Ms. Bauer believed that the markdown that was expected from

Muller, discussed by Heartland's Board on the morning of September 28, was now

complete.

The information available to Ms. Bauer at the end of September is similar

to that discussed in *In re Oracle Corporation Derivative Litigation*, 867 A.2d 904

(Del. Ch. 2004). In that case, the court granted summary judgment dismissing a

breach of fiduciary duty claim predicated on alleged insider trading. *Id.* at 905-06.

One issue presented was whether increasingly pessimistic projections should have

caused the defendants to refrain from trading. *Id.* at 948. The court concluded that those pessimistic projections were not material as a matter of law, because they remained within the performance estimates public at the time the defendants traded. *Id.* at 948-49. Similarly, September projections that the Heartland Funds may have to take markdowns were consistent with the actual (discounted) valuations underlying the Funds' NAVs by September 28.

Opinions expressed in mid-September about the health of the Funds were preliminary, and they reflected sales efforts that the Funds' portfolio manager himself believed were unwise. Markdowns that were foreseen in fact occurred, affecting the Funds' published NAV in late September. Nobody at Heartland opined on or before October 3 that bonds in the Funds should be marked down further than they were.

The information about bids received in September simply does not create a reasonable inference that Ms. Bauer believed on October 3 that the Short Duration was mispriced.

### B. Additional Information Available to Ms. Bauer in Early October Creates No Inference She Knew the Short Duration Fund Was Mispriced.

To bolster its theory based on the September e-mails from Mr. Beste and Mr. Clark, the Commission points to various miscellaneous information about the Funds that it alleges creates an inference Ms. Bauer knew the Short Duration Fund was overpriced. The Commission alleges that Ms. Bauer "knew" the Funds were

35

involved in a "cash flow crisis," (Am. Compl. at ¶ 92), and that Heartland was considering suspending redemptions. (*Id.* at ¶ 97.)

Aside from the question of whether such information about the Funds' management can ever be material, *see* Section II, supra, the Commission's allegations are not supported by the facts and do not raise a reasonable inference that Ms. Bauer knew the Short Duration Fund was mispriced.

The undisputed evidence shows that, by October 3 when she redeemed her shares, Ms. Bauer knew that Heartland had hired Mr. Fiskow to act as Director of Fixed Income and Co-Portfolio Manager of the Funds. She knew that Heartland had made arrangements to ensure that Mr. Winston and Mr. Pawlak stayed, and understood that Heartland was not actively considering selling the Funds. While there had been brief discussion at the September 28 Board meeting about suspending redemptions, Ms. Bauer did not believe the Board was considering doing so.

Ms. Bauer further knew that the Funds' investments in defaulted securities, which were permitted by the prospectus, had declined. Illiquid securities as a percentage of assets also had declined to 8.53%, well below the 15% limit in the prospectus. Perhaps most significantly, though, Ms. Bauer knew that the Short Duration Fund's borrowings were entirely paid off and that, if necessary, that fund could borrow up to 33% of its assets to fund redemptions. The Short Duration Fund would have no problem borrowing to finance redemptions if necessary, because its credit line had just been renewed in the ordinary course of business.

Thus while Ms. Bauer knew, as did the public, that the Short Duration Fund's published NAV recently had declined, the arguably nonpublic information she held was positive. Even if data was available from which one might have drawn pessimistic assumptions about the Short Duration Fund's future NAV, there is no indication that Ms. Bauer actually drew those assumptions. *See Freeman v. Decio*, 584 F.2d 186, 199 (7th Cir. 1978) (affirming summary judgment dismissing insider trading claim where "[t]he district court rejected the plaintiff's contentions on the grounds that there was no evidence that the defendants actually made any such pessimistic predictions"); *Oracle*, 867 A.2d at 944 ("Plaintiff's contention seems to be that someone at Oracle should have been concerned, but they do not combine that with any evidence that suggests that [Oracle could not meet stated projections].") (emphasis in original).

### C. Ms. Bauer Could Not Have Foreseen the October 13 Markdown.

Finally, the Commission employs fraud by hindsight, seeking an inference that because the Short Duration Fund was devalued by approximately 33% on October 13, Ms. Bauer knew on October 3 that such devaluation was forthcoming. No such inference is available.

#### 1. The Markdown Was Unprecedented.

There is no evidence from which a trier of fact can reasonably infer that Ms. Bauer knew on October 3 that the Short Duration Fund would take a 33% haircut. "[A]lthough the SEC may prove that a defendant possessed material nonpublic information through the use of circumstantial evidence (beyond alleged

'suspicious' trading), the Agency may not rest on evidence that would require a jury to speculate that the defendant possessed that information." *Truong*, 98 F. Supp. 2d at 1097-98 (emphasis in original). The SEC bases its case that Ms. Bauer foresaw the October 13 markdown on pure speculation.

The October 13 markdown, which the Pricing Committee made in Ms. Bauer's absence, was unprecedented. The markdown was prompted by serious concerns that Mr. Fiskow, a new portfolio manager with no mutual fund experience, raised on October 11, after selling a bond for 10% lower than its carrying value. Although spreads of this degree are not unusual in the high-yield municipal bond market, Mr. Fiskow perceived a sudden adverse change in market conditions. In light of Mr. Fiskow's concerns, the Board instructed the Pricing Committee to fair value Fund holdings on October 13.

