## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

_____

**SECURITIES AND EXCHANGE**
**COMMISSION,**

          **Plaintiff,**

                            **Case No. 03-C-1427**

      **v.**

                            **Honorable Judge**
**JILAINE H. BAUER**                  **Charles N. Clevert**

          **Defendant.**

_____

## SECURITIES AND EXCHANGE COMMISSION'S BRIEF IN SUPPORT OF ITS CROSS MOTION FOR SUMMARY JUDGMENT AGAINST JILAINE H. BAUER ON INSIDER TRADING CHARGES

# TABLE OF CONTENTS

I.  Introduction ............................................................................................................1

II.  Statement of Undisputed Facts ...........................................................................3

    A.  Ms. Bauer Liquidates Her Shares of the Short Duration Fund ...........................3

    B.  The Mutual Funds and the Investment Adviser...................................................4

        1.  Heartland Group Inc. – the Mutual Funds ................................................4
        2.  Heartland Advisors, Inc. – The Investment Adviser................................6

    C.  The Funds' Problems Lead to a Crisis.................................................................7

        1.  The Funds' Developing Problems in 1999 and 2000...............................7
        2.  August 2000: Significant Net Redemptions, Absence of
            New Cash Flow, and Liquidity Pressures ...............................................8
        3.  Early September 2000: the Funds' Problems Continue to
            Grow, Negotiations with State of Wisconsin Investment Board .............10
        4.  Mid-September 2000: the Beginning of the Avalanche .........................11
         5.  The September 28, 2000 Devaluation......................................................16
         6.  The Funds' Crisis Continues....................................................................18
        7.  October 11, 2000 – Ms. Bauer Implements a Tape Purge Procedure......20
        8.  October 13, 2000 – The Funds Crash ....................................................21

III.  Argument .............................................................................................................21

    A.  Summary Judgment Should Be Granted as There is No Genuine Issue of
        Material Fact as to Ms. Bauer's Insider Trading .................................................21

        1.  Summary Judgment Standard ..................................................................21
        2.  Ms. Bauer Engaged in Insider Trading, in Violation of the
            Antifraud Provisions of the Federal Securities Laws .............................22
        3.  Ms. Bauer Had a Duty to Disclose or Abstain from Trading or
            Tipping When In Possession of Material, Non-Public Information ........23
        4.  Ms. Bauer Possessed Material, Non-Public Information when
            She Liquidated on October 3, 2000 ........................................................24
        5.  Possession of Material, Non-Public Information Creates
            Inference of Use.......................................................................................31

    B.  Ms. Bauer Acted With Scienter .........................................................................33

    C.  Ms. Bauer's Guilty Knowledge .........................................................................34

D.  Injunctive Relief Against Ms. Bauer Is Appropriate .............................................35

E.  Disgorgement, Prejudgment Interest, and Civil Penalty......................................36

IV.  Conclusion ........................................................................................................37

## TABLE OF AUTHORITIES

**Cases**

Anderson v. Liberty Lobby, Inc. 477 U.S. 242 (1986).........................................................21

Basic, Inc. v. Levinson, 485 U.S. 224 (1988)...........................................................22, passim

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ...........................................................21

Chiarella v. United States, 445 U.S. 222 (1980)...........................................................23

Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976).......................................................23, 33

First Nat. Bank v. Lewco Securities Corp., 860 F.2d 1407 (7th Cir. 1988) ...........................22

Matshushita Elec. Indus. Co. Lt. v. Zenith Radio Corp., 475 U.S. 574 (1986)....................22

Michalic v. Cleveland Tankers, Inc. 364 U.S. 325, 330 (1960) ...........................................34

Santiago v. Lane, 894 F.2d 218, 221 (7th Cir. 1990) ...........................................21

SEC v. Adler, 137 F.3d 1325, 1337 (11th Cir. 1998)...........................................31

SEC v. Blavin, 760 F.2d 706 (6th Cir. 1985) ...........................................33

SEC v. Clark, 915 F.2d 439 (9th Cir. 1990) ...........................................36

SEC v. Gruenberg, 989 F.2d 977 (8th Cir. 1993) ...........................................35

SEC v. Jakubowski, 150 F.3d 675 (7th Cir. 1998) ...........................................23, passim

SEC v. Lipson, 278 F.3d 656 (7th Cir. 2002) ...........................................31, passim

SEC v. Murphy, 626 F.2d 633 (9th Cir. 1980) ...........................................35

SEC v. Shapiro, 494 F.2d 1301 (2d Cir. 1974)...........................................28

SEC v. Tome, 833 F.2d 1086 (2d Cir. 1987)...........................................36

SEC v. Youmans, 729 F.2d 413 (6th Cir. 1974)...........................................35

Sims v. Board of School Directors, 2006 WL 757816 (E.D.Wis. March 22, 2006) ............21

Sullivan v. Rilling, 1999 U.S. Dist. LEXIS 4746 (N.D.Ill. Mar. 31, 1999) ...........................22

United States v. O'Hagan, 521 U.S. 642 (1997)....................................................24

United States v. Ryan, 213 F.3d 347 (7th Cir. 2000)...........................................35

United States v. Teicher, 987 F.2d 112 (2d Cir. 1993)........................................31

United States v. Smith, 155 F.3d 1051 (9th Cir. 1998) ......................................31

**Statutes, Rules and Regulations**

Fed. R. Civ. P. 56(c) ...........................................................................................21

Rule 10b-5 [17 C.F.R. 240.10b-5] .............................................................2, passim

Section 10(b), Securities Exchange Act of 1934 [15 U.S.C. 78j(b)]..............2, passim

Section 17(a), Securities Act of 1933 [15 U.S.C. 77t(a)] .................................2, passim

Section 36(a), Investment Company Act of 1940 [15 U.S.C. 80a-36(a)].........2, passim

Section 21(d)(1), Securities Exchange Act 1934 [15 U.S.C. 78u(d)(1)] ..............35

Section 21A, Securities Exchange Act 1934 [15 U.S.C. 78u-1]...........................36

## I.    INTRODUCTION

On October 3, 2000, Defendant Jilaine H. Bauer was a Vice President and the Secretary of the mutual fund known as The Heartland Group, Inc. ("Heartland Group"). Ms. Bauer also held multiple senior positions with Heartland Advisors, Inc. ("Heartland Advisors"), which served as the investment adviser to the Heartland Group. Through her positions, Ms. Bauer had learned several material facts reflecting adversely on the risks and anticipated returns of the Heartland Short Duration High-Yield Municipal Fund ("Short Duration Fund") and the Heartland High-Yield Municipal Bond Fund ("High-Yield Fund") (collectively "the Funds"), two portfolio series of the Heartland Group.

Among other things, Ms. Bauer knew that the Funds were experiencing large scale net redemptions as shareholders pulled their money out of the Funds; that the Funds lacked sufficient cash to meet the ongoing redemptions and to manage the Funds' portfolios; and that the Funds portfolio managers could not raise the needed cash by selling bonds held by the Funds unless they offered those bonds to the market at material price reductions—that is, the Funds had valued their bonds at prices higher than other dealers were willing to pay for the bond. Ms. Bauer also knew that a significant sale of bonds arranged by Heartland Advisors in late September 2000 provided only a temporary fix; that Heartland Advisors was seeking another fund sponsor which would buy the Funds altogether; that the Heartland Group Board was considering suspending shareholder redemptions; and that at least one portfolio manager believed it was only a matter of time before they experienced a meltdown of the Funds and an avalanche of redemptions and litigation. Ms. Bauer knew that this information had not been shared with the public.

At approximately 7:05 a.m. on October 3, 2000, while sitting in her car outside the offices of Heartland Advisors, Ms. Bauer placed a telephone call to Heartland Advisors'

shareholders services department.  Based on the material, nonpublic information she possessed, Ms. Bauer placed an order to liquidate her holdings in the Funds—approximately 4,976 shares of the Short Duration Fund.  Ten days later, the Funds wrote down the values of the bonds held in their portfolios.  Shares of the Short Duration Fund fell by 44%.  Shareholders who were caught holding shares of the Short Duration Fund saw their investments plummet in value.  Because she had already bailed out, however, Ms. Bauer did not share in those losses.

Ms. Bauer was a corporate insider who owed Heartland Group and its shareholders a fiduciary duty not to use material, nonpublic information for her own gain.  Ms. Bauer breached this fiduciary duty when she liquidated all her shares of the Short Duration Fund based on material, nonpublic information regarding the Short Duration Fund.  Ms. Bauer avoided losses of approximately $20,004.15.  By selling shares of the Short Duration Fund based on material, nonpublic information regarding the Fund, Ms. Bauer violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and Section 36(a) of the Investment Company Act of 1940 ("Investment Company Act").

This issue is ripe for summary judgment because, as discussed below, there is no genuine issue of material fact that Ms. Bauer traded based on non-public material information regarding the Short Duration fund.  Indeed, Ms. Bauer's own admissions support a finding for the Commission.  Ms. Bauer admits she possessed non-public information at the time she traded that could have been material to other Short Duration Fund shareholders [PFOF ¶8 (Ex.3 at ¶69); ¶ 157 (Ex. 60 at HAI 31273)]; she cannot dispute the timing of her trades as reflected by her Short Duration Fund account records [PFOF ¶12 (Ex. 4 at JHB 0747)]; she admits she avoided losses

by her timely trading [PFOF ¶15 (Ex. 3 at ¶71)]; and she agrees that if she had material non-public information about the Funds she should not have traded. PFOF ¶10 (Ex. 6 at 258-59).

