## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

SECURITIES AND EXCHANGE
COMMISSION,

              Plaintiff,

              Case No. 03-C-1427

      v.

              Honorable Judge

JILAINE H. BAUER,             Charles N. Clevert

              Defendant.

---

## SECURITIES AND EXCHANGE COMMISSION'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST JILAINE H. BAUER ON <u>DISCLOSURE ISSUES</u>

# TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    STATEMENT OF UNDISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
       A.    The Standard for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
       B.    Anti-Fraud Provisions of the Federal Securities Laws . . . . . . . . . . . . . . . . . . 5
       C.    Ms. Bauer's Role in Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
       D.    Omissions and Misrepresentations to Shareholders . . . . . . . . . . . . . . . . . . . . 10
             1.    False Statement Regarding Intensive Credit Research . . . . . . . . . . 10
             2.    Omissions and Misrepresentations Regarding Liquidity and
                   Redemption Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
                   a.    False Disclosure Regarding Defaults in the Semi-Annual Report
                         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
                   b.    Misleading Talking Points Concerning the Fund's Liquidity
                         Crisis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
             3.    Failure to Disclose the SWIB Transaction . . . . . . . . . . . . . . . . . . . . . 19
       E.    October 13, 2000 - The Funds Crash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
       F.    Guilty Knowledge/Cover Up . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
       G.    Aiding and Abetting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

IV.    INJUNCTIVE RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

V.     CIVIL PENALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

VI.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES

## Federal Cases

Aaron v. SEC, 446 U.S. 680 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Basic Inc. v. Levinson, 485 U.S. 224 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 13

Caterpillar, Inc. v. Great Am. Ins. Co., 62 F.3d 955 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 5

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Franke v. Midwestern Oklahoma Dev. Auth., CCH Fed. Sec. L. Rep. ¶95,786 (WD Okl. 1976)  7

Graham v. SEC, 222 F.3d 994 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Herman & MacLean v. Huddleston, 459 U.S. 375 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Makor Issues and Rights Ltd. v. Tellabs. Inc., 437 F.3d 588 (7th Cir. 2006) . . . . . . . . . . . . . . . 7

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . 5

Michaels v. Michaels, 767 F.2d 1185 (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Michalic v. Cleveland Tankers, Inc., 364 U.S. 325 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Monetta Financial Services, Inc. v. SEC, 390 F.3d 952 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . 26

Pacific Dunlop Holdings v. Allen & Co., 993 F.2d 578 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . 10

SEC v. Bolla, 550 F.Supp.2d 54 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

SEC v. Capital Gains Research Bureau, Inc. 375 U.S. 180 (1963) . . . . . . . . . . . . . . . . . . . . . 6, 8

SEC v. Fife, 311 F.3d 1 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SEC v. Gruenberg, 989 F.2d 977 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

SEC v. Holschuh, 694 F.2d 130 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SEC v. Hughes Capital Corp., 124 F.3d 449 (3rd Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SEC v. Jakubowski, 150 F.3d 675 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SEC v. Koenig, 2007 U.S. Dist. LEXIS 26088 at *24 (N.D. Ill. April 5, 2007) . . . . . . . . . . . . 26

SEC v. Lyttle, 538 F.3d 601 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SEC v. Murphy, 626 F.2d 633 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

SEC v. Phan, 500 F.3d 895 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SEC v. Steadman, 967 F.2d 636 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 25

SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2nd Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . 6

SEC v. Youmans, 729 F.2d 413 (6th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Sunstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033 (7th Cir. 1977) . . . . . . . . . . . . . . . . . 7

United States v. One Parcel of Land, 965 F.2d 311 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . 27

United States v. Ryan, 213 F.3d 347 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**State Cases**

Mercy Medical Center, Inc. v. United Healthcare of the Mid-Atlantic, Inc., 149 Md. App. 336, 815 A.2d 886 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Tele-Port, Inc. v. Ameritech Mobile Communications, Inc., 248 Wis.2d 846, 637 N.W.2d 782 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**Administrative Cases**

Fundamental Portfolio Advisors, Inc., 56 S.E.C. 651 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Federal Statutes**

Section 10(b) of the Securities Exchange Act of 1934 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

Section 17(a) of the Securities Act of 1933 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Section 17(a)(1) of the Securities Act of 1933 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Section 17(a)(2) of the Securities Act of 1933 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Section 17(a)(3) of the Securities Act of 1933 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Section 20(b) of the Securities Act of 1933 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Section 20(d) of the Securities Act of 1933 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Section 206(1) of the Investment Advisers Act of 1940 . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

Section 206(2) of the Investment Advisers Act of 1940 . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

Section 209(d) of the Advisers Act of 1940 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Section 209(e) of the Advisers Act of 1940 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Section 21(d) of the Securities Exchange Act of 1934 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Section 21(d)(1) of the Securities Exchange Act of 1934 . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Section 31(a) of the Investment Company Act of 1940 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Section 34(b) of the Investment Company Act of 1940 . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

Section 42(d) of the Investment Company Act of 1940 . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Section 42(e) of the Investment Company Act of 1940 . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Federal Rules**

Federal Rules of Civil Procedure 56©) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4

Rule 10b-5 of the Securities Exchange Act of 1934, 17 C.F.R. § 240.10b-5 . . . . . . . . . . . . 5, 7

Rule 31a-2(a)(3) of the Investment Company Act of 1940, 17 C.F.R. § 270.31a-2(a)(3) . . . . . . 6

## I.       INTRODUCTION

In September 2000, the Heartland Short Duration Fund and High-Yield Bond Fund were

in the midst of a crisis.  PFOF ¶ 149 (Ex. 48).  Factors contributing to that crisis had been

existent and growing in severity for months.  Those factors included increasing illiquidity in the

Funds due to defaulted and non-performing bonds, increasing net redemptions by shareholders,

and the inability of the Funds' portfolio managers to raise capital by selling securities from the

Funds' portfolios.  These factors led an official of the Funds' investment adviser, Heartland

Advisors, to warn in September 2000 of a possible "meltdown" of the Funds.  PFOF ¶ 123 (Ex.

35).  The official further warned that Heartland Advisors needed to look at pricing which would

probably be "the beginning of the avalanche." (Id.)  The gravity of the crisis led the Heartland

Group's Board to consider the desperate step of suspending further redemptions by shareholders

of the Funds.  PFOF¶ 158 (Ex. 52).  Disastrously for the Funds' shareholders, the crisis finally

led Heartland Advisors to make a massive one-day pricing adjustment, which resulted in a

dramatic drop in the NAV of the High-Yield Fund from $8.01 to $2.45, PFOF¶ 184 (Ex. 66 at

HAI 66393), and in the NAV of the Short Duration Fund from $8.70 to 4.87.  PFOF¶ 185 (Ex. 66

at HAI 66393).[1]  The Funds' crisis and its causes were known to senior officials inside Heartland

Advisors.  The crisis and its causes, however, were not disclosed to the public shareholders of the

Funds until after October 13, 2000–by which time it was too late for shareholders to act on the

---

[1] As used in this brief, the abbreviated names "Short Duration Fund," "High-Yield Fund,"  "the Funds,"  "Heartland Group," "Heartland Advisors," "NAV," "June 9, 2000 prospectus," and "SWIB" have the same meanings as defined in the Commission's accompanying Proposed Findings of Fact in Support of the instant motion.  The Commission's Proposed Findings of Fact are cited in this brief as "PFOF ¶_____."

basis of those facts.