Ms. Bauer was not present for most of that October 13 Pricing Committee meeting. Although Ms. Bauer reminded the Committee that it was required to value each bond individually, in her absence the Committee applied an additional, across-the-board "haircut" of approximately 50% to the total value of the High-Yield Fund, and 33% to the total value of the Short Duration Fund.

The haircut employed on October 13 had never been used or discussed by the Pricing Committee. Ms. Bauer did not know what caused the Pricing Committee to use that procedure that day, or how the Committee decided to do so. Other entities refused to recognize the haircut as an appropriate measure of Fund value. For example, the Funds' auditor would not complete its audit for 2000

because it did not consider Heartland to have provided competent information about the value of Fund securities. Accordingly, the Commission cannot create a reasonable inference that Ms. Bauer knew the haircut would take place.[110]

### 2. Ms. Bauer Had Legitimate Reasons to Redeem Her Shares.

Moreover, a defendant in an insider trading case can defeat any inference of "bailing out" that is created by a sale before a subsequent disclosure of negative information by "showing that sales in question were consistent in timing and amount with a past pattern of sales or that other circumstances might reasonably account for their occurrence." *Freeman v. Decio*, 584 F.2d 186, 197 n.44 (7th Cir. 1978); *see also Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (explanations for stock sales, "ranging from long-standing programs of periodic divestment, to the need to free cash to meet matured tax liabilities, [if] ... unrebutted [on summary judgment] . . . are sufficient to defeat any inference of bad faith.") (citation omitted). The undisputed evidence demonstrates that Ms. Bauer had legitimate reasons to redeem her shares on October 3.

Ms. Bauer had purchased shares in the Short Duration Fund with funds that were not intended for long-term investment, but rather to supplement her money market account for relatively short-term needs such as tuition and tax payments. She redeemed some of her Short Duration shares to meet those needs at the end of

---

[110] Nevertheless, Ms. Bauer does not concede that the October 13 markdown was inappropriate. She simply had no information upon which to predict it on October 3.

1998.  She did not do so at the end of 1999, because she recently had sold her ownership interest in HAI and so had cash available from that transaction.

At the end of September, 2000, Ms. Bauer expected to shortly leave Heartland for a new job in San Francisco.  While she had not yet received a formal offer, she understood that an offer was forthcoming and that it was likely to be acceptable to her.  Ms. Bauer had had a number of meetings with a longtime business contact, whom she understood to be the person with the authority to decide whether to hire her.  Accordingly, Ms. Bauer began to make arrangements to move, including collecting information about Bay Area housing and schools and meeting with a realtor to discuss listing her house in Wisconsin for sale.

As a result of her impending move, Ms. Bauer expected to shortly incur substantial relocation costs.  These were likely to include the cost of shipping household goods, a down payment on a new house in a more expensive housing market, and the cost of carrying two mortgages.  At the same time, Ms. Bauer knew her resignation from Heartland would cause her to forfeit her annual bonus, which had been 30% of salary in the previous year.

Ms. Bauer had recently been restricted from trading in the Funds, and she knew that she might learn additional information that would restrict her again.  Moreover, Ms. Bauer had become concerned about recent volatility in Short Duration share price.  As a result, because she believed she would need to use this short-term investment for her move, Ms. Bauer redeemed her shares in the Short Duration Fund on October 3.  *See In re Cabletron Sys., Inc.*, 311 F.3d 11 (1st Cir.

2002) (an insider's "resignation provides a plausible innocent explanation for large stock sales"); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999) (finding that the plaintiffs failed to state a securities claim because sales by insider were not evidence of scienter because "[i]t is not unusual for individuals leaving a company, like [defendant], to sell shares."); *Provenz*, 102 F.3d at 1491 (granting summary judgment to defendant who "sold some shares to purchase a new home and sold the remainder of his stock when he resigned"); *In re Read-Rite Corp. Sec. Litig.*, 115 F. Supp. 2d 1181, 1183-84 (N.D. Cal. 2000) (defendant who traded during otherwise suspicious period was not liable for securities fraud where the sales were made in conjunction with her resignation). Ms. Bauer's planned resignation erases any remaining doubt that she redeemed her Short Duration Fund shares for a legitimate purpose.

For seven years, since beginning its initial investigation, the Commission has worked to create an inference of wrongdoing where in fact there is none. Jilaine Bauer did not believe the Short Duration Fund to be overpriced any time before she redeemed her shares on October 3. The Commission's insider trading claim must fail as a matter of law.

## CONCLUSION

For all the foregoing reasons, Jilaine Bauer respectfully requests that the

Court grant summary judgment dismissing the Commission's insider trading

claims against her.

Dated at Milwaukee, Wisconsin, this 3rd day of May, 2008.

Reinhart Boerner Van Deuren, s.c.          Mark A. Cameli
1000 North Water Street, Suite 2100        Laura Gramling Perez
Milwaukee, WI 53202
414-298-1000 (phone)                       BY_____
414-298-8097 (fax)                         Attorneys for Defendant, Jilaine H. Bauer
E-mail:  mcameli@reinhartlaw.com;
              lperez@reinhartlaw.com