There is no genuine issue that a reasonable investor would have considered the non-public information known by Ms. Bauer to be important in making an investment decision. That is the standard of materiality under Basic v. Levinson, 485 U.S. 224, 231-232 (1988). Furthermore, Ms. Bauer's September 28, 2000 e-mail suggesting that notes, diaries, and similar information relating to the Funds be destroyed and her October 11, 2000 direction that Heartland Advisors begin regularly destroying tapes of telephone conversations with shareholders are evidence of efforts by Bauer to eliminate potential evidence of the significant problems that confronted the Funds. Ms. Bauer's actions in this regard show her guilty knowledge relating to both her insider trading and the significant undisclosed problems involving the Funds.

II.     STATEMENT OF UNDISPUTED FACTS

        A.      Ms. Bauer Liquidates Her Shares of the Short Duration Fund.

On Tuesday morning, October 3, 2000, Ms. Bauer owned 4,976.156 shares of the Short Duration Fund. PFOF ¶5 (Ex. 3 at ¶67). At approximately 7:05 a.m. that morning, Ms. Bauer placed an order to liquidate her Short Duration Fund account from her car outside Heartland Advisors' offices. PFOF ¶6 (Ex. 3 at ¶68; Ex. 4 at JHB 751); ¶7 (Ex. 5 at 123). Ms. Bauer redeemed all 4,976.156 of her Short Duration Fund shares for $44,267.15. PFOF ¶155 (Ex. 4 at JHB 752). Ms. Bauer's October 3, 2000 liquidation was the only time she redeemed any shares in the Short Duration Fund during calendar years 1999 and 2000. PFOF ¶12 (Ex. 7; Ex. 4 at JHB 747).

On October 13, 2000, ten days after Ms. Bauer liquidated her Short Duration Fund account, Heartland Advisors reduced the value of the Short Duration Fund 44%. PFOF ¶14 (Ex.

9 at 5).  On October 3, 2000, when Bauer sold, the Net Asset Value ("NAV") of the Short

Duration Fund was $ 8.89 per share.  PFOF ¶13 (Ex. 8 at HAI 15767).  On October 13, 2000, the

NAV of the Short Duration Fund plummeted to $4.87 per share.  PFOF ¶14 (Ex. 9 at 5).  Ms.

Bauer admits that if she had sold her shares in the Short Duration Fund on October 13, 2000, the

price she would have obtained for the shares would have yielded approximately $20,000 less

than the price she obtained on October 3, 2000.  PFOF ¶15 (Ex. 3 at ¶71).

When she placed her trade on October 3, 2000, Ms. Bauer was aware of the laws relating

to insider trading.   PFOF ¶9 (Ex. 6 at 256).  Ms. Bauer was, among other things, a Vice

President of Heartland Group.  PFOF ¶32 (Ex. 6 at 62; Ex. 3 at ¶18).  Ms. Bauer knew that

Heartland Advisors had a corporate policy against insider trading.  PFOF ¶41 (Ex. 15); ¶ 47 (Ex.

6 at 353-54).   That policy, among other things, defined the terms non-public and material.

PFOF ¶42 (Ex. 15 at TH 0002).  Ms. Bauer knew that if she had material non-public information

about the Short Duration Fund, she should not trade.  PFOF ¶10 (Ex. 6 at 258-59).  Further, Ms.

Bauer acknowledged that, at the time she traded, she had non-public information that could be

material to investors in the Short Duration Fund.  PFOF ¶157 (Ex. 60 at HAI 31273) .

Finally, Ms. Bauer, in August and September 2000, restricted herself and other

employees at Heartland Advisors from trading in their Fund shares because, in her opinion, they

possessed material, non-public information regarding the Funds.  PFOF ¶11 (Ex. 6 at 259).

    B.    <u>The Mutual Funds and the Investment Adviser.</u>

        1.    <u>Heartland Group Inc. - the Mutual Funds.</u>

Heartland Group is an open-end investment company (commonly referred to as a mutual

fund) based in Milwaukee, Wisconsin**.**  PFOF ¶¶16-17 (Ex. 2 at ¶19).  At all relevant times,

Heartland Group has been registered with the Securities and Exchange Commission ("SEC").

PFOF ¶16 (Ex. 2 at ¶19). An open-end mutual fund, such as Heartland Group, offers redeemable securities to investors. PFOF ¶18 (Ex. 10). The mutual fund, such as Heartland Group, issues as many shares as there is demand for in a given day and redeems unwanted shares. PFOF ¶19 (Ex. 9 at 7-8).

During the year 2000, Heartland Group offered shares to the public in seven separate mutual funds. PFOF ¶28 (Ex. 2 at ¶8). One of these funds was the High-Yield Fund, and another was the Short Duration Fund (collectively the "Funds"). Id. Both the Funds began operating on January 2, 1997. PFOF ¶¶23-24 (Ex. 2 at ¶¶20-21). Both the Funds had the same portfolio management team. PFOF ¶25 (Ex. 13).

The High-Yield Fund and Short Duration Fund held common securities principally involving non-rated municipal bonds issued by health care providers. Id. at 36-41. For example, the Funds both held municipal bonds issued by Tulsa County Oklahoma Industrial Authority, Worth Illinois Nursing Home Revenue, Rusk County Texas Health Facilities ("Sugarland"), and by affiliates of Heritage Housing Development ("Heritage"), among others. Id.

As open-end mutual funds, the Funds sold and redeemed shares on a daily basis at the shares' NAV. PFOF ¶20 (Ex. 11). The Funds' NAVs are calculated by valuing each asset owned by the fund, adding the values together, subtracting any liabilities, and then dividing the net value of the portfolio by the number of shares outstanding. PFOF ¶39 (Ex. 9 at 7). For funds such as the High Yield Fund and the Short Duration Fund, the NAV is primarily driven by the underlying value of the portfolios' securities. PFOF ¶40 (Ex. 6 at 65). The NAV is an important piece of information for an investor as it represents the price at which an investor can purchase or redeem shares of the fund. PFOF ¶38 (Ex. 6 at 64).

During the years 1999 and 2000, Ms. Bauer was an officer of Heartland Group. PFOF ¶32 (Ex. 6 at 62; Ex. 3 at ¶18). She served as Vice President of Heartland Group and regularly attended meetings of the Heartland Group Board of Directors. See, e.g., PFOF ¶53 (Ex. 20); ¶ 58 (Ex. 24); ¶104 (Ex. 37); ¶134 (Ex. 34).

Ms. Bauer became an investor in the Short Duration Fund in 1998. PFOF ¶168 (Ex. 5 at 116). From January 1, 1999 until her liquidation on October 3, 2000, she made no redemptions. PFOF ¶¶12 (Ex. 7; Ex. 4 at JHB 0747).

2.      Heartland Advisors, Inc. – The Investment Adviser.

Heartland Group's Board of Directors (the "Board") delegated the day-to-day responsibilities for operating and overseeing the Funds to Heartland Advisors. PFOF ¶21 (Ex.2 at ¶27; Ex.12). Heartland Advisors is a Wisconsin corporation that was, at all times relevant to the SEC's Complaint, dually registered with the SEC as an investment adviser and a broker-dealer. PFOF ¶26 (Ex. 2 at ¶8). Heartland Advisors maintains its principal place of business in Milwaukee, Wisconsin. PFOF ¶27 (Ex. 2 at ¶8).

Ms. Bauer held numerous positions at Heartland Advisors. From 1998 until she left Heartland Advisors in 2002, Ms. Bauer was the General Counsel and Chief Compliance Officer of Heartland Advisors. PFOF ¶30 (Ex. 6 at 30-31). Ms. Bauer also was the Secretary and a Senior Vice President of Heartland Advisors. PFOF ¶31 (Ex. 3 at ¶¶14,17). Ms. Bauer was the Chairperson of the Pricing Committee from 1998 until February 1, 2001. PFOF ¶35 (Ex.6 at 31-32). The Pricing Committee had the task, delegated by the Heartland Groups' Board, of overseeing pricing. PFOF ¶36 (Ex. 14). From July 2000 through October 13, 2000, Ms. Bauer was a member of Heartland Advisors' Credit Committee, which was responsible for, among other things, oversight of the creditworthiness of the bonds held by the Funds, by establishing

6

policies and guidelines and by reviewing on a regular basis work performed by credit analysts. PFOF ¶¶33-34 (Ex. 3 at ¶¶ 19, 34).

Heartland Advisors maintained a policy against insider trading. PFOF ¶41 (Ex. 15). Relating to the insider trading policy, Ms. Bauer discussed with Heartland employees how the policy extended not only to non-public information known about publicly traded companies in which mutual funds were investing, but also about the mutual funds themselves. PFOF ¶47 (Ex. 16 at 353-54). The insider trading policy states, "Information that is not widely available or disseminated" is nonpublic. PFOF ¶42 (Ex. 15 at TH 0002). The insider trading policy also defines the materiality of information, stating "Information is material if it has market significance – info a reasonable investor would want to know before making an investment decision." Id.

C.      The Funds' Problems Lead to a Crisis.

        1.      The Funds' Developing Problems in 1999 and 2000.

Beginning in mid-1999, the Funds began to experience net redemptions – meaning that more shareholder money was leaving the Funds than was coming in. PFOF ¶48 (Ex. 6 at 217). Heartland Advisors' Investment Policy Committee held a meeting on January 18, 2000 to discuss the redemption activity in the Funds and the use of a credit facility to finance redemptions. PFOF ¶¶50-51 (Ex. 18).