Defendant Jilaine H. Bauer was one of the insiders who knew the truth. Ms. Bauer was a Vice-President of Heartland Group. PFOF¶ 30 (Ex. 7 at 62:11-13; Ex. 3 at Request 18). She was also the General Counsel and Chief Compliance Officer of Heartland Advisors. PFOF¶ 26 (Ex. 7 at 11:1-4, 30:23-31:7). She attended Board meetings for Heartland Group. PFOF¶ 90 (Ex. 26); PFOF ¶ 102 (Ex. 27); PFOF ¶ 130 (Ex. 38); PFOF ¶ 157 (Ex. 52). She was the chair and a voting member of Heartland Advisors' Pricing Committee, PFOF ¶ 33, (Ex. 7 at 31:25-32:5, 143:24-144:7, 229:11-16; Ex. 3, Request 20), and she was a member of Heartland Advisors' Credit Committee. PFOF¶ 31 (Ex. 3 at Request 19). She also had regular contact with the Funds' portfolio managers, analysts and accounting department. (Id.) and PFOF¶ 40, (Ex. 5 at 6:3-11); PFOF ¶ 41, (Ex. 5 at 6:1-3). Ms. Bauer had worked in the mutual fund field for her entire career as an attorney. PFOF¶ 24, (Ex. 4 at 43:23-44:4).

Within Heartland Advisors, Ms. Bauer was the individual primarily responsible for disclosures to and communications with shareholders of the Funds. As in-house counsel and Compliance Officer, Ms. Bauer was responsible for causing and overseeing the preparation of the Funds' prospectuses and supplements thereto, Statements of Additional Information ("SAI"), PFOF¶ 39, (Ex. 5 at 4:14-22, 26:10-21); PFOF ¶ 43, (Ex. 1, Ex. 2, Ex. 3); PFOF ¶ 46 (Ex. 1, Ex. 2, Ex. 3), annual, semiannual, and quarterly reports, shareholder letters and other marketing materials. PFOF¶ 48, (Ex. 5 at 191:13-20); PFOF ¶ 49, (Ex. 5 at 191:21-23; Ex. 3, Request 42). Ms. Bauer would work with portfolio managers, fund accountants, the Board and management to obtain changes and worked with Heartland Group's outside counsel to update prospectus

2

disclosure on an annual basis and see that it was filed with the SEC and disseminated to shareholders. PFOF¶¶ 39, 40, 41, 42, 45 (Ex. 5 at 4:14-22, 6:1-15, 26:10-21, 29:14-19). Ms. Bauer was responsible for making sure that advertising and other printed materials were reviewed and approved and filed with the appropriate agency before being disseminated to investors. PFOF¶ 48, 49 (Ex. 5 at 191:13-23; Ex. 3 at Request 42). She was also responsible for overseeing the creation of "talking points" to be used by Heartland Advisors' Shareholder Services representatives ("Shareholder Services") for use in answering questions from shareholders of the Funds. PFOF¶ 50, (Ex. 12 at 35:2-7, 40:5-7, 41:4-17).

Through the months preceding October 13, 2000, Ms. Bauer played an integral role in creating and disseminating several communications to the Funds' shareholders, including a prospectus dated May 1, 2000, as supplemented June 9, 2000 ("June 9, 2000 prospectus"), several supplements to that prospectus, a May 1, 2000 SAI as supplemented on June 9, 2000, a Semi-annual Report dated July 1, 2000, several sets of talking points, and an October 10, 2000 letter to shareholders. PFOF¶¶ 39, 40, 41, 42, 45 (Ex. 5 at 4:14-22, 6:1-15, 26:10-21, 29:14-19). (Ex. 19). PFOF¶ 46 (Ex. 2 at ¶ 36). (Ex. 21). PFOF¶¶ 48, 49 (Ex. 5 at 191:13-23). (Exs. 22, 36). PFOF¶ 52 (Exs. 33, 45, 59). As alleged in the Commission's First Amended Complaint ("Complaint") (see generally ¶¶ 35 through 45 and 61 through 65) several material facts were either misrepresented in or misleadingly omitted from these communications to shareholders, including: 1) the false statement that Heartland Advisors managed the risks of investing in the Funds by performing "intensive credit research" (Complaint at ¶¶ 38-39); 2) the misleading omission to disclose the Funds' liquidity crisis (id. at ¶¶ 42, 43); and 3) the misleading omission

to disclose the existence and terms of the Funds' transaction with SWIB (id. at ¶¶ 61-65).

The evidence shows beyond any genuine dispute: 1) the existence and materiality of the foregoing misrepresentations and omissions; 2) that Ms. Bauer knew of each of those misrepresentations and omissions; 3) that Ms. Bauer knew, or recklessly, disregarded, the truth as to each of those misrepresentation and omissions; and 4) that Ms. Bauer was personally involved in the making and dissemination of the misrepresentations and omissions.  In other words, the evidence establishes beyond any genuine dispute that Ms. Bauer engaged in fraud in connection with the foregoing, material misrepresentations and omissions and that the Commission should be awarded judgment against her as a matter of law.

## II.      STATEMENT OF UNDISPUTED FACTS

The Proposed Findings of Fact in Support of the Securities and Exchange Commission's Motion for Summary Judgment against Jilaine H. Bauer on Disclosure Issues is incorporated herein by reference.

## III.     ARGUMENT

### A.       The Standard for Summary Judgment

Summary judgment is appropriate where the parties' submissions demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A moving party bears the initial burden of showing that no genuine issue of fact exists.  Celotex, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

4

A genuine issue of material fact exists only where the potential evidence would permit a reasonable finder of fact to return a verdict for the nonmoving party. <u>Caterpillar, Inc. v. Great Am. Ins. Co.</u>, 62 F.3d 955, 960 (7th Cir. 1995), citing <u>Anderson</u> at 248-249. The court must view the record as a whole and in the light most favorable to the nonmoving party, and resolve all ambiguities and draw all inferences in favor of the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986); <u>Anderson</u>, 477 U.S. at 255. At the summary judgment stage the court's function is not to weigh the evidence or determine the truth of the matter but to determine whether there is a genuine issue for trial. <u>Id.</u> at 249-250.

### B. Anti-Fraud Provisions of the Federal Securities Laws

Section 17(a) of the Securities Act of 1933 ("Securities Act") generally prohibits any person, in the offer or sale of any security, and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder generally prohibit any person, in connection with the purchase or sale of any security, from, directly or indirectly: (1) employing any device, scheme or artifice to defraud; (2) obtaining money or property by means of any untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) engaging in any transaction, practice or course of business that operates or would operate as a fraud or deceit upon any person.

Section 206(1) of the Investment Advisers Act of 1940 ("Advisers Act") prohibits an investment adviser from employing "any device, scheme or artifice to defraud any client or prospective client." Section 206(2) prohibits an investment adviser from engaging "in any

5

transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client." Investment advisers owe a fiduciary duty to their clients to exercise the utmost good faith, and to provide such clients with full and fair disclosure of all material facts. See SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 194 (1963).

Section 34(b) of the Investment Company Act of 1940 ("Investment Company Act") prohibits any person from making any untrue statement of a material fact in any registration statement, application, report, account, record, or other document filed with or transmitted to the Commission or which is required to be kept under Section 31(a) of the Investment Company Act.[2] Section 34(b) also prohibits any person filing, transmitting or keeping those documents from omitting to state any fact necessary in order to prevent the statements made in those documents from being misleading.

A misstatement or omission is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision and there is a substantial likelihood that its disclosure would have been viewed by the investor as having significantly altered the "total mix" of information made available about the investment. Basic Inc. v. Levinson, 485 U.S. 224, 231-232 (1988). The importance attached to information by those who possess it is a significant factor in determining whether it is material. Michaels v Michaels, 767 F.2d 1185, 1198 (7th Cir. 1985), citing SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 851 (2nd Cir. 1968).