Ms. Bauer attended a meeting of Heartland Group's Board on April 27, 2000, at which the Funds' co-portfolio manager, Thomas Conlin, stated that the High Yield Fund had been experiencing net redemptions and had not purchased any new securities for the past six months. PFOF ¶¶53-54 (Ex. 20 at HAI 687-88). At this meeting, Ms. Bauer circulated a report on the Funds' illiquid securities for the quarter ended March 31, 2000, relating to technical defaults and

7

substantive defaults of bonds held in the Funds. PFOF ¶55 (Ex. 20 at HAI 693). Illiquid securities in both Funds included the Sugarland and Heritage bonds, among others. PFOF ¶52 (Ex. 19).

2. <u>August 2000: Significant Net Redemptions, Absence of New Cash Flow, and Liquidity Pressures.</u>

By August 2000, Ms. Bauer knew that the Funds were dealing with a number of problems. On August 10, 2000, Heartland Group's Board of Directors held a meeting, which Bauer attended. PFOF ¶58 (Ex. 24). At this meeting, William Nasgovitz, President of Heartland Group and Heartland Advisors, noted that there were a number of credit issues in the Funds. PFOF ¶59 (Ex. 24 at HAI 709). Mr. Conlin made a presentation and stated that management of the High Yield Fund had been hampered by significant net redemptions and the absence of subscriptions providing new cash flow. PFOF ¶60 (Ex. 24 at HAI 718). Mr. Conlin admitted that there was some liquidity risk because a material percentage of the portfolio consisted of defaulted or watch list securities and significant borrowings. PFOF ¶62 (Ex. 24 at HAI 719). Mr. Conlin also stated that it was possible that year-end tax loss selling would bring additional liquidity pressures. PFOF ¶63 (Ex. 24 at HAI 719). Director Jon Hammes stated that both the High Yield Fund and Short Duration Fund needed to be prepared for more redemptions, and he further noted that if there are credit problems with the Funds, there is a natural tendency for the portfolio managers to minimize them. PFOF ¶¶64-65 (Ex. 24 at HAI 720). Ms. Bauer was left with the impression that Heartland Group's Board was somewhat unsettled and a little bit concerned by some of Mr. Conlin's presentation. PFOF ¶67 (Ex. 6 at 236-37).

Following the Board meeting, on August 12, 2000, Mr. Nasgovitz sent an e-mail to Ms. Bauer, among others, advising that they needed to respond to the Board as to the game plan – worst case for the High Yield Fund. PFOF ¶68 (Ex. 25). In his e-mail, Mr. Nasgovitz wrote that

8

the problems are generally deeper than envisioned and resolution is slower than anticipated. PFOF ¶69 (Ex. 25). Mr. Nasgovitz also noted that the integrity of the Funds, the credibility of the investment process, the research team, and the firm were at stake. PFOF ¶70 (Ex. 25).

Ms. Bauer understood the significance of the problems the Funds faced. Following the August 10, 2000 Board meeting, Paul Beste, Heartland Advisors' Chief Investment Officer, who was not part of the fixed income team, moved his office to the fixed income area to help address the problems with the Funds and monitor activities. PFOF ¶71 (Ex. 6 at 237; Ex. 22 at 147; Ex. 26 at 67-68). Mr. Beste also enlisted the help of Kevin Clark, Heartland Advisors' Senior Vice President of Trading, to see what kind of demand existed for the Funds' securities. PFOF ¶72 (Ex. 76 at 216; Ex. 27 at 159). On August 16, 2000, Ms. Bauer sent an e-mail to Messrs. Nasgovotiz, Beste, Conlin and Greg Winston, a co-portfolio manager of the Funds. PFOF ¶73 (Ex. 28). In her e-mail, Ms. Bauer discusses the evaluation of contingency plans in the event redemptions continue to be a problem for the Funds. PFOF ¶74 (Ex. 28). Ms. Bauer noted that it might be useful to meet to discuss contingency plans and a timetable for how long Heartland Advisors should give sales initiatives time to work before other options are considered or implemented. PFOF ¶75 (Ex. 28). Ms. Bauer concluded her message:

> I'm not trying to be negative – just realistic. It may be a minority view but I think its [sic] extremely remote that our problems will be solved thru [sic] sales efforts alone and time could work against us if we wait too long to consider other alternatives.
>
> Id.

The Funds' problems only worsened when, two days later, on August 18, 2000, Mr. Conlin submitted his resignation. PFOF ¶76 (Ex. 29 at 55-56, 59). Mr. Conlin was asked to reconsider, and Mr. Conlin agreed to defer his resignation until September. Id. However, after September 1, 2000, Mr. Conlin could not make any major investment decisions with respect to

9

the Funds except in consultation with Mr. Nasgovitz or Mr. Beste.  PFOF ¶78 (Ex. 23 at 46).

Mr. Conlin stopped coming in to the office.  PFOF ¶77 (Ex. 6 at 249).

3.  Early September 2000: the Funds' Problems Continue to Grow;
Negotiations with State of Wisconsin Investment Board.

In early September, Heartland Advisors continued to face problems related to

redemptions.  Following a $0.07 decline in the NAV of the High-Yield Fund, Ms. Bauer inquired

whether Heartland Advisors' shareholder service representatives had received any calls on the

price decline.  PFOF ¶80 (Ex. 31).  Following her previously expressed concern on August 16

about the Funds' problems with redemptions, in a September 6, 2000, e-mail to Mr. Beste, Ms.

Bauer wrote, "To reduce risk of redemptions, it might be useful to meet with the reps to discuss

the portfolio and develop talking points based on questions they anticipate."  PFOF ¶81 (Ex. 31).

In her e-mail, Ms. Bauer suggested ways to mitigate shareholder concerns, including

acknowledgment that the Funds invested in bonds that have a higher risk of default that

Heartland Advisors tries to minimize with its credit research.  PFOF ¶82 (Ex. 31).  The following

day, however, Mr. Nasgovitz stated in an e-mail to Ms. Bauer, among others, that Heartland

Advisors was "doing catch up research on the portfolios."  PFOF ¶83 (Ex. 32).  Another

Heartland Advisors employee also expressed concern in an e-mail on September 8, 2000,

whether Heartland Advisors was communicating the same message to all investors regarding the

Funds.  PFOF ¶84 (Ex. 33).  This employee wrote, "In talking with Jilaine [Bauer] the issues

really revolve around disclosure and status of holdings information."  PFOF ¶85 (Ex. 33).

While it attempted to sell bonds from the Funds' portfolios, Heartland Advisors

continued search for non-traditional sources of liquidity for the Funds, and it was led to contact

the State of Wisconsin Investment Board ("SWIB").  PFOF ¶¶86-87 (Ex. 22 at 140-41).  Ms.

Bauer first learned that Heartland Advisors was exploring a transaction with SWIB in late

10

August or early September. PFOF ¶89 (Ex. 6 at 187-88). Mr. Beste conducted negotiations, although there was no negotiation as to the price of individual bonds. PFOF ¶88 (Ex. 22 at 142); ¶93 (Ex. 26 at 149). SWIB did not negotiate the bonds they wanted or did not want; Heartland Advisors decided which securities they wanted to place in the SWIB transaction, with a goal of removing defaulted, non-performing bonds from the Funds. PFOF ¶¶90-91 (Ex. 26 at 140-41). Mr. Beste discussed the proposal with Ms. Bauer, among others. PFOF ¶92 (Ex. 22 at 142-43; Ex. 37). The major features of the SWIB transaction were that SWIB bought a group of securities from the Funds, but SWIB retained the right to put the bonds back to Heartland Advisors' parent company, Heartland Holdings, Inc., if SWIB did not achieve a 20% return on its investment. PFOF ¶94 (Ex. 37; Ex. 22 at 151-52). Mr. Nasgovitz agreed to personally guarantee this return to SWIB. Id. Ms. Bauer knew the details of the SWIB transaction at the time she liquidated her Short Duration Fund shares. PFOF ¶¶95-96 (Ex. 6 at 194-95). However, Ms. Bauer knew that Heartland Advisors did not disclose to investors or the public any details concerning this transaction. PFOF ¶97 (Ex. 6 at 196-97). In fact, an October 10, 2000 shareholder letter, reviewed and edited by Ms. Bauer, which had been sent to explain the reason for the September 28, 2000 devaluation made no mention of the transaction at all. PFOF ¶¶158-160, 163 (Ex. 62 at HAI 18958).

4.    Mid-September 2000: the Beginning of the Avalanche.

While discussions with SWIB were occurring, on September 8, 2000, Mr. Clark advised Mr. Nasgovitz, and shared his concerns with Ms. Bauer, that he was "extremely concerned about the liquidity of the HY Fund and question whether or not we should go thru with the SWIB sale. It seems that this is a very short term solution that may impair our ability to meet the bigger problem . . ." PFOF ¶98 (Ex. 35). Mr. Clark further advised, "we are potentially days away

from a literal melt down in these funds, a couple of weeks at the most." Id.  Mr. Clark continued:

> At the very least we probably need to look at pricing which will probably be the beginning of the avalanche and if this fund melts down I feel that the Heartland franchise will be damaged to the extent that we could get a run on all of our products as the press and the lawsuits start spreading . . .

> Id.

Ms. Bauer was aware of Mr. Clark's concerns and discussed them with him.  PFOF ¶99 (Ex. 16 at 337-39).  Ms. Bauer previously had discussions with Mr. Clark, and Mr. Beste, about whether Heartland Advisors was in a position to continue to sponsor the Funds given the net redemptions.  PFOF ¶100 (Ex. 16 at 339-41).