---

[2]Section 31(a) of the Investment Company Act and Rule 31a-2(a)(3) promulgated thereunder requires the keeping of mutual fund sales literature.

6

Scienter is a necessary element of a violation of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, and Section 206(1) of the Advisers Act. Scienter is a "mental state embracing the intent to deceive, manipulate or defraud." See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976). Reckless disregard of the truth establishes the element of intent for this purpose. Sunstrand Corp. v. Sun Chemical Corp. 553 F.2d 1033, 1044-45 (7th Cir. 1977). Scienter is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers [of securities] that is either known to the defendant or is so obvious that the actor must have been aware of it." Sunstrand, 533 F.2d at 1045 (citing Franke v. Midwestern Oklahoma Dev. Auth., CCH Fed. Sec. L. Rep. ¶95,786 (WD Okl. 1976). Under "the popular definition of recklessness" when "the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk." SEC v. Lyttle, 538 F.3d 601, at *4 (7th Cir. 2008) (citing Makor Issues and Rights Ltd. v. Tellabs, Inc., 437 F.3d 588, 600 (7th Cir. 2006)). Deliberate ignorance, as well, can stand in for actual knowledge. SEC v. Jakubowski, 150 F.3d 675, 681-682 (7th Cir. 1998). Proof of scienter may be made by direct or circumstantial evidence. Herman & MacLean v. Huddleston, 459 U.S. 375, 390 n. 30 (1983).

Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act do not require a showing of scienter. Negligence, defined as a failure to exercise reasonable care, is sufficient to establish violations of those provisions. SEC v. Hughes Capital Corp., 124 F.3d 449, 453-54 (3rd Cir. 1997). See also, Aaron v. SEC, 446 U.S. 680, 695-696 (1980); SEC v. Holschuh, 694 F.2d 130, 143 (7th Cir. 1982); SEC v. Fife, 311 F.3d 1, *9 (1st Cir. 2002); SEC v. Phan, 500

7

F.3d 895, 908 (9th Cir. 2007). Likewise, scienter is not required to establish a violation of Section 34(b) of the Investment Company Act, <u>Fundamental Portfolio Advisors, Inc.</u>, 56 S.E.C. 651, 670 (2003), recon., 85 SEC Docket 1754 (May 23, 2005), or of Section 206(2) of the Advisers Act. <u>See</u> <u>SEC v. Steadman</u>, 967 F.2d 636, 643 n.5 (D.C. Cir. 1992) (citing <u>SEC v. Capital Gains Research Bureau, Inc.</u>, 375 U.S. 180, 191-94 (1963)).

### C. Ms. Bauer's Role in Disclosure

Ms. Bauer played an integral, direct and hands-on role in the disclosures made to shareholders of the Funds. It was a role she was uniquely suited for at Heartland Advisors. When Ms. Bauer joined Heartland Advisors and Heartland Group in January 1998, she had already worked almost 20 years in the mutual fund industry. PFOF¶ 24, (Ex. 4 at 43:23-44:4). After finishing law school, Ms. Bauer joined the mutual fund complex Stein Roe & Farnham. (Id.) At the time she left Stein Roe Farnham, Ms. Bauer was its General Counsel and compliance officer. (Id.) During her tenure at Heartland Advisors she held a Series 7 registration (general securities) and a Series 24 registration (securities principal) PFOF¶ 27, (Ex. 4 at 43:2-14). Ms. Bauer decided to join Heartland Advisors because, among other reasons, she believed she could "add value with the experience I had gained at a larger, more mature organization . . ." PFOF¶ 28, (Ex. 4 at 48:25-49:3). What Ms. Bauer found most appealing in particular about Heartland Advisors "was the opportunity to participate as part of the management team." (Id.)

Ms. Bauer joined Heartland Advisors as its General Counsel and Chief Compliance Officer. PFOF¶ 26, (Ex.7 at 11:1-4, 30:23-31:7). She also served as Heartland Advisors' Secretary. PFOF¶ 29, (Ex. 3 at Request 14, 17). Ms. Bauer was one of the six members of

8

Heartland Advisors' Management Committee. PFOF¶ 35, (Ex. 4 at 49:21-24).  She later served

as one of seven members of the firm's Operations Committee. PFOF¶ 38, (Ex. 4 at 56-19-

57:12).[3]  In addition to these roles, Ms. Bauer was the Chairman of Heartland Advisors' Pricing

Committee.  PFOF¶ 33, (Ex. 7 at 31:25-32:5).  The Pricing Committee had the task, delegated by

the Funds' Board, of overseeing the valuation of portfolio securities held by the Funds.  PFOF¶

34, (Ex. 24).  Additionally, beginning in July 2000, Ms. Bauer was a member of Heartland

Advisors' Credit Committee. PFOF¶ 31, (Ex. 3 at Request 19).  The Credit Committee was

responsible for, among other things, oversight of the creditworthiness of the bonds held by the

Funds, by establishing policies and guidelines and by reviewing on a regular basis work

performed by credit analysts. PFOF¶ 32, (Ex. 3 at Request 34).

Ms. Bauer played an integral role in drafting, reviewing, editing , updating, filing with the

appropriate regulatory agency, and disseminating various disclosures concerning the Funds.

PFOF¶ 39, (Ex. 5 at 4:14-22, 26:10-21); PFOF ¶ 43 (Exs. 1 at ¶36, 2 at ¶36, 3 at Request 40);

PFOF ¶ 45, (Ex. 5 at 6:14-15).  These filings and promotional materials included the Funds' June

9, 2000 prospectus and several supplements thereto; the Funds' May 1, 2000 SAI as

supplemented on June 9, 2000; the July 1, 2000 semi-annual report; and correspondence to the

Funds' shareholders dated October 10, 2000. PFOF¶ 39, (Ex. 5 at 4:14-22, 26:10-21); PFOF ¶

43, (Exs. 1 at ¶36, 2 at ¶36, 3 at Request 40); PFOF ¶ 46 (Ex. 1 at ¶36, 2 at ¶36, 3 at Request 41);

PFOF¶ 172, (Ex. 58); PFOF ¶ 173, (Ex. 64).   Ms. Bauer was also responsible for overseeing the

---

[3]The Management Committee ceased to exist January 2000, PFOF ¶ 36, (Ex. 4 at 49:21-24).  The Operations Committee was formed to focus on operational and personnel aspects of the business. PFOF¶ 37, (Ex. 4 at 53:18-21); PFOF ¶ 38, (Ex. 4 at 56:19-57:12).

creation of so-called "talking points," which were question-and-answer scripts for Shareholder

Services to use in answering shareholders who called Heartland Advisors by telephone. PFOF¶

50 (Ex. 12 at 35:2-7; 40:5-7). Talking points would typically be drafted by Shareholder Services

supervisors and then reviewed, edited, and approved by Ms. Bauer before their use. PFOF ¶ 50,

(Ex. 12 at 41:4-17); PFOF¶ 51, (Ex. 6 at 378:22-379:15). See also, generally, PFOF ¶ 52, (Exs.

32, 45, 59); PFOF ¶ 55, (Exs. 32, 49, 57, 60). In preparing communications with the

shareholders of the Funds, Ms. Bauer, interacted with the Funds' portfolio mangers, PFOF ¶ 40,

(Ex. 5 at 6:3-11); Heartland Advisors' Marketing Department, PFOF ¶ 54, (Ex. 40, 46); Fund

accountants, PFOF ¶ 41, (Ex. 5 at 6:1-3); and others. PFOF ¶ 53, (Ex. 31).