Shortly after Mr. Clark expressed his fears of a melt down, on September 11, 2000, Mr. Beste sent an e-mail to Ms. Bauer, among others, about attempts to sell bonds in the Funds' portfolios.  PFOF ¶101-02 (Ex. 36).  Mr. Beste noted that the goal had been to raise $4 million and $8 million in each of the Funds the prior week.  Id.  However, Mr. Beste informed that only $0.5 million had been raised in the High Yield Fund and less than $2 million had been raised in the Short Duration Fund.  Id.  Mr. Beste further informed:

> Goal for the week of September 11, 2000

> 1.      Tom [Conlin] and Greg [Winston] will continue to work on selling bonds with a goal of $4 to $8 million to be sold this week.  *Additional mark downs on our pricing and additional points will be given* so we can accomplish our objective.

> PFOF ¶103 (Ex. 36) (emphasis added)

On September 11, 2000, Ms. Bauer attended a special meeting of Heartland Group's Board.  PFOF ¶104 (Ex. 37).  At this meeting, Mr. Beste reported that portfolio loans stood at $11.7 million in the Short Duration Fund and $11.8 millions in the High Yield Fund.  PFOF

¶105 (Ex. 37 at HAI 759). Mr. Beste reported that the Funds had experienced net outflows of money since August of 1999: the Short Duration Fund had an outflow of $66 million ($30 million in 2000); the High Yield Fund had a net outflow of $22 million ($10 million in 2000). PFOF ¶106 (Ex. 37 at HAI 760). The Funds' portfolio valuations were also discussed, and Mr. Beste stated that his analysis showed some significant discrepancies from the pricing that the Funds were using. PFOF ¶107 (Ex. 37 at HAI 760). Finally, Mr. Beste referred to a draft purchase and sale agreement and reported that Heartland Advisors had been negotiating for a sale of a package of defaulted bonds to SWIB. PFOF ¶108 (Ex. 37 at HAI 762). The proposed SWIB sale was approved. Id. at HAI 763.

Around this time, Ms. Bauer revisited Mr. Conlin's resignation, when she had a conversation with Mr. Conlin about his resignation date; in that conversation Mr. Conlin indicated that he wanted to resign right away. PFOF ¶109 (Ex. 6 at 247). However, Heartland Advisors was interested in trying to coordinate the announcement of Mr. Conlin's departure with the SWIB transaction as Heartland Advisors was expecting increased redemptions as a result of the announcement of Mr. Conlin's departure. PFOF ¶110 (Ex. 6 at 248-49).

As September 2000 continued, Heartland Advisors' concerns regarding redemptions and prospects for liquidity continued to grow as Heartland Advisors was unable to sell the Funds' bonds at their carrying prices. Mr. Clark again noted his serious concerns on September 18, 2000, when he reported in an e-mail to Mr. Nasgovitz, Ms. Bauer, and others, "Unfortunately, as we dig deeper into the situation the prospects for liquidity are not that good . . . We have received some indications of levels where we could move a few positions but they are down 30-50% from current levels. . . . I still feel we need to come up with a contingency game plan just in case we have a run on the funds and cannot payout redemptions." PFOF ¶111 (Ex. 38). Mr.

Winston confirmed the problems selling the Funds' bonds the next day, on September 19, 2000 at 5:55 pm, when he reported to Ms. Bauer and Mr. Nasgovitz, among others, that "[d]espite lowering prices on several items in HY Mun (including WI – Milennium and NY – Very Special Place) there was no activity. Will follow-up again tomorrow and adjust again if need be." PFOF ¶114 (Ex. 40). Minutes later, at 6:20 pm, Mr. Nasgovitz sent Ms. Bauer an e-mail, which stated:

> Just saw your note Tom [Conlin] – the problem is both high yield funds have had $20 mil in loans for a long time. And 34% of the high yield is in default or on the watch list. You assured us that $4mil would be sold in Aug. but no bonds were sold. We have been working day and nite [sic] including weekends to work out of this. We believe we have a sound plan which hopefully proceeds with credit reviews tomorrow am. Plus the firm has indicated an interest in guaranteeing over $10 million face of Heritage defaulted bonds which will be removed from both funds. And yes with Greg [Winston], Derek [Pawlak], Kevin [Clark], Paul [Beste] and myself we decided Monday nite [sic] to take losses on about $5mil of high risk issues to create liquidity. Tom we hit our loan limit last week. What else do you recommend to do to repay the loans and get the funds on sound footing? JILIANE AND PAUL – I WOULD LIKE TO SEND THIS OR SOMETHING CLOSE TO CONLIN

> PFOF ¶112 (Ex. 39).

At 7:00 am the next morning, Mr. Beste responded to Mr. Nasgovitz's e-mail, copying Ms. Bauer on the response. PFOF ¶113 (Ex. 40). In his message, Mr. Beste acknowledged Heartland Advisors' concerns that liquidity must be raised and the Funds' loans must be paid off. Id. Mr. Beste also stated, "[Mr. Conlin] is unwilling to take the action required in the market since he does not agree with the discount required to sell non-rated bonds in todays [sic] market." Id.

On September 20, 2000, Ms. Bauer called a special meeting of the Pricing Committee, which was held jointly with the Credit Committee, to review the valuations of the Funds' bonds. PFOF ¶115 (Ex. 41). Raising liquidity for the Funds was discussed. PFOF ¶117 (Ex.41). Ms. Bauer noted the "ongoing efforts to obtain indications of interest" to purchase

bonds held by the Funds, and Messrs. Clark and Beste had made calls in efforts to sell bonds from the Funds, but indicated that initial bids were at "significant discounts." PFOF ¶¶116-17 (Ex. 41). At the meeting, Derek Pawlak, a credit analyst for the Funds, expressed concern that resources were not available to monitor bonds. PFOF ¶119 (Ex. 41). There also was discussion about the possibility of a reduction in portfolio security valuations across the board. PFOF ¶118 (Ex. 41).

On September 25, 2000, Ms. Bauer provided guidance to Heartland Advisors' employees who were taking shareholder calls and inquiring about the Funds. PFOF ¶120 (Ex. 42). In an e-mail, Ms. Bauer wrote, "We discussed and agreed on these guidelines which should be revisited once we sticker the prospectus and earlier if there is any other material event (significant NAV adjustment/new securities added to watch list/material redemptions)." PFOF ¶121 (Ex. 42). That same day, Ms. Bauer also reported to Messrs. Beste, Nasgovitz and Clark regarding her unsuccessful effort to find a buyer for the Funds. PFOF ¶122 (Ex. 43).

On September 26, 2000, Heartland Advisors' Vice President of Marketing and Communications sought assistance to deal with Heartland's "crisis situation" by contacting Edelman Public Relations Worldwide ("Edelman"). PFOF ¶123 (Ex. 44). Heartland Advisors was planning to announce Mr. Conlin's resignation and also was planning to significantly reprice downward the NAVs of the Funds. PFOF ¶126 (Ex. 44). Ms. Bauer participated in a meeting with representatives of Edelman at approximately 7:00 pm on September 27, 2000. PFOF ¶127 (Ex. 44). At this meeting, Edelman learned information not previously known to it that would have altered its approach if it had received the information. Id. The representatives of Heartland Advisors at this meeting were more concerned with the repricing messages and related issues than Mr. Conlin's resignation. Id. As a result, Edelman endeavored to redraft talking points and

key messages, with significant input from Ms. Bauer. PFOF ¶128 (Ex. 44). Ms. Bauer was very particular about how and what was said about repricing. Id. That same evening, at 7:35 pm, Ms. Bauer advised Heartland Advisors' customer services representatives how to respond to expected questions from the Funds' shareholders. PFOF ¶129 (Ex. 45). In an e-mail, Ms. Bauer commented on a talking point as follows:

> What are you doing to fix the portfolio?
> Fill in here!!!!***All of our portfolios are actively managed meaning they are not static. While we aren't at liberty to discuss specific portfolio mgt strategies, mitigating the price volatility and working to improve the Funds' investment returns are our most pressing priority. We believe things will improve as the intrinsic value of the Funds' portfolios aligns more closely with the market value***[Bauer] COMMENT: Not sure I like this but you can think about it – its [sic] difficult to take proactive steps to restructure portfolio if all cash raised is used to pay out redemptions but we cant [sic] say that).**

> PFOF ¶130 (Ex. 45) (emphasis in original)

One investor in the Short Duration Fund testified that he would have "absolutely" wanted to know information that the fund wasn't able to meet shareholder redemptions. PFOF ¶138 (Ex. 48 at 49). This information would have been "critical." Id. "If they can't meet redemptions, they're having trouble selling some of the assets. So there's an underlying issue there that says something's really wrong." Id. The Funds' redemption problems would have been similarly important to other investors in the Short Duration Fund. PFOF ¶¶137-38 (Ex. 48 at 50; Ex. 49 at 24; Ex. 50 at 21-23; Ex. 51 at 27-28).

5.    The September 28, 2000 Devaluation.

On September 28, 2000, Mr. Nasgovitz informed certain individuals, including Ms. Bauer, that the SWIB sale would be completed. PFOF ¶131 (Ex. 3 at ¶65; Ex. 46). Mr. Nasgovitz cautioned however, that the SWIB sale entailed lower prices for the securities and will result in losses for the Funds. Id. That same morning, Heartland Advisors informed employees

16

Mr. Conlin's resignation and the hiring of a new portfolio manager for the Funds, Phil Fiskow. PFOF ¶132 (Ex. 47). Heartland Advisors remained concerned that redemptions in the Funds might increase in connection with the announcement of Mr. Conlin's resignation, and there was a concern that there might be additional redemptions because of downward adjustment to the Funds' NAV and that the Funds might not have adequate cash to meet redemptions. PFOF ¶133 (Ex. 5 at 108).