### D. Omissions and Misrepresentations to Shareholders

#### 1. False Statement Regarding Intensive Credit Research

Ms. Bauer, along with outside counsel, participated in drafting the prospectuses of

Heartland Group, including the Funds. PFOF¶ 39, (Ex. 5 at 4:14-22, 26:10-21). She was

responsible for "maintaining the prospectus disclosure and updating it on an annual basis and

monitoring the disclosure throughout the year and supplementing it as we deemed appropriate . .

." (Id.). A prospectus is a communication offering a security for sale which gives potential

buyers the means of understanding the intricacies of the transaction. See, Pacific Dunlop

Holdings v. Allen & Co., 993 F.2d 578, 589-590 (7th Cir. 1993).

Heartland Group issued a June 9, 2000 prospectus.[4] (Ex. 19). That prospectus was filed

---

[4] The "June 9, 2000 prospectus" discussed in this brief was Heartland Group's prospectus dated
May 1, 2000 as supplemented June 9, 2000. PFOF ¶ 13 (Ex. 19). Subsequent supplements were made to

10

with the SEC, sent to shareholders, and posted on the Heartland Funds website. PFOF ¶ 45, (Ex. 5 at 6:14-15; Ex. 16 at 13:7-14:5; and e.g. Ex. 67). A portion of the June 9, 2000 prospectus entitled "Principal Investment Strategies" stated that the Funds, which invested in medium and lower-quality obligations involving higher yields but greater risk than investment grade securities, i.e., so-called junk bonds, sought to manage that risk through "intensive credit research." PFOF¶ 56, (Ex. 19 at IM 00296 and IM 00298). This representation was repeated in the June 9, 2000 prospectus as supplemented on August 11, 2000, September 28, 2000 and October 16, 2000. PFOF ¶ 101 (Ex. 28); PFOF ¶ 187, (Ex. 67 at pp 12-13 and 15). The statement was false.

Heartland Advisors employed two fixed-income research analysts to analyze the municipal bonds held by the Short Duration Fund, the High-Yield Fund, and one other bond fund. PFOF ¶ 57, (Ex. 13 at 11:18-12:7; 15:3-9.) One of the analysts, Scott Drier, followed 50-75 bonds. PFOF ¶ 58, (Id. at 14:1-9.) Mr. Drier left Heartland in May 2000. PFOF ¶ 59, (Id. at 9:4-8.) Mr. Dreier was never replaced. PFOF ¶ 60, (Ex. 5 at 167:22-168:3.) Derek Pawlak, the other fixed-income research analyst, testified that after Mr. Drier quit, Heartland Advisors did not employ enough credit analysts to adequately analyze the bonds held by the Short Duration and High-Yield Funds. PFOF ¶ 61, (Ex. 14 at 330:21-24.)

Three months later, on September 7, 2000, Mr. Nasgovitz complained in an e-mail that the portfolio managers were doing "catch up research" on the Funds and asked to know which bonds in the three high yield funds were not up to date. PFOF ¶ 66, (Ex. 34). Shortly after Mr.

_____

the June 9, 2000 prospectus. PFOF ¶ 101 (Ex. 28); PFOF ¶ 187 (Ex. 67).

11

Fiskow became the new co-portfolio manager for the Funds on September 28, 2000, he became concerned while "reviewing some of the credit files [of the Funds] and seeing virtually nothing in the credit files." PFOF ¶ 69, (Ex. 8 at 84:19-22). He felt "that they were incomplete" and "lacking certain material" which he felt "was basic to a credit file." PFOF ¶ 70, (Ex. 8 at 83:14-84:2). Mr. Fiskow felt the credit files were missing basic information such as current financials, credit write-ups in terms of why the bond was bought in the first place, trust indentures and follow-up reports demonstrating constant and continuing monitoring of the credits. PFOF ¶ 71, (Ex. 8 at 84:3-13).

Ms. Bauer knew, or recklessly disregarded warnings, that the promise to manage risk through intensive credit research was false. She knew that one of only two fixed-income analysts had quit and never been replaced. PFOF ¶ 50 (Ex. 5 at 167:22-168:3). She attended an August 2000 meeting at which she heard complaints that Mr. Pawlak needed help and was overworked. PFOF ¶¶ 62-64, (Ex. 5 at 161:4-163:6). She received Mr. Nasgovitz's September 7, 2000 e-mail expressing concern about the "catch up research" being performed by the fixed-income analysts. PFOF ¶ 66, (Ex. 34). Two weeks later, she heard from Mr. Pawlak that sufficient resources were not available and that he believed Heartland's competition had greater ability to monitor credits. PFOF ¶ 67, (Ex. 44).

Nevertheless, Ms. Bauer did nothing in August 2000 or September 2000 to correct that false statement in either the June 9, 2000 prospectus or in the August 11, or September 28, 2000 supplements. PFOF ¶ 56, (Ex. 19 at IM 00296, IM 00298); PFOF ¶ 101, (Ex. 28). Instead of taking corrective action, Ms. Bauer allowed those documents–and the false statement about

12

"intensive credit research"–to continue to be disseminated to shareholders and prospective

shareholders of the Funds, even after the massive devaluation in October. PFOF ¶ 187, (Ex. 67

at pp 12-13 and 15).

Indeed, on September 7, 2000–the day Nasgovitz sent her, and others, his e-mail

complaining that Heartland's analysts were performing "catch up research"–Ms. Bauer reviewed

and approved a set of talking points for Shareholder Services to use in answering questions from

shareholders. PFOF ¶ 65, (Ex.32). Those talking points repeated the false statement that

Heartland managed risk through "intensive credit research." (Id.) Ms. Bauer continued to review

and approve talking points which touted Heartland's proprietary credit research process into early

October, even though Mr. Pawlak continued to warn that he did not have the resources available

to monitor the Funds' bonds. PFOF¶ 68, (Ex. 60); PFOF ¶ 67, (Ex. 44 at p 2).

The Funds' promise to manage the risk by performing intensive credit research was

material. It directly addressed the core question of how much risk an investor assumed by

purchasing shares of the Funds. PFOF ¶ 72, (Ex. 68; Ex. 16 at 35:4-10); PFOF ¶ 73, (Ex. 15 at

65:14-66:1). Clearly, the fact that Heartland Advisors was not really performing the promised

research was information which a reasonable investor would have deemed important in making a

decision whether to invest in, or to sell out of, the Funds. See Basic, 485 U.S. at 231-232. And,

just as clearly, disclosure of the truth would have significantly altered to "total mix" of

information available about an investment in the Funds. Id. Not surprisingly, shareholders

testified that the fact that [Heartland Advisors] sought to manage risk in the Funds through

"intensive credit research" was important to them PFOF ¶ 72, (Ex. 68; Ex. 16 at 35:4-10); PFOF

¶ 73, (Ex. 15 at 65:14-66:1).

## 2. Omissions and Misrepresentations Regarding Liquidity and Redemption Issues

### a. False Disclosure Regarding Defaults in the Semi-Annual Report

On August 30, 2000, Heartland mailed to the Funds' shareholders a semi-annual report for the Funds dated July 1, 2000. PFOF¶¶ 74-75, (Ex. 22). The July 1, 2000 semi-annual report included a Schedule of Investments ("Schedule") listing the securities held by the Funds as of June 30, 2000. PFOF ¶ 77, (Ex. 22 at HAI 045140-145). For the High-Yield Fund, the Schedule listed six defaulted securities, which constituted 11% of the securities held by the High-Yield Fund and 8.4% of that Fund's total net assets. PFOF¶¶ 81-82, (Ex. 22 at HAI 045133, HAI 045143-145).