Ms. Bauer participated in a special meeting of the Board of Directors on September 28, 2000. PFOF ¶134 (Ex. 34). At this meeting, Mr. Beste discussed a proposal of Heartland Advisors to limit telephone redemptions in the Funds to amounts not more than $25,000 in order to manage large and unexpected redemptions. PFOF ¶135 (Ex. 34 at HAI 0727). After considerable discussion, the Board decided not to limit telephone redemptions. Id. However, in response to a question about Heartland Advisors' plans for dealing with a possible increase in redemptions, Mr. Nasgovitz noted, among other things, that the Funds might ask the SEC for permission to suspend redemptions. PFOF ¶136 (Ex. 34 at HAI 0729). Ms. Bauer also participated in a meeting of the Pricing Committee, during which Mr. Beste reported that the Funds' pricing service was reviewing a number of bonds in the Funds' portfolios and anticipated adjusting valuations downward. PFOF ¶ 139 (Ex. 52).

That same day, September 28, 2000, Ms. Bauer sent an e-mail to Messrs. Nasgovitz, Beste, Clark and Winston which, by her own admission, was unlike any message she had sent before. PFOF ¶140 (Ex. 53); ¶142 (Ex. 6 at 240). Ms. Bauer's message advised them to "eliminate on a regular basis" certain materials that they may have been keeping over the past six or seven weeks, including "diar[ies], research file notes or miscellaneous material involving discussions relating to portfolio securities, underlying credits and valuation issues." PFOF ¶141

(Ex. 53). Six to seven weeks before this e-mail was approximately August 10, 2000, the day of the Board of Directors meeting that left Ms. Bauer with the impression that the Board was somewhat unsettled and concerned about the Funds. PFOF ¶67 (Ex. 6 at 236-37). Ms. Bauer had never previously sent Heartland Advisors' employees an e-mail encouraging the destruction of documents. PFOF ¶142 (Ex. 6 at 240).

On September 28, 2000, the prices of the bonds involved in the SWIB transaction were lowered by as much as 50%. PFOF ¶143 (Ex. 6 at 200-201). As a result, at the close of the day, the NAV of the Short Duration Funds declined from $9.10 to $8.91, while the NAV of the High Yield Fund declined from $8.75 to $8.03. Id.; Ex. 8 at HAI 15766-67. That same day, Heartland Advisors announced Mr. Conlin's resignation from the firm in a press release, which Ms. Bauer reviewed and approved. PFOF ¶144 (Ex. 54).

      6.    The Funds' Crisis Continues.

As anticipated by Ms. Bauer on August 16 and Mr. Clark in mid-September, the cash received from the sale of some defaulted bonds to SWIB did not solve the Funds' problems. On Monday, October 2, 2000, in response to a request from the SEC on Friday, September 29, 2000, Ms. Bauer sent the SEC a letter providing information about the Funds' holdings, borrowing, and pricing. PFOF ¶147 (Ex. 6 at 120-21); ¶148 (Ex. 21; Ex. 55). In her letter, Ms. Bauer also explained events leading to the downward adjustment in the Funds' NAVs on September 28, 2000. PFOF ¶149 (Ex. 21 at HAI 377-78). Ms. Bauer explained that many options had been discussed, including keeping the Funds open and selling securities at distressed prices, suspending redemptions, looking for buyers for all or large blocks of securities in the Funds' portfolios, and discussions with other fund sponsors that might have an interest in acquiring the Funds. Id. In her letter, Ms. Bauer wrote that Heartland Advisors "had explored and was

continuing to explore all of these options . . ." Id.  Ms. Bauer herself continued to explore selling

the Funds and, on October 2, 2000, Ms. Bauer sent Mr. Beste materials provided to Federated

relating to a potential sale of the Funds by Heartland.  PFOF ¶153 (Ex. 57; Ex. 58).

The Funds' new co-portfolio manager, Mr. Fiskow, also quickly realized that the Funds'

problems continued, learning about the extent of the Funds' troubles by the end of his first day at

work on Monday October 2, 2000.  PFOF ¶150 (Ex. 56 at 29).  Mr. Fiskow became aware that

the Funds were having trouble selling bonds at the prices at which they were being carried.

PFOF ¶151 (Ex. 56 at 61, 63).  Mr. Fiskow quickly became very concerned about "trouble

selling bonds, that we didn't have our arms completely around the bonds that we owned in the

portfolios, that we had redemptions and that we had not enough resources to get everything

done."  PFOF ¶152 (Ex. 56 at 51-52).  Mr. Fiskow also was very concerned that "the credit files

were not complete, we didn't have enough analysts to really spend the time necessary."  Id.,

Ex.56 at 53, 84-85.  In less than two days at Heartland Advisors, Mr. Fiskow understood, and

confirmed, the serious problems facing the Funds that Heartland Advisors had been attempting to

address for at least the previous six to seven weeks.

Also on October 2, 2000, Ms. Bauer received information she had requested regarding

any price declines in so-called watch list securities held by the Funds since June 30, 2000.  PFOF

¶154 (Ex. 59).  The information Ms. Bauer received listed the significant price changes in

defaulted and watch list securities in the Funds' portfolios as of September 27, 2000.  Id.  This

information was not publicly available nor was it disclosed to investors.

The following morning, on October 3, 2000, at approximately 7:00 a.m., Ms. Bauer

placed a telephone order from her car outside Heartland Advisors' offices redeeming all

4,976.156 shares of her Short Duration Fund account. PFOF ¶155 (Ex. 5 at 123). She received $44,267.15. Id., Ex. 4 at JHB 752.

The very next day, on October 4, 2000, Ms. Bauer sent an e-mail to certain Heartland Advisors personnel regarding a draft of an updated Q&A intended to respond to shareholder questions. PFOF ¶156 (Ex. 60). In her e-mail, Ms. Bauer noted that Heartland Advisors was planning to send shareholders, during the week of October 9, 2000, a special report, including a schedule of investments, the default percentage, and a more detailed explanation of the price change on September 28, 2000. PFOF ¶157 (Ex. 60). Ms. Bauer also wrote that "all s/h [shareholders] would be interested in the information" and that the special report needed to be mailed directly to the Funds' shareholders because "this info is non-public, could be material and can be shared but not selectively." Id. Ms. Bauer knew all this information, which was still nonpublic, at the time of her liquidation. Id.

7.     October 11, 2000: Ms. Bauer Implements a Tape Purge Procedure.

On October 11, 2000, Bauer sent an e-mail to the Heartland Advisors shareholder services department. In that e-mail, Ms. Bauer instructed shareholder services employees to implement a procedure of purging call center tapes. PFOF ¶ 164-65 (Ex. 63). Under this new procedure call center tapes were to be retained for a 6-month period and then destroyed. Id. Ms. Bauer instructed Shareholder Service employees to implement the procedure immediately. Id. In the weeks immediately preceding Ms. Bauer's e-mail, a Heartland Advisors officer had raised the specter of litigation, PFOF ¶98 (Ex. 35); and the staff of the SEC had contacted Ms. Bauer, asking for information about the Funds. PFOF ¶147 (Ex. 6 at 120-121). As a consequence of this procedure, which was implemented on October 11, 2000, call center tapes were destroyed, including tapes from 2000. PFOF ¶165 (Ex. 63).

8.   October 13, 2000: The Funds Crash.

On October 13, 2000, the Funds' portfolio managers provided an assessment of the value of each bond based on each bond being sold individually within seven days.  PFOF ¶167 (Ex. 64).  The Pricing Committee then further reduced the individual portfolio security valuations recommended by the Funds' portfolio managers by an additional 33% discount for the Short Duration Fund and 50% for the High Yield Fund.  Id.  As a result, the NAV of the Short Duration Fund plummeted from $8.70 per share to $4.87 per share; the NAV of the High-Yield Fund dropped from $8.01 per share to $2.45 per share.   PFOF ¶14 (Ex. 9 at 5).  In one single day, Short Duration Fund shareholders lost 44% of the value of their accounts.  Shareholders in the High Yield Fund fared even worse – losing an approximate 70% of the value of their accounts in a single day.

III.   ARGUMENT

A.   Summary Judgment Should Be Granted as There is No Genuine Issue of Material Fact as to Ms. Bauer's Insider Trading.

1.   Summary Judgment Standard.

Under Fed. R. Civ. P. Rule 56(c), summary judgment is proper when the pleadings and other submissions in the case show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Sims v. Board of School Directors, Case No. 02 C 0555, 2006 WL 757816 at *5 (E.D.Wis. March 22, 2006).  A genuine dispute about a material fact exists only where a reasonable finder of fact could decide for the nonmoving party.  Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986); Santiago v. Lane, 894 F.2d 218, 221 (7th Cir. 1990); Sims, 2006 WL 757816 at * 5.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine need for trial and summary judgment is proper.

<u>Matshushita Elec. Indus. Co. Lt. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). The non-movant has to show more than simply some metaphysical doubt as to the facts. <u>First Nat. Bank v. Lewco Securities Corp.</u>, 860 F.2d 1407, 1411 (7th Cir. 1988) (citations omitted). While the resolution of factual disputes, the sufficiency of evidence and the relative credibility of the parties are matters generally left to a jury or fact finder at trial, summary judgment is nonetheless appropriate where the evidence is so one-sided that one party must prevail as a matter of law. <u>Anderson</u>, 477 U.S. at 251-52; <u>Sims</u> 2006 WL 757816 at * 5. Where, as here, both parties have moved for summary judgment, "a district court must evaluate each party's motion on its own merits…." <u>Sullivan v. Rilling</u>, Case No. 94 C 539, 1999 U.S. Dist. LEXIS 4746, at *5-6 (N.D.Ill. Mar. 31, 1999)(citation omitted).