However, as Ms. Bauer was fully aware, the semi-annual report materially understated the defaulted securities held by the High-Yield Fund. On August 24, 2000–three days before the semi-annual report was mailed to shareholders–Ms. Bauer sent a letter to the Chicago Office of the Securities and Exchange Commission, in response to a request for information about defaulted securities. PFOF¶ 83, (Ex. 30). Ms. Bauer's letter included a list of defaulted securities held in the Funds' portfolios during the period August 1, 1999 through July 31, 2000. PFOF ¶ 84, (Ex. 30 at CGG 002522-23). Ms. Bauer's list of defaulted securities was materially larger than the list contained in the semi-annual report. For the High-Yield Fund, Ms. Bauer's list included five more defaulted securities than did the semi-annual report. PFOF ¶ 85, (Ex. 30); PFOF ¶¶ 86-87, (Ex. 22 at HAI 045143-145). Those securities had been issued in connection

14

with several failing healthcare facilities (the "Heritage bonds") and were all in payment default. PFOF ¶ 94, (Ex. 20).  Including the five Heritage bonds nearly doubled the number of defaulted securities held by the High-Yield Fund from the six disclosed in the Schedule to eleven, or 20.3% of the securities held by the High-Yield Fund, PFOF ¶ 88, (Ex. 22).  The five additional defaulted securities likewise increased the value of the defaulted securities held by the High-Yield Fund to over 12% of the total net asset value of the Fund.  PFOF¶ 89, (Ex. 22).  Ms. Bauer had known of the defaulted Heritage bonds for months.  Earlier in 2000, Ms. Bauer had circulated at the April 27, 2000 Board of Director's meeting a report on the Funds' illiquid securities for the quarter ended March 31, 2000.   PFOF ¶ 92, (Ex. 26 at HAI 000693; Ex. 25).  The March 31, 2000 report circulated by Ms. Bauer reflected the five defaulted Heritage bonds that were not disclosed in the semi-annual report.  PFOF ¶93, (Ex. 26 at HAI 000693).   In addition, Ms. Bauer received a memo in the package for the Credit Committee Meeting to be held April 19, 2000.  PFOF ¶ 96 (Ex. 20; Ex. 5 at 148:1-4).  In the April 6, 2000 memo, Mr. Dreier noted that Heritage anticipated filing bankruptcy on all their projects with the exception of one hospital facility in California.  He also noted that Heartland's Fund Accounting had been notified to stop accruing interest on all of the Heritage bonds except those relating to the hospital and to back out all previously accrued interest dating back to the prior coupon payment.  PFOF ¶ 94 (Ex. 20 at HAI 044722-23).

Ms. Bauer did not act to correct the false and misleading semi-annual report, despite having several opportunities to do so.  In August and September Heartland issued two supplements to the Funds' prospectus.  PFOF¶ 101 (Ex. 28).  Ms. Bauer could have acted to

15

disclose all the defaulted securities held by the High-Yield Fund in those supplements, but she did not.

On September 6, 2000, Ms. Bauer reviewed and approved a set of talking points for use by Shareholder Services. PFOF¶ 65, (Ex. 33). An answer contained in the September 6 talking points specifically mentioned a defaulted Texas bond but did not disclose the additional defaulted securities held by the High Yield Fund. (Id.) On September 21, 2000, Ms. Bauer reviewed and approved another set of talking points. PFOF¶ 97, (Ex. 45). The September 21 talking points contained an answer for investors who called Shareholder Services and expressed concern about the High Yield Fund: "As our 6/30 semi annual report indicated, the High Yield Fund contains a number of bonds in payment default." PFOF ¶ 98, (Ex. 45). Ms. Bauer approved this statement for use in response to shareholder inquiries, even though she knew that the Semi-Annual Report materially understated the number and value of defaulted securities held by the High-Yield Fund. A few days later, on September 27, 2000, Ms. Bauer reviewed and approved another set of talking points. PFOF¶ 99, (Ex. 49). Once again shareholders were to be referred to the "6/30 semi annual report" to find the defaulted bonds, notwithstanding that the real number of defaulted securities held by the High-Yield Fund was nearly double the amount disclosed in the Semi-Annual report. (Id.) PFOF ¶ 100, (Ex. 49).

Ms. Bauer's own words establish the materiality of the truth regarding the defaulted securities held by the High-Yield Fund. In a September 13, 2000 e-mail message, she advised several Heartland officials about legally required disclosures concerning the Funds. PFOF ¶ 136 (Ex. 40). Ms. Bauer's e-mail reads, in pertinent part:

16

NASD rules require all communications to be fair and balanced and to meet an antifraud standard that requires all material facts to be disclosed and no material facts to be omitted.

(Id.)  Having established this starting point, Ms. Bauer then set out disclosures she considered necessary with respect to the High-Yield and Short Duration Funds:

> DISCLOSURE B (to be added . . . if either dflts [sic] or loans are at 10% or more of net assets) . . . If 10% or more of net assets are in defaulted securities, then add: "As of (date) approximately __% of the Fund's assets were invested in securities in payment default."

(Id.)  By June 30, 2000, the defaulted securities held by the High-Yield Fund totaled over 12% of that Fund's assets. PFOF ¶ 89, (Ex. 22).  Nevertheless, Ms. Bauer did not follow her own directions.  Instead, she did not act to disclose the full extent of the defaulted bonds held by the High Yield Fund in the July 1, 2000 semi-annual report and the supplements to the Funds' prospectus, and she approved several sets of talking points which referred shareholders to the false and misleading semi-annual report.

### b.  Misleading Talking Points Concerning the Fund's Liquidity Crisis

Throughout 2000, the Funds had been experiencing an increasingly severe liquidity crisis, and, as a result, the portfolio managers were unable to purchase new securities. PFOF ¶ 167 (Ex. 56) at HAI 000374.  A material percentage of the High Yield Fund portfolio consisted of defaulted or watch list securities.  PFOF ¶ 105 (Ex. 27).  Throughout September 2000, Heartland was unable to sell bonds out of the Funds in sufficient number to raise needed cash.  PFOF ¶¶ 138, 139 (Ex. 43).

There is no dispute whether Ms. Bauer was aware of the liquidity crisis.  She received

17

several e-mails reporting Heartland's unsuccessful efforts to sell bonds held by the Funds. PFOF ¶ 129 (Ex. 37); PFOF ¶ 137 (Ex. 41); PFOF ¶ 138 (Ex. 43). Mr. Clark's September 18, 2000 e-mail noted that the "prospects for liquidity are not that good." PFOF ¶ 137 (Ex. 41). Ms. Bauer reported on her unsuccessful effort to find a buyer for the Funds in a September 25, 2000 e-mail. PFOF ¶ 145 (Ex. 47). On September 8, 2000, Mr. Clark, one of Heartland's officers, shared with Mr. Nasgovitz and Ms. Bauer his concerns about the liquidity of the High Yield Fund. In particular, Mr. Clark warned, "we are potentially days away from a literal melt down in these funds, a couple of weeks at the most." PFOF ¶ 123 (Ex. 35). Mr. Clark concluded that they needed to look at pricing which would "probably be the beginning of the avalanche" and that if the Fund did melt down that Heartland could be damaged and they could get a run on all of their funds. Id. Ms. Bauer was aware of Mr. Clark's concerns and discussed them with him. PFOF ¶124 (Ex. 6 at 337:18-339:12).