Here, based on uncontroverted documentary evidence and on Ms. Bauer's own admissions, the SEC has met its burden and has shown that no genuine issue of material fact exists regarding Ms. Bauer's liability for fraudulent insider trading. As a result, this Court should grant summary judgment against Ms. Bauer, finding that she violated the antifraud provisions of the federal securities laws. In light of the facts involved, it is also appropriate for this Court to issue an order of civil injunction against Ms. Bauer and order her to pay disgorgement, prejudgment interest and a civil penalty.

>   2.   <u>Ms. Bauer Engaged in Insider Trading, in Violation of the Antifraud Provisions of the Federal Securities Laws</u>.

Section 17(a) of the Securities Act prohibits fraud in the offer or sale of a security. Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit the same conduct, if committed in connection with the purchase or sale of securities. Among other things, these provisions prohibit trading in an issuer's securities, in violation of a duty to the issuer and its shareholders, based on material, non-public information about the issuer. Information is material

if a reasonable investor would consider it important to an investment decision and there is a substantial likelihood that its disclosure would have been viewed by the investor as having significantly altered the "total mix" of information made available about the investment. Basic, Inc. v. Levinson, 485 U.S. 224, 231-232 (1988). The definition of materiality of information is echoed in Heartland's insider trading policy. PFOF ¶42 (Ex. 15 at TH 0002). Furthermore, to prove an insider trading violation, the SEC must show that the defendant acted with scienter. Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976). Recklessness satisfies the scienter requirement. SEC v. Jakubowski, 150 F.3d 675, 681 (7th Cir. 1998).

Similarly, Section 36(a) of the Investment Company Act provides that the Commission may bring an action alleging, as pertinent here, that a person serving or acting as an officer of the investment adviser to a registered investment company has engaged "in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of" the registered investment company. If such allegations are established, the court may enjoin such person from acting in any or all such capacities either permanently or temporarily and award such injunctive or other relief against such person as may be reasonable and appropriate in the circumstances.

3.      Ms. Bauer Had a Duty to Disclose or Abstain from Trading or Tipping When In Possession of Material, Non-Public Information.

Under the classical theory of insider trading, traditional insiders of an issuer, such as officers, directors and employees, in possession of material, non-public information have a fiduciary duty to the issuer and its shareholders to publicly disclose such information or to abstain from trading in the issuer's securities. See Chiarella v. United States, 445 U.S. 222, 230 (1980) ("Corporate insiders . . . have an obligation to place the shareholder's welfare before their

Case 2:03-cv-01427-CNC   Filed 06/20/08   Page 28 of 42   Document 413

own.").  If an insider trades or tips while in possession of the material, non-public information, the insider's failure to disclose the information prior to trading or tipping operates as a fraud. See Id. at 228.  Under the misappropriation theory of insider trading, a person violates the antifraud provisions of the federal securities laws when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information. United States v. O'Hagan, 521 U.S. 642, 652 (1997).   "[T]he misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information."  Id.

Ms. Bauer was a traditional insider.  As an officer of Heartland Group, PFOF ¶32 (Ex. 3 at ¶18; Ex. 6 at 62), Ms. Bauer had a fiduciary duty not to use material, non-public information for improper purposes.

4.     Ms. Bauer Possessed Material, Non-Public Information when She Liquidated on October 3, 2000.

On October 3, 2000, when Ms. Bauer liquidated her shares in the Short Duration Fund, she knew that the Short Duration Fund and the High-Yield Fund were in a crisis situation.  PFOF ¶126 (Ex. 44).  Among other things, Ms. Bauer knew that the Funds were experiencing undisclosed, chronic net redemptions and that those redemptions were likely to increase.  PFOF ¶¶74-75 (Ex. 28); ¶¶81-82 (Ex. 31); ¶133 (Ex. 5 at 108).  She knew that the Funds lacked sufficient cash to meet the ongoing redemptions and to manage the Funds' portfolios, and that the Funds portfolio managers were unable to raise the needed cash by selling securities from the Funds' portfolios at their carrying values.  PFOF ¶103 (Ex. 36); ¶¶113-18 (Ex. 40, Ex. 41); ¶127 (Ex. 44 at Ex. A pp.1-2); ¶130 (Ex. 45 at HAI 085-86).  Ms. Bauer also knew that the SWIB transaction provided only a temporary solution, PFOF ¶98 (Ex. 35), that Heartland Advisors was trying to sell the Funds to another fund sponsor, and that the Heartland Group Board was

considering suspending shareholder redemptions. PFOF ¶100 (Ex. 16 at 339-41); ¶122 (Ex. 43); ¶135-36 (Ex. 34 at HAI 66373-75); ¶148-49 (Ex. 21 at HAI 377-78); ¶153 (Ex. 57; Ex. 58). Ms. Bauer knew that the Funds were facing a meltdown and an avalanche of redemptions and litigation. PFOF ¶98 (Ex. 35); ¶133 (Ex. 5 at 108).

The evidence forecloses any genuine dispute about Ms Bauer's knowledge. For example, in August 2000, Ms. Bauer expressed doubts about solving the Funds' problems through sales efforts alone. PFOF ¶75 (Ex. 28). Beginning in September 2000, Ms. Bauer knew that Heartland Advisors' attempts to sell bonds to raise desperately-needed cash were failures. PFOF ¶103 (Ex. 36); ¶111 (Ex. 38); ¶113 (Ex. 39); ¶114 (Ex. 40); ¶117-18 (Ex. 41); ¶126 (Ex. 44).

On September 18, 2000, Mr. Clark explained to Ms. Bauer and others that, "as we dig deeper into the situation the prospects for liquidity are not that good." PFOF ¶111 (Ex. 38). Getting right to the point, Mr. Clark told Ms. Bauer that, despite "many conversations" with potential buyers of the Funds' bonds, "[w]e have received some indications of levels where we could move a few positions but they are down 30%-50% from current levels." Id. That is, Mr. Clark told Ms. Bauer that the Funds' bonds were marked 30%-50% higher than market prices for those bonds. Two days later, Mr. Beste sent an e-mail to Ms. Bauer and others and confirmed Mr. Clark's statement that the Funds were overvalued: "He [Conlin] knows that [raising liquidity and paying down the loans] will have an impact on performance and he is unwilling to take the action *required* in the market since he does not agree with the *discount required* to sell non-rated bonds in today's market." PFOF ¶113 (Ex. 39)(emphasis added). Prior to the SWIB transaction, Ms. Bauer learned from Mr. Clark that the anticipated transaction with the SWIB was a "very short-term solution that may impair [Heartland Advisors'] ability to meet the bigger problem." PFOF ¶98 (Ex. 35). Ms. Bauer knew that in September, 2000 Mr. Clark had expressed the

opinion that the Funds were potentially days, or a few weeks at most, away from a "literal melt down." Id. Mr. Clark also informed Ms. Bauer at this time that he believed the pricing of the Funds' securities needed to be investigated further, which would lead to an "avalanche," given the Funds' cash-flow situation. Id.

On September 27, 2000, Ms. Bauer participated in a meeting with a public relations company that Heartland Advisors had contacted to assist with the Funds' crisis. PFOF ¶127 (Ex. 44). At this meeting, it was made clear that Heartland Advisors was more concerned with the anticipated repricing of the Funds and related issues than Heartland Advisors' announcement of Mr. Conlin's resignation. Id. Ms. Bauer provided significant input in drafting talking points and "was very particular about how and what was said around repricing." PFOF ¶128 (Ex. 44).

That same evening, Ms. Bauer sent a "talking points" message to Heartland Advisors' shareholder services representatives acknowledging that the Funds were unable to take proactive steps to restructure the portfolios since all cash raised was used to pay out redemptions, but she advised "we cant [sic] say that." PFOF ¶130 (Ex. 45 at HAI 085-86). This admission by Ms. Bauer, mere days before she redeemed all her shares, that the Funds were unable to extricate themselves from their problems, and her particularity about how and what was said to investors to reduce the risk of redemptions, provides a damning insight into her thorough knowledge of material, non-public information about the Funds' crisis.

The following day, on September 28, 2000, Ms. Bauer attended a Special Meeting of Heartland Group's Board, at which Mr. Nasgovitz stated that the Funds might be required to take the monumental step of asking the SEC for permission to suspend redemptions. PFOF ¶136 (Ex. 34 at HAI 66375). At a Pricing Committee meeting, Ms. Bauer learned that the Funds' pricing service was reviewing a number of Funds' securities for likely additional price reductions.

PFOF ¶139 (Ex. 52). Ms. Bauer then received, pursuant to her request and the afternoon prior to her liquidation, information that included the price declines in defaulted and watch list securities, a number of which remained in the Funds. PFOF ¶154 (Ex. 59).

Then, on October 2, 2000, Ms. Bauer sent a letter to the staff of the SEC regarding, among other things, the September 28, 2000 Board meeting. PFOF ¶149 (Ex. 21). In her letter, Ms. Bauer noted that management of Heartland Advisors had told the Board that the Funds might be required to sell securities at distressed prices if redemptions accelerated more rapidly than anticipated. Id.. Ms. Bauer also detailed discussions at the Board meeting concerning the implications of keeping the Funds open and selling securities at distressed prices, as well as suspending redemptions, among other possibilities. Id. Ms. Bauer wrote, "Heartland [Advisors] explained that it had explored and was continuing to explore all of these options." Id. These, and other, material facts were not disclosed to investors in the Funds but were known to Ms. Bauer prior to her sale on October 3, 2000.

The next day Ms. Bauer placed an order to liquidate all her shares in the Short Duration Fund at approximately 7:05 a.m. PFOF ¶6 (Ex. 3 at ¶68; Ex. 4 at JHB 751).