On September 26, 2000, with Heartland's planned announcement of Mr. Conlin's resignation and plan to significantly reprice downward the NAVs of the Funds, PFOF ¶ 149 (Ex. 48 at ¶3 and Ex. A, p.1) only a few days away, Heartland sought assistance to deal with its "crisis situation" by contacting a public relations firm. PFOF ¶ 146 (Ex. 48). Ms. Bauer participated in a meeting with representatives of the firm the evening of September 27, 2000. PFOF ¶150 (Ex. 48 at Ex. A, pp 1-2). At this meeting, it was made clear that Heartland was more concerned with the repricing message and related issues than Mr. Conlin's resignation. Id. Ms. Bauer provided significant input in drafting talking points and "was very particular about how and what was said about repricing." PFOF ¶ 151 (Ex. 48 at Ex. A, p.2).

18

On that very same day, Ms. Bauer approved talking points that, in response to the proposed question: "What are you doing to fix the portfolio?" included the statement:

> *All of our portfolios are actively managed meaning they are not static.  While we aren't at liberty to discuss specific portfolio management strategies, mitigating the price volatility and working to improve the Funds' investment returns are our most pressing priority.  We believe things will improve as the intrinsic value of the Funds' portfolios aligns more closely with the market value*

PFOF ¶ 153 (Ex. 49). (emphasis in original)

In her e-mail approving the September 27, 2000 talking points, Ms. Bauer all but confessed that she was concealing material information and misleading shareholders, when she wrote: **([Bauer] COMMENT: Not sure I like this but you can think about it – its [sic] difficult to take proactive steps to restructure portfolio if all cash raised is used to pay out redemptions but we cant [sic] say that).** (Id.)(emphasis in original).  Ms. Bauer approved this statement despite her knowledge that it was false and misleading.

### 3.    Failure to Disclose the SWIB Transaction

While it attempted to sell bonds from the Funds' portfolios, Heartland also searched for non-traditional sources of liquidity for the Funds.  PFOF ¶ 110 (Ex. 10 at 140:24-141:25).  That search led to negotiations of a possible transaction with SWIB.  PFOF ¶¶ 111-112 (Ex. 10 at 140:24-141:25).  Ms. Bauer first learned that Heartland was exploring a transaction with SWIB in late August or early September.  PFOF ¶ 113 (Ex. 7 at 187:22-188:2).  Under the agreement Heartland ultimately reached with SWIB, the latter bought twelve defaulted bonds from the Funds, and seventeen defaulted bonds from another bond fund and private accounts for

19

approximately $8,347,085. PFOF ¶ 165 (Ex. 54 at SWIB 000032). SWIB, however, demanded the contractual right to put the bonds back to Heartland's parent company, Heartland Holdings, Inc., at a guaranteed return of 20%. PFOF ¶ 118, (Ex. 10 at 151:13-21); PFOF ¶ 133 (Ex. 38). SWIB also insisted that Mr. Nasgovitz personally guarantee this return to SWIB. PFOF ¶ 118, (Ex. 10 at 151:11-13). The put and the guaranteed return were the "essence of the transaction." PFOF ¶ 119 (Ex. 39 at SWIB 000005). Mr. Beste discussed the proposed terms of the SWIB transaction with Ms. Bauer, among others. PFOF ¶ 116 (Ex. 10 at 142:15-143:20; Ex. 38 at HAI000762-763).

On the morning of September 28, 2000, Mr. Nasgovitz informed certain individuals, including Ms. Bauer, that the SWIB sale would be completed. PFOF ¶154 (Ex. 3 at Request 65; Ex. 51). Mr. Nasgovitz cautioned that the SWIB sale entailed lower prices and would result in losses for the Funds. Id. At the close of that day, the prices of the bonds involved in the SWIB transaction were lowered by as much as 50%. PFOF ¶ 162 (Ex. 7 at 200:25-201:2). As a result, the NAV of the Short Duration Funds declined from $9.10 to $8.91, while the NAV of the High Yield Fund declined from $8.75 to $8.03. PFOF ¶ 163, 164 (Ex. 55 at HAI 019593 and HAI 019598). The SWIB transaction was completed the next day at the lower prices. PFOF ¶ 165, (Ex. 54 at SWIB 000032).

On October 4, 2000, Ms. Bauer sent an e-mail to several Heartland officials regarding a draft Q&A for use in responding to shareholder questions about the September 28 devaluation. PFOF ¶ 169 (Ex. 57). Ms. Bauer stated in her e-mail that the Funds' shareholders needed to be sent a special report containing a schedule of investments, the default percentage, and a more

20

detailed explanation of the price change on September 28. PFOF ¶ 170 (Ex. 57). Ms. Bauer further stated that all shareholders would be interested because this information "is non-public, could be material and can be shared but not selectively." Id. Under the draft Q&A addressed in Ms. Bauer's e-mail, shareholders calling with questions in the wake of the September 28, 2000 devaluation were to be asked to wait for the forthcoming special report. PFOF ¶ 171, (Ex. 57 at HAI 031277 and HAI 031279).

On October 10, 2000, the special report, consisting of a letter and summary of portfolio holdings was sent to shareholders. PFOF ¶ 173 (Ex. 64). A few days earlier, Ms. Bauer had made proposed changes to the letter for the special report. She noted some changes were made in light of the additional scrutiny the letter could be given. PFOF ¶ 172, (Ex. 58). The special report ostensibly explained the reasons for the September 28, 2000 devaluation. PFOF ¶ 176, (Ex.64 at HAI 018958). The October 10, 2000 special report letter states, in part, that "[t]he recent decline in share price on September 28 [2000] was primarily due to the pricing service's decision to make a sizeable adjustment to the valuations of a number of securities in the Fund's portfolio–many of which were in healthcare-related sectors where the Fund has been heavily weighted." (Id.).

The special report was materially false and misleading. It did not disclose the SWIB transaction. PFOF ¶ 175-178, (Ex. 64). Nor did it identify the securities that had been sold to SWIB or disclose that those securities were in default and had been sold at reduced prices. (Id.) The special report did not disclose that SWIB had entered into the transaction only after it had secured the right to put the defaulted securities to Heartland's holding company at a guaranteed

21

profit. (Id.)  And, the special report did not disclose either the Funds' liquidity crisis or that the SWIB transaction was, at best, a temporary solution to that crisis.  (Id.)

Ms. Bauer reviewed and made changes to the special report and therefore knew of its contents.  PFOF ¶ 172 (Ex. 58).  Ms. Bauer also knew, or recklessly disregarded, that the special report was materially false and misleading.  She knew of the SWIB transaction. PFOF ¶ 113 (Ex. 7 at 187:6-188:2); PFOF ¶ 116 (Ex. 38).  She knew of the bonds that had been conveyed in that transaction, and that those bonds were in default and had been conveyed at reduced prices.  PFOF ¶ 161-162 (Ex. 7 at 200:3-201:2).  She knew that the transaction was only acceptable to SWIB because Heartland had guaranteed a 20% return, PFOF ¶ 120, (Ex. 7 at 194:16-24), and that Mr. Nasgovitz personally guaranteed that bonds could be put to Heartland's parent company at the negotiated profit.  PFOF ¶121 (Ex. 7 at 193:24-195:14); PFOF ¶ 133, (Ex. 38 at HAI 000762-763).  She also knew that the Funds were in the midst of a growing liquidity crisis, PFOF ¶ 156 (Ex. 4 at 108:2-21), and she knew, or recklessly disregarded, that the SWIB transaction was, at best, only a temporary solution to that crisis. PFOF ¶ 123 (Ex. 35); PFOF ¶ 167 (Ex. 56 at HAI 000377-378).  And, of course, Ms. Bauer knew that instead of disclosing these facts to the Funds' shareholders the special report misleadingly explained the September 28 devaluation PFOF ¶ 175-178 (Ex. 64).