The day immediately following her liquidation, on October 4, 2000, Ms. Bauer stated in an e-mail that the Funds' shareholders needed to be sent a special report containing some of the very same information that she had already traded on, including a schedule of investments and a default percentage, and a more detailed explanation of the Funds' devaluation on September 28, 2000. PFOF ¶156 (Ex. 60). In her e-mail, Ms. Bauer noted that all shareholders would be interested in this information and stated, "[w]e need to do this because this info is non-public, could be material and can be shared but not selectively." Id.

Information is material if a reasonable investor would consider it important to an investment decision and there is a substantial likelihood that its disclosure would have been viewed by the investor as having significantly altered the "total mix" of information made available about the investment.  Basic, 485 U.S. at 231-232; see also PFOF ¶41 (Ex. 15).  The test for materiality, followed by the Supreme Court in Basic, is a balance between the probability that an event will occur and the magnitude of the event in the life of the corporation.  Basic, 485 U.S. at 238-39.  "The definition of 'materiality' . . . covers whatever is important enough to reasonable participants in an investment decision to alter their behavior.  Usually price (or facts that influence price) is all that matters to securities transactions, but Rule 10b-5 does not foreclose the possibility that the participants will deem other facts vital."  Jakubowski, 150 F.3d at 681 (citations omitted).  Heartland Advisors' own policy against insider trading defined materiality as "info a reasonable investors would want to know before making an investment decision."  PFOF ¶42 (Ex. 15 at TH 0002).  Trading by those who knew of non-public information is itself evidence of materiality.  SEC v. Shapiro, 494 F.2d 1301, 1307 (2d Cir. 1974).

The information regarding the Short Duration Fund and the High-Yield Funds that Ms. Bauer knew before she liquidated went to the very core of a decision whether to invest in, or flee from, the Funds.  Ms. Bauer's knowledge concerned the Funds' liquidity, their defaulted securities, the valuations of the securities in the Funds, the ability to sell securities at their carrying values, the ability to meet redemption requests, the continuing possibility that redemptions would be suspended and the fact that the Funds might be in "crisis" or days away from a "meltdown."  PFOF ¶126 (Ex. 44); ¶98 (Ex. 35).  Ms. Bauer admitted that all shareholders would be interested in obtaining a "special report" including an up-to-date schedule

28

of investments, the default percentage, and a more detailed explanation of the September 28, 2000 devaluation. PFOF ¶156-57 (Ex. 60). She further acknowledged the materiality of this information by specifying that it should be mailed directly to the Funds' shareholders and not just posted on Heartland Advisors' website. Id.

Information concerning whether an investor may be able to redeem her investment; whether the portfolio is being priced correctly; whether the Fund is in "crisis" or whether a meltdown is imminent goes to the very heart of an investment decision. Not surprisingly, several actual Fund investors testified that they in fact would have found the information important. PFOF ¶137-38 (Exhibits 48-51).

Ms. Bauer held unique positions with Heartland Group and Heartland Advisors. She was a Vice President of Heartland Group, and regularly attended meetings of Heartland Group's Board. PFOF ¶32 (Ex. 3 at ¶18; Ex. 6 at 62); ¶53 (Ex. 20); ¶ 58 (Ex. 24); ¶104 (Ex. 37); ¶134 (Ex. 34). She was not only Heartland Advisors' General Counsel, but also its Senior Vice President, Chief Compliance Officer, Secretary, and the Chairperson of the Pricing Committee. PFOF ¶30 (Ex. 6 at 30-31); ¶31 (Ex. 3 at ¶¶14,17); ¶35 (Ex 6 at 31-32). She became a member of Heartland Advisors' Credit Committee in July 2000. PFOF ¶33 (Ex. 3 at ¶19). In fulfilling these roles, Ms. Bauer was at the center of the Funds' crisis throughout 2000. There is no genuine issue of material fact that Ms. Bauer possessed material non-public information regarding the Short Duration Fund prior to her sale.

Indeed, Ms. Bauer herself admits that, on October 3, 2000, she was in possession of non-public information regarding the Short Duration Fund. PFOF ¶8 (Ex. 6 at 260-61; Ex. 3 at ¶69). She claims that the information was not material to her. Id. Of course, even if true this claim does not fit with the controlling legal standard. Under Basic v. Levinson materiality is defined as information that a reasonable investor would consider important in making an investment

decision. The non-public facts known to Ms. Bauer went to the very core of the risks and returns of investing in the Funds. Clearly, a reasonable fund investor would have considered such information important in making investment decisions about the Funds. It should surprise no one that real Heartland investors deposed during the case considered the information in question to have been important. PFOF ¶¶137-38 (Exhibits 48-51). Under <u>Basic v. Levinson</u>, Ms. Bauer's self-serving claim that the information she possessed prior to her October 2000 liquidation was not material to her simply does not insulate her from the consequences of her illicit actions. To hold otherwise would allow insider traders to avoid responsibility for their fraud by simply claiming that the information was not material to them. Such a proposition is ridiculous on its face; contrary to the law and offensive to public policy.

In any event, Ms. Bauer's claim that the information was not material is an after-the-fact assertion that is belied by her own contemporaneous words. In a September 25, 2000 e-mail Ms. Bauer wrote "We discussed and agreed on these guidelines which should be revisited once we sticker the prospectus ***and earlier if there is any other material event (significant NAV adjustment/new securities added to watch list/material redemptions)"*** (emphasis added). Each of the items Ms. Bauer described in that e-mail as "...any other material event..." were ongoing problems in the Funds up to her sale on October 3, 2000. PFOF ¶121 (Ex. 42). Similarly, on September 27, 2000, Bauer drafted an e-mail regarding 'talking points" for Shareholder Services. In that e-mail Bauer says ***"...Not sure I like this but you can think about it-its [sic] difficult to take proactive steps to restructure portfolio if all cash raised is used to pay our redemptions but we cant* [sic] *say that."*** (Emphasis added). PFOF ¶130 (Ex. 45 at HAI 085-86). It is difficult to imagine a more clear admission of materiality than Bauer's candid statement that investors could not be told all the Funds' cash was being used to pay redemptions! In a last

example, Bauer's October 4, 2000 e-mail leaves no doubt that the information in question was material. That e-mail, which is a draft Q&A to answer shareholder questions regarding the Funds, reads in part ***"... a more detailed explanation of the price change on 9/28 ...We need to do this because this info is non-public, could be material and can be shared but not selectively. Knowing that all s/h [shareholders] would be interested, we think the best way to make it public is thru mailing…."*** (Emphasis added.) PFOF ¶157 (Ex. 60).

     5.     <u>Possession of Material Non-Public Information Creates Inference of Use.</u>

There is some conflict within the federal circuits about whether the use of inside information, as contrasted with knowing possession, must be proven to establish fraudulent insider trading. <u>Compare</u> <u>United States v. Teicher</u>, 987 F.2d 112, 120-21 (2d Cir. 1993) <u>cert. denied</u>, 510 U.S. 976 (1993) (suggesting in dictum that "knowing possession" is sufficient) with <u>SEC v. Adler</u>, 137 F.3d 1325, 1337 (11th Cir. 1998) (use required, but proof of possession provides strong inference of use), and <u>United States v. Smith</u>, 155 F.3d 1051, 1069 & n. 27 (9th Cir. 1998) <u>cert. denied</u> 525 U.S. 1071 (1999) (requiring that use be proven in a criminal case). The Seventh Circuit has favorably viewed the dictum stated in <u>Teicher</u> that proof of possession is sufficient; but the Court did not have occasion to decide whether or not it agrees with the <u>Teicher</u> dictum. <u>SEC v. Lipson</u>, 278 F.3d 656, 660 (7th Cir. 2002). The Seventh Circuit, however, did uphold jury instructions that reflected the holding in <u>Adler</u> that possession creates an inference of use. <u>Id.</u> at 660-661. (If defendant possessed nonpublic information which showed that a stock was overpriced, and having this information defendant sold a large quantity of that stock shortly before the information became public and the stock dropped sharply in value, "common sense tells us that it is probable that his decision to sell when he did and how much he did (rather than

sell later or sell less) was influenced by the information.")  Measured by this standard, the Commission's evidence sustains its insider trading charges against Ms. Bauer.

Approximately three months after redeeming all her shares of the Short Duration Fund, Ms. Bauer testified that "the primary reason" that she redeemed was that she was uncomfortable with the price volatility of the Short Duration Fund.  PFOF ¶172 (Ex. 5 at 128).  Ms. Bauer explained that she wanted to have these assets "relatively liquid and available," and "she was concerned about protecting these assets."  Id.  Doubtless, Ms. Bauer's inside knowledge of the Funds' problems and ensuing crisis contributed to her concern.  Indeed, it likely caused her to fear the loss of those assets in their entirety, or at least a significant portion.  As Ms. Bauer knew before redeeming all her shares, the Funds were having problems with illiquid and defaulted securities, with redemptions, and were continuing to explore suspending redemptions in the Funds.  See, e.g., PFOF ¶149 (Ex. 21). Undoubtedly, public investors would have had the same concerns about protecting their investments in the Funds had they known the information Ms. Bauer knew at the time she redeemed all her shares.  PFOF ¶¶137-38 (Exhibits 48-51).