The details of the SWIB transaction would have been important to any reasonable shareholder in evaluating whether to invest in–or to sell out of–the Funds.  Full, honest disclosure of those facts undeniably would have altered the total mix of information available to shareholders of the Funds in light of the September 28 devaluation.  The NAV of each Fund had

22

been written down materially on September 28, 2000. At the very same time, the Funds had effected a significant transfer of assets to SWIB under highly unusual terms. The transferred Heritage bonds were in default; they were sold at lowered prices; SWIB demanded a put and a guaranteed return as part of the transaction; the transaction provided at best a temporary fix to the Funds' liquidity problems. These facts cast the securities held by the Funds in a harshly negative light and indicated that more negative developments were likely to follow. What reasonable investor would not have considered such facts in making an investment decision about the Funds? In particular, what reasonable shareholder would not have considered such facts in deciding whether to sell out of the Funds?

**E.     October 13, 2000 - The Funds Crash**

On October 13, 2000, the Funds' portfolio managers gave the Pricing Committee an assessment of the value of each bond held by the Funds, based on each bond being sold individually within seven days. PFOF ¶ 184 (Ex. 65). The Pricing Committee then further reduced the individual portfolio security valuations recommended by the Funds' portfolio managers by an additional 33% discount for the Short Duration Fund and 50% for the High Yield Fund. Some individual bonds were then further readjusted based on the portfolio managers' recommendations. Id. As a result, the NAV of the Short Duration Fund plummeted from $8.70 per share to $4.87 per share; the NAV of the High-Yield Fund dropped from $8.01 per share to $2.45 per share. PFOF ¶185, 186 (Ex. 66 at HAI 66393). In one single day, Short Duration Fund shareholders lost 44% of the value of their accounts. Shareholders in the High Yield Fund fared even worse – losing an approximate 70% of the value of their accounts. (Id.)

23

**F. Guilty Knowledge/Cover Up**

On September 28, 2000, Ms. Bauer sent an e-mail to, among others, the portfolio managers of the Funds. PFOF ¶ 159, (Ex. 53). In that e-mail, Ms. Bauer stated that "Over the past 6-7 weeks you may have been keeping a diary, research file notes or miscellaneous material involving discussions relating to portfolio securities, underlying credits and valuation issues . . ." Id. She went on to suggest that the portfolio managers and other officials may have "within your notes/files material that is unnecessary to keep as part of that record . . ." Id. Ms. Bauer then wrote, "As a legal matter, I recommend that you only keep those records that you are required to maintain . . . please take time to review your files and discard what is nonessential . . ." Id.

Ms. Bauer admitted that she believed this was the only time she had ever sent such an e-mail. PFOF ¶ 160 (Ex. 7 at 240:6-10). That is, on the very day of the Funds' first major devaluation and on the eve of the SWIB transaction, PFOF ¶ 161 (Ex. 7 at 200:3-201:5); PFOF ¶ 154 (Ex. 3 at Request 65, Ex. 51), Ms. Bauer, apparently for the first time ever, advised the Funds' portfolio managers and others to destroy documents relating to "portfolio securities, underlying credits and valuation issues." PFOF 160 (Ex. 7 at 240:6-10); PFOF ¶ 159 (Ex. 53). Ms. Bauer also suggested that the time period for this file purge be the "past 6-7 weeks," exactly the period of time covered by the efforts of Heartland to address the Funds' worsening liquidity crisis, (Id.), a time period when the Funds were facing the possibly of a "literal melt down." PFOF ¶123 (Ex. 35).

Subsequently, on October 11, 2000, approximately a week and a half after the SEC had contacted Heartland and requested information and documents regarding the events surrounding

24

the September 28 devaluation, Ms. Bauer, again for the first time, instituted a procedure for destroying tape recordings of Shareholder Services telephone conversations with Fund shareholders.  PFOF ¶¶180-181 (Ex. 62).  Under this procedure, which was implemented immediately, four years of tapes were destroyed. PFOF ¶ 182 (Ex. 63 at HAI 145138-139; Ex. 12 at 105:8-18).

Ms. Bauer's actions are circumstantial "evidence of a cover-up, attempted cover-up, which has generally been held to be admissible as far as casting some reflection on how the defendant evaluated his own conduct."  United States v. Ryan, 213 F.3d 347, 350 (7th Cir. 2000) (case involving bank fraud, a specific intent crime, where kickbacks not reported on defendants tax return).  Circumstantial evidence is not only sufficient but may also be more certain, satisfying and persuasive than direct evidence.  Michalic v. Cleveland Tankers, Inc. 364 U.S. 325, 330 (1960).  Ms. Bauer's actions, as in the Ryan case, "constitute[] circumstantial evidence of intent to defraud."  Id. at 351.

## G.    Aiding and Abetting

The Commission has charged Ms. Bauer with aiding and abetting violations of Section 206 of the Advisers Act.  To establish liability for aiding and abetting, the Commission must prove 1) a primary violation; 2) that the aider and abettor knew or was generally aware that her actions were part of an overall course of conduct that was illegal or improper; and 3) that the aider and abettor provided substantial assistance to the primary violator.  See SEC v. Steadman, 967 F.2d 636, 647 (D.C. Cir. 1992).  Reckless conduct is sufficient to satisfy the second element. See Graham v. SEC, 222 F.3d 994, 1004 (D.C. Cir. 2000) (addressing aiding and abetting

25

violations of Section 10(b) of the Exchange Act); see also SEC v. Koenig, 2007 U.S. Dist. LEXIS 26088 at *24 (N.D. Ill. April 5, 2007). Cf. Monetta Financial Services, Inc. v. SEC, 390 F.3d 952, 956 (7th Cir. 2004) (finding no intent without deciding whether recklessness is sufficient). The evidence establishes all three of the foregoing elements.

Heartland Advisors was a registered investment adviser. PFOF ¶ 20 (Ex. 1, Ex. 2). On behalf of the Funds, Heartland Advisors issued a prospectus, several supplements to the prospectus, an SAI, a semi-annual report, and an October 10, 2000 letter to shareholders. PFOF ¶ 22 (Ex. 1, Ex. 2); PFOF ¶ 45 (Ex. 5 at 6:14-15; Ex. 16 at 13:7-14:5; Ex. 67); PFOF ¶ 173, (Ex. 64). Shareholder Services used "talking points" to answer shareholder inquiries. PFOF ¶ 50, (Ex. 12 at 35:2-7). Those documents contained false and misleading statements. Heartland Advisors misrepresented that it was managing risk by performing intensive credit research. PFOF ¶ 62, (Ex. 5 at 161:4-16); PFOF ¶ 66, (Ex. 34); PFOF ¶¶ 69-71, (Ex. 8 at 83:14-84:22). Heartland Advisors materially understated the defaulted securities held by the High-Yield Fund. PFOF ¶¶ 74-82, 86-89 (Ex. 22). Heartland Advisors did not disclose the Funds' liquidity crisis. PFOF ¶ 178, (Ex. 64). And, Heartland Advisors misleadingly failed to disclose the existence and terms of the SWIB transaction, in connection with the September 28, 2008 devaluation. (Id.). Senior officials of Heartland Advisors knew the truth and nevertheless knowingly made the above misrepresentations and omissions. PFOF ¶¶ 39-42, (Ex. 5 at 4, 6, 26, 29); PFOF ¶¶ 48-49, (Ex. 5 at 191); PFOF ¶ 56, (Ex. 19); PFOF ¶¶ 62-64 (Ex. 5 at 161-163); PFOF ¶ 65, (Exs. 32, 33); PFOF ¶ 66, (Ex. 34); PFOF ¶¶ 74-82, 86-89 (Ex. 22); PFOF ¶ 178, (Ex. 64); PFOF ¶ 101, (Ex. 28); PFOF ¶ 122, (Ex. 7 at 196-197); PFOF ¶ 123, (Ex. 35); PFOF ¶ 173, (Ex. 64); PFOF ¶