Ms. Bauer also has proffered that she was interviewing for different job opportunities, including one that potentially involved relocating to San Francisco.  PFOF ¶172 (Ex. 5 at 124-25).  At the time of her liquidation, Ms. Bauer did not have a written offer for a position in San Francisco, and she still needed to meet a number of people before she made any decisions regarding a potential move to San Francisco.  Id. at 138, 141.  In any event, this purported additional motivation for Ms. Bauer's liquidation does not succeed in sanitizing her conduct. The Seventh Circuit held that the mere existence of an alternative legitimate purpose for selling securities does not serve as a defense to allegations of a defendant's illegal sale.  Lipson, 278 F.3d at 661-662 (citation omitted).  The Seventh Circuit was speaking of just this situation when

it said "the existence of the legitimate purpose would not sanitize the illegitimate one." Id. at 661-662. Based on the guidance of the Seventh Circuit and Ms. Bauer's actual knowledge of material, non-public information prior to her sale it cannot be seriously argued that she did not violate the prohibition against insider trading found in the federal securities laws.

   B.  Ms. Bauer Acted With Scienter.

   Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. at 193 n.12. Recklessness is a sufficiently culpable state of mind to support a finding of liability under Section 10(b) and Rule 10b-5. SEC v. Blavin, 760 F.2d 706, 711 (6th Cir. 1985); see also Jakubowski, 150 F.3d at 681. Recklessness is "'highly unreasonable conduct which is an extreme departure from the standards of ordinary care.'" Blavin, 760 F.2d at 711 (citation omitted). Ms. Bauer acted with scienter when she sold all her shares in the Short Duration Fund on October 3, 2000. She admitted that she knew it was against the law to trade while in possession of material, non-public information regarding the Funds. PFOF ¶9-10 (Ex. 6 at 256, 258-59). She also knew that Heartland Advisors' policy against insider trading extended to non-public information about Heartland Groups' mutual funds themselves. PFOF ¶47 (Ex. 16 at 353-54). Likewise, Ms. Bauer had restricted herself and others at Heartland from trading in Fund shares due to the existence of material non-public information. PFOF ¶11 (Ex. 6 at 259); ¶46 (Ex. 5 at 155). Indeed, the day after liquidating her account she stated in writing that Fund shareholders would want to know at least some of the non-public information she possessed when she redeemed her shares. PFOF ¶157 (Ex. 60). Ms. Bauer is an experienced lawyer and compliance professional. She was fully cognizant of the legal prohibitions against insider trading. The evidence leaves no genuine dispute: She knew exactly what she was doing when she placed her early morning telephone call on October 3, 2000.

Case 2:03-cv-01427-CNC   Filed 06/20/08   Page 38 of 42   Document 413

C.      Ms. Bauer's Guilty Knowledge.

In addition to the direct evidence that Ms. Bauer, acting with scienter, liquidated her

shares based on the material, non-public information she possessed at the time, her affirmative

steps to destroy potential evidence provides additional circumstantial evidence of her guilty

knowledge.  Circumstantial evidence is not only sufficient but may also be more certain,

satisfying and persuasive than direct evidence.  Michalic v. Cleveland Tankers, Inc. 364 U.S.

325, 330 (1960).  As discussed previously, on September 28, 2000, Ms. Bauer sent an e-mail to,

among others, the portfolio managers of the Funds.  PFOF ¶141 (Ex. 53).  In that e-mail, Ms.

Bauer stated that "Over the past 6-7 weeks you [the portfolio managers of the municipal funds]

may have been keeping a diary, research file notes or miscellaneous material involving

discussions relating to portfolio securities, underlying credits and valuation issues..."  Id.  She

went on to suggest that the portfolio managers may have "...within your notes/files material that

is unnecessary to keep as part of that record..."  Id.  Ms. Bauer then wrote, "As a legal matter, I

recommend that you only keep those records that you are required to maintain...please take time

to review your files and discard what is nonessential..."  Id.  Ms. Bauer admitted that she

believed that this was the only time she had ever sent such an e-mail.  PFOF ¶142 (Ex. 6 at 240).

Ms. Bauer, apparently for the first time ever, suggested destroying certain information related to

the "portfolio securities, underlying credits and valuation issues" that had been maintained by the

portfolio managers.  Id.  Ms. Bauer also suggested that the time period for this file purge be the

"past 6-7 weeks", exactly the period of time covered by the efforts of Heartland to address the

serious problems in the Funds concerning the pricing of the portfolio; liquidity and redemption

detailed throughout this brief.  PFOF ¶141 (Ex. 53).  A time period when the Funds were facing

the possibly of a "literal melt down." PFOF ¶98 (Ex. 35).  Finally, Ms. Bauer suggested this

purge on the eve of the SWIB transaction and the day the NAVs of the Funds substantially declined. PFOF ¶131 (Ex. 3 at ¶65; Ex. 46); ¶143 (Ex. 6 at 200-01); Ex. 8 at HAI 15767.

Additionally, on October 11, 2000, approximately a week and a half after the SEC had contacted Heartland and requested information, including documents, regarding the events surrounding the devaluation of the Funds, Ms. Bauer, again for the first time, instituted a procedure for destroying tape recordings of Heartland telephone calls. PFOF ¶¶164-65 (Ex. 63). This procedure, which was immediately implemented, called for the destruction of shareholder services tapes that recorded conversations with Fund shareholders. Id. Under this procedure, years of tapes were destroyed. Id.

Ms. Bauer's actions are "evidence of a cover-up, attempted cover-up, which has generally been held to be admissible as far as casting some reflection on how the defendant evaluated his own conduct." United States v. Ryan, 213 F.3d 347, 350 (7th Cir. 2000) (case involving bank fraud, a specific intent crime, where kickbacks not reported on defendants tax return). As such, Ms. Bauer's actions, as in the Ryan case, "...constitute[] circumstantial evidence of intent to defraud." Id. at 351

D.    Injunctive Relief Against Ms. Bauer Is Appropriate.

Section 21(d)(1) of the Exchange Act authorizes the SEC to seek injunctive relief where a person is engaged in or is about to engage in acts or practices, which violate the Exchange Act. In considering requests for permanent injunction, courts determine whether there is a reasonable likelihood that the defendants will engage in future violations of the federal securities laws. See e.g., SEC v. Gruenberg, 989 F.2d 977, 978 (8th Cir. 1993). Courts consider the totality of the circumstances in determining whether there is a likelihood of future violations. SEC v. Murphy, 626 F.2d 633, 655 (9th Cir. 1980)(citations omitted). In granting or denying injunctive relief,

courts have considered the following factors: (i) the egregiousness of the violations; (ii) the isolated or repeated nature of the violations; (iii) the degree of scienter; (iv) the sincerity of the defendant's assurances, if any, against future violations; (v) the defendant's recognition of the wrongful nature of his conduct; (vi) the likelihood that the defendant's occupation will present opportunities (or lack thereof) for future violations; and (vi) the defendant's age and health. SEC v. Youmans, 729 F.2d 413, 415 (6th Cir. 1984).

A permanent injunction against Ms. Bauer is appropriate. Ms. Bauer's conduct was egregious. She is an experienced lawyer and compliance official. PFOF ¶30 (Ex. 6 at 30-31). She knew the prohibitions of the law. PFOF ¶¶9-10 (Ex. 6 at 256, 258-59). She acted knowingly and deliberately. Through her actions, she breached the trust placed in her by Heartland Group and the shareholders of the Short Duration Fund. Ms. Bauer has never acknowledged her wrongdoing. Ms. Bauer is in her fifties and, thus, relatively young. As an experienced securities lawyer, if not enjoined, she will have opportunities for future violations.

E.     Disgorgement, Prejudgment Interest, and Civil Penalty.

Disgorgement of illegally obtained profits is a well-established and appropriate remedy to be utilized in insider trading cases. See e.g., SEC v. Tome, 833 F.2d 1086, 1096 (2d Cir. 1987). The purpose of disgorgement is to ensure that the wrongdoers will not profit from their wrongdoing. Id. Ms. Bauer should disgorge the loss she avoided by her sale of Short Duration Fund shares. SEC v. Clark, 915 F.2d 439, 454 (9th Cir. 1990). Plaintiff respectfully requests that this Court order Ms. Bauer to pay disgorgement in the amount of $20,000 and prejudgment interest thereon.

Under the Insider Trading and Securities Fraud Enforcement Act as promulgated under Section 21A of the Exchange Act, a civil penalty can be imposed against persons who either

purchase or sell securities while in possession of material, nonpublic information or improperly provide others such information. The penalty may be as high as three times the amount of the profit gained or the loss avoided as a result of the unlawful conduct. The SEC respectfully requests that this Court impose the maximum amount of civil penalty against Ms. Bauer, i.e., a civil penalty equal to three times the loss avoided in the unlawful sale of Short Duration Fund shares. As indicated above, Ms. Bauer's conduct was egregious in that she intentionally breached the duty of confidentiality that she owed to Heartland Group and its shareholders. She betrayed their trust and used material information that had not been made public to them for her own selfish, financial motives. Rather than acknowledging her responsibility in the face of overwhelming evidence, Ms. Bauer has chosen to offer self-serving explanations as to when and why she redeemed all her Short Duration Funds shares. Lipson, 278 F.3d at 664 (defendant's insistence of innocence in the face of "overwhelming evidence" of illegal insider trading justified imposition of the maximum civil penalty).

IV.     CONCLUSION

In light of the above, Plaintiff respectfully requests that this Court enter an order of summary judgment against Ms. Bauer on the insider trading charges.

Respectfully submitted,

s/ John E. Birkenheier
John E. Birkenheier
Gregory P. von Schaumburg
Paul N. Mensheha
Attorneys for Plaintiff
Securities and Exchange Commission
175 W. Jackson Blvd. Suite 900
Chicago, IL 60604
P: (312) 353-7390
F: (312) 353-7398

Dated: June 20, 2008