26

187 (Ex. 167). The officials' knowledge is imputed to Heartland Advisors. See, e.g., Mercy Med. Ctr., Inc. v. United Healthcare of the Mid-Atlantic, Inc., 149 Md. App. 336, 366, 815 A.2d 886 (2003); Tele-Port, Inc. v. Ameritech Mobile Comm., Inc., 248 Wis.2d 846, 854, 637 N.W.2d 782 (2001); United States v. One Parcel of Land, 965 F.2d 311, 316 (7th Cir. 1992). Thus, Heartland Advisors violated Sections 206(1) and 206(2) of the Advisers Act.

Ms. Bauer knew, or recklessly disregarded, that the promise to manage risk through intensive credit research was false, PFOF ¶ 50 (Ex. 5 at 167:22-168:3); PFOF ¶¶ 62-64, (Ex. 5 at 161:4-163:6); PFOF ¶ 66, (Ex. 34); PFOF ¶ 67, (Ex. 44), that the defaulted securities held by the High-Yield Fund were materially understated, PFOF ¶¶ 74-82, 86-89 (Ex. 22), that material facts concerning the Fund's liquidity crisis were not being disclosed, PFOF ¶ 174 (Ex. 58 and Ex. 64); PFOF ¶¶ 175-178, (Ex. 64), and that the existence and terms of the SWIB transaction were not being disclosed. (Id.) Ms. Bauer personally wrote, reviewed, and/or approved all the Funds' disclosure documents, PFOF¶ 39, (Ex. 5 at 4:14-22, 26:10-21); PFOF ¶ 43 (Exs. 1, 2, 3 at Request 40); PFOF ¶ 45, (Ex. 5 at 6:14-15); PFOF ¶ 46 (Ex. 1, 2, 3 at Request 41), and she reviewed, edited, and approved the talking points. PFOF ¶ 50, (Ex. 12 at 41:4-17); PFOF¶ 51, (Ex. 6 at 378:22-379:15); PFOF ¶ 52, (Exs. 32, 45, 59); PFOF ¶ 55, (Exs. 32, 49, 57, 60). It follows that Ms. Bauer knowingly, or at least recklessly, provided substantial assistance to Heartland Advisors' violations. As a result, she aided and abetted those violations.

## IV.    INJUNCTIVE RELIEF

Section 20(b) of the Securities Act, Section 21(d)(1) of the Exchange Act, and Section 42(d) of the Investment Company Act authorize the Commission to seek injunctive relief when a

27

defendant has engaged in acts or practices which violate those Acts. Section 209(d) of the Advisers Act provides for permanent injunctions against persons who aid and abet violations of that Act. In considering requests for permanent injunctions, courts determine whether there is a reasonable likelihood that the defendants will engage in future violations of the federal securities laws. See, e.g., SEC v. Gruenberg, 989 F.2d 977, 978 (8th Cir. 1993). Courts consider the totality of the circumstances in determining whether there is a likelihood of future violations. SEC v. Murphy, 626 F.2d 633, 655 (9th Cir. 1980)(citations omitted). In granting or denying injunctive relief, courts have considered the following factors: (i) the egregiousness of the violations; (ii) the isolated or repeated nature of the violations; (iii) the degree of scienter; (iv) the sincerity of the defendant's assurances, if any, against future violations; (v) the defendant's recognition of the wrongful nature of his conduct; (vi) the likelihood that the defendant's occupation will present opportunities (or lack thereof) for future violations; and (vi) the defendant's age and health. SEC v. Youmans, 729 F.2d 413, 415 (6th Cir. 1984).

A permanent injunction against Ms. Bauer is warranted. Ms. Bauer's conduct is rendered egregious by the fact that she is an experienced lawyer and compliance official, who knew the prohibitions of the law. PFOF ¶¶ 24-25, 27 (Ex. 4 at 43-45); PFOF ¶26 (Ex. 7 at 11, 30-31). Her violations occurred in six publicly disseminated documents and in seven sets of talking points, over the last, critical months before the meltdown of the Funds in October 2000. PFOF ¶43 (Ex. 3 at ¶40); PFOF ¶ 46 (Ex. 3 at ¶41); PFOF ¶ 48 (Ex. 5 at 191); PFOF ¶ 49 (Ex. 5 at 191, Ex. 3 at ¶ 42); PFOF ¶ 52 (Exs. 33, 45, 59); PFOF ¶ 55 (Exs. 32, 49, 57, 60). She acted knowingly, or with a reckless disregard for the truth. PFOF ¶ 56 (Ex. 19); PFOF ¶ 62-64 (Ex. 5 at 161-163);

28

PFOF ¶ 66 (Ex. 34); PFOF ¶ 67 (Ex. 44); PFOF ¶¶ 74-82, 86-89 (Ex. 22); PFOF ¶¶ 83-85 (Ex. 30); PFOF ¶ 92 (Exs. 25, 26); PFOF ¶ 94 (Ex. 20); PFOF ¶ 96 (Ex. 20, Ex. 5 at 148); PFOF ¶ 98 (Ex. 45); PFOF ¶ 100 (Ex. 49); PFOF ¶ 101 (Ex. 28); PFOF ¶ 187 (Ex. 67); PFOF ¶ 129 (Ex. 37); PFOF ¶ 137 (Ex. 41); PFOF ¶ 138 (Ex. 43); PFOF ¶ 145 (Ex. 47); PFOF ¶¶ 106-108 (Ex. 29); PFOF ¶ 113 (Ex. 7 at 187-188); PFOF ¶ 120 (Ex. 7 at 194); PFOF ¶ 121 (Ex. 7 at 194-195); PFOF ¶ 122 (Ex. 7 at 196-197). Ms. Bauer has never acknowledged her wrongdoing. Ms. Bauer is in her fifties and, thus, relatively young. As an experienced securities lawyer, if not enjoined, she will have opportunities for future violations.

## V.    CIVIL PENALTIES

Section 20(d) of the Securities Act, Section 21(d) of the Exchange Act, and Section 42(e) of the Investment Company Act authorize Courts to impose civil money penalties against persons who violate the provisions of those Acts.[5]  The Commission requests that, if the Court determines to grant the instant motion, it order Ms. Bauer to pay a civil money penalty in an amount to be set after briefing and a hearing on the amount of the penalty.

---

[5]The Commission is not seeking a civil money penalty against Ms. Bauer under Section 209(e) the Advisers Act.  See  SEC v. Bolla, 550 F. Supp. 2d 54 (D.D.C. 2008).

## VI. CONCLUSION

In light of the foregoing, the Commission respectfully requests that this Court enter an order of summary judgment against Ms. Bauer on the disclosure charges.

Respectfully submitted,


<u>s/ John E. Birkenheier</u>
John E. Birkenheier
Gregory P. von Schaumburg
Paul N. Mensheha
Attorneys for Plaintiff
Securities and Exchange Commission
175 W. Jackson Blvd. Suite 900
Chicago, IL 60604
P: (312) 353-7390
Dated: September 24, 2008          F: (312) 353-7398

30