# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

      v.                              Case No. 03-C-1427

JILAINE H. BAUER,

        Defendant.

## DECISION ON CROSS MOTIONS FOR SUMMARY JUDGMENT ON THE INSIDER TRADING CLAIM (DOCS. # 399, 411)

On March 31, 2011, the court issued its order denying in part and granting in part cross motions for summary judgment. The following memorandum sets forth the basis for that decision.

Plaintiff, the Securities and Exchange Commission (SEC), brought this action against defendant, Jilaine H. Bauer (Bauer),[1] alleging various offenses including violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10 b-5 thereunder, Sections 34(b) and 36(a) of the Investment Company Act, aiding and abetting violations of Sections 206(1) and 206(2) of the Advisers Act and breach of fiduciary duty. Both parties seek summary judgment on insider trading claims.

Bauer asserts that she is entitled to summary judgment on SEC's insider trading claims because there is no evidence that she possessed material, nonpublic information when she redeemed her shares of Heartland Short Duration High-Yield Municipal Fund (Short Duration Fund) on October 3, 2000. She argues that there is no evidence that at the time of her redemption she knew that the Short Duration Fund was overpriced or that she could have

---

[1] The SEC originally filed the complaint against other defendants who have since either settled with the SEC or been granted summary judgment. See Documents # 378, 384 and 395.

foreseen a mid-October markdown of the Fund. Bauer further contends that she had a legitimate reason to redeem her shares that defeats any inference that she acted in bad faith.

The SEC submits that it is entitled to summary judgment on its insider trading claims because Bauer redeemed her shares of the Short Duration Fund while in possession of material, nonpublic information. It states there is evidence that she was in possession of material information regarding the price of the Fund, liquidity and redemption issues respecting the Fund, the possible sale or merger of the Fund, and difficulty selling securities. The SEC contends that Bauer's possession of the material, nonpublic information creates an inference that she used that information. Finally, the SEC argues that there is direct (Bauer's knowledge of insider trading laws) and circumstantial evidence (emails regarding destruction of records) that Bauer acted with scienter. For the reasons set forth below, the SEC's motion will be granted and Bauer's motion will be denied.

FINDINGS OF FACT

Heartland

Since 1987, Heartland Group, Inc. (HGI) has been registered with the SEC as an open-end, management investment company. (Am. Compl., ¶ 19.) Heartland Advisors, Inc., (HAI) is dually registered with the SEC as an investment adviser and a broker-dealer. (Am. Compl. ¶ 8.) At all times relevant to this action, HAI managed the mutual fund portfolio series of HGI and was the principal underwriter and distributor of the Funds' shares. (*Id.*)

At all times relevant to this action, HGI offered several different mutual funds to investors, including the Heartland High-Yield Municipal Bond Fund (High-Yield Fund) and the Short Duration Fund (collectively, the Funds). (Am. Compl., ¶ 19.) The Short Duration Fund's investment goal was high level federally tax-exempt current income with low share price

-2-

fluctuation.  (HGI's 6/9/00 Supplemental Prospectus, IM 00296.)  The Short Duration Fund was

suggested as possibly appropriate for investors with short term investment needs because it

sought to minimize share price fluctuation by maintaining short portfolio duration.  (*Id.* at IM

00297.)  The prospectus stated that, because the Short Duration Fund's investments might be

more thinly traded than higher quality securities and because of adverse interest rates,

economic or credit conditions, the Fund could experience delays and difficulties disposing of

securities.  (*Id.*)  In these circumstances, the prospectus stated that the Short Duration Fund

may elect to borrow to meet redemption obligations to facilitate a more orderly liquidation of

securities and to help maximize proceeds.  (*Id.*)

Jilaine Bauer

Bauer, a resident of Mequon, Wisconsin, has a Bachelor of Science degree in

psychology from the University of Illinois and a J.D. from Loyola University.  (Am. Compl., ¶ 11;

Bauer 1/17/01 Dep., 41:4-9.)  She has no finance or other business degrees.  (Bauer 1/17/01

Dep., 41:9-10.)  Bauer began in the securities industry in 1980 and maintained securities

licenses for a majority of the time before leaving HAI in 2002.  (Bauer Decl. at ¶ 5.)  She has no

experience as a municipal bond fund portfolio manager, credit research analyst or trader.

(Bauer 3/03/05 Dep., 229:20-230:21.)  Mindful of HAI's policies on insider trading and personal

trading, Bauer discussed them with employees on a regular basis.  (Bauer Decl., ¶ 20; Bauer

8/15/01 Dep., 353:22-354:18.)

From1998 to November 2002, Bauer was General Counsel and Chief Compliance

Officer of HAI.  (Bauer Decl., ¶ 1.)  From March 2000 to March 2001, she was the Secretary and

a Senior Vice-President of HAI.  (Bauer Admissions, Req. 14, 17.)  From March 2000 to March

2001, Bauer was a Vice President of HGI.  (Bauer Admissions, Req.18.)  From July 2000 to

-3-

October 13, 2000, she was a member of HAI's Credit Committee.[2] (Bauer Admissions, Req.19.) Bauer served as chair of HAI's Pricing Committee from 1998 to February 1, 2001. (Bauer 3/5/05 Dep., 31:25-32:5.) However, she was not a member of HAI's Investment Policy Committee (IPC).[3] (Nasgovitz 10/16/01 Dep., 343:5-14.)

Bauer's initial purchase of Short Duration Fund shares was in 1998. (Bauer 1/17/01 Dep., 116:1-15, 117:16-20.) She purchased additional shares at various times during 1998 and 1999. (Bauer 1/17/01 Dep., 116:1-16, 118:9-119:3; Bauer Decl., ¶ 22; 12/31/98 Account Summary, HAI 88058; 12/31/99 Account Summary, HAI 75883.) Bauer did not purchase any shares of the Short Duration Fund during 2000, although her account shows the purchase of additional shares on September 29, 2000, when she reinvested a cash dividend check that was more than six months old. (Bauer 1/17/01 Dep., 121:7-122:8.)

Bauer testified that she purchased the shares in the Short Duration Fund because it had been communicated to her that members of senior management were expected to invest in the HGI Funds and that the Short Duration Fund seemed the most appropriate fund for her money given her financial needs at that time. (*Id.,* 116:17-117:15.) The monies she invested were a "backup" for savings in a money market fund. (Bauer 1/17/01 Dep., 116:17-117:6.) According to Bauer, these liquid assets were reserved to pay large expenses such as school tuition and property taxes. (*Id.,* 130:19-25.)

---

[2] The Credit Committee was responsible for, among other things, oversight of the creditworthiness of the bonds held by the Short Duration Fund, by establishing policies and guidelines and by reviewing on a regular basis work performed by credit analysts. (Bauer Admissions, Req. 34.)

[3] The Investment Policy Committee was responsible for reviewing investment strategies, sector and industry weightings and performing risk management oversight. (Charter for the Investment Policy Committee, HAI 73280.)

-4-

Bauer did not redeem any shares of the Short Duration Fund during 1999. (12/31/99 Account Summary, HAI 75883.) She held shares in the Short Duration Fund until October 3, 2000. (Bauer 1/17/01 Dep., 119:4-14.)

<u>The Fund Portfolio Managers</u>

Until the end of September 2000, Thomas Conlin (Conlin) and Greg Winston (Winston) were the Funds' portfolio managers. (Am. Compl. ¶¶ 12-13.) On August 18, 2000, Conlin submitted his resignation to HGI and HAI's President,[4] William Nasgovitz (Nasgovitz), who asked him to reconsider. (Am. Compl. ¶ 9; Conlin Dep., 55:-56:7.) Conlin later agreed to defer his resignation until September. (Conlin 4/7/05 Dep., 56:15-19, 59:2-6; Bauer 1/17/01 Dep., 163:25-164:14; Nasgovitz 12/14/05 Dep., 137:1-139:17.) At the end of September 2000, Conlin resigned and the Funds were managed by Winston together with Derek Pawlak (Pawlak) and Philip Fiskow (Fiskow). (HGI's 9/28/00 Supplemental Prospectus, HAI 000201.)

<u>The High-Yield Municipal Bond Market</u>

According to a white paper Commission Chairman Cox presented to Congress, the municipal securities market lacks many of the systemic protections customary in many other sectors of the U.S. capital markets. (SEC's 7/26/07 *Disclosure and Accounting Practices in the Municipal Securities Market*, pp. 3-4.) Disclosure is substantially less comprehensive and less readily available than disclosure by public reporting companies, because the detailed registration and periodic disclosure system established by the federal securities laws and the SEC do not apply to municipal issuers. (SEC's 7/26/07 *Disclosure and Accounting Practices in*

---

[4] Nasogvitz held more than one title at both HAI and HGI. He was President, Chief Executive Officer and Chief Investment Officer of HAI and President and Director of HGI. Am. Compl. ¶ 9.

-5-

*the Municipal Securities Market*, pp. 5-6 and 9-10.)  With little or no daily information and limited trade activity, pricing of municipal bonds is difficult.  (Warga Expert Report, pp.26-28.)

Open end mutual funds like the Short Duration Fund do not trade on an exchange as shareholders conduct their transactions with the mutual funds.  (Fong Expert Report, pp. 6-7.)  The investment company issues as many shares as there is demand in a given day, and redeems unwanted shares.  (Fong Expert Report, p. 6.)

### Pricing and the Pricing Committee

Rule 22c-1, promulgated under the Investment Company Act of 1940 ("1940 Act"), requires a mutual fund to redeem its shares at a price based on the current net asset value.  (17 C.F.R. § 270.22c-1(a).)  Net asset value, or "NAV," is calculated by valuing each asset (for the most part, securities) owned by the fund, adding the values together, subtracting any liabilities, and then dividing the net value of the portfolio by the number of shares outstanding. (Fong Expert Report, p. 7.)  HGI's High Yield and Short Duration Funds published a net asset value for the Funds at the end of each day.  (Bauer 3/3/05 Dep., 69:2-14; Fong Expert Report, p. 7.)  A mutual fund's net asset value is an important piece of information for an investor.  (Bauer 3/3/05 Dep., 64:7-11.)

The HAI Pricing Committee had the task, delegated by the Funds' Board, of overseeing pricing.  (Charter of the Pricing Committee,  HAI 015573.)  Bauer chaired regular meetings of the Pricing Committee to review pricing information presented to the Funds' Board of Directors each quarter, scheduled special meetings to consider pricing of individual securities, prepared and maintained meeting minutes and voted on pricing actions from time to time. (Bauer 1/17/1 Dep., 78:16-79:1; Bauer Decl., ¶ 13.)   HGI's Board established a set of Pricing Procedures that governed how the Pricing Committee was to execute its duties.  (HGI's Pricing

Policies and Procedures, HAI 031152-57.) The Pricing Procedures specified that valuations published by the pricing service, Muller Financial Corporation (Muller), also known as Interactive Data Corp. (IDC), generally should be used because the Board had determined that market quotations for most of the Funds' debt securities were not readily available. (*Id.*, HAI 031152.) Bauer never provided the Funds' pricing service with information, nor participated in substantive discussions with the pricing service about the valuations they provided. (Bauer Decl., ¶ 14.)

In early September 2000, the Pricing Committee evaluated Muller's services.[5] (9/1/00 Pricing Committee Meeting Minutes, HAI 0015628-29.) HAI's Chief Operating Officer and Vice President, Paul Beste (Beste), initiated comparisons between Muller values and values provided by three other pricing sources—J.J. Kenny, Bloomberg and PricewaterhouseCoopers. (Memorandum from Beste on Review of Pricing Sources for the Funds to the Pricing Committee and IPC (August 25, 2000), HAI 74265-66.) In his report to the Pricing Committee, Beste discussed his analysis, stated that although there were pricing differences, he attributed this to J.J. Kenny's lack of current information and indicated that he could not conclude that J.J. Kenny's assessments were accurate. (9/1/00 Pricing Committee Meeting Minutes, HAI 0015628-29; Email from Beste to Conlin, Winston, Pawlak, Nasgovitz, Kevin Clark, Bauer, and Hugh Denison (August 31, 2000 8:19 AM CST, HAI 000102. )

In addition to comparing carrying values to valuations provided by these other sources, Beste compared the sales prices of all securities sold by the Short Duration Fund from January 1, 2000, to August 18, 2000, with their carrying values on "trade date minus 1." (Memorandum from Beste on Review of Pricing Sources for the Funds to the Pricing Committee

---

[5] Bauer also testified that Paul Beste met with Muller during the first six months of 2000 to evaluate the services it provided to HAI as part of the formal annual review process and reported back to the Pricing Committee. (Bauer 1/17/01 Dep., 112:20-115:25.)

-7-

and IPC (August 25, 2000), HAI 74265-66.) Of the 70 trades made by the Fund during the period, 42 were sold at a price equal to or better than their carrying value, and 28 were sold at prices that ranged between 0.75 and 0.13 basis points lower than the carrying values. (*Id.*)

August 2000

On August 10, 2000, Bauer participated in an HGI Board of Directors meeting. (HGI 8/10/00 Meeting of the Board of Directors Minutes, HAI 000709.) Director John Hammes said that the Funds needed to be prepared for more redemptions. (*Id.*, HAI 000720.) In her March 3, 2005, deposition, Bauer testified that she had the impression that the Board was "somewhat unsettled" and a "little bit concerned" by some of Conlin's presentation that day. (Bauer 3/3/05 Dep., 236:14-237:3.) Bauer sent an e-mail to Messrs. Nasgovitz, Beste, Conlin and Winston on August 16, 2000, discussing, among other things, the evaluation of "contingency plans in the event redemptions continue to be a problem." (Email from Bauer to Nasogvitz, Beste, Conlin and Winston (8/16/00 12:40 CST), HAI 031286.)

After Conlin gave his resignation, Beste moved to the fixed income area to become more involved and to develop a better understanding of how the markets were functioning. (Beste 8/29/01 Dep., 184:12-18 .) Around this time, Beste enlisted the help of HAI's Senior Vice President, Kevin Clark (Clark), to solicit bids directly from "non-traditional" buyers without using the services of a dealer. (Am. Compl., ¶ 14; Clark 9/6/01 Dep., 157:14-159:8-20.) This work was in addition to the portfolio managers' sales through traditional brokers. (Clark 9/6/01 Dep., 155:7-156:23.) In late August or early September 2000, Beste was negotiating to sell a package of the Fund's nonperforming bonds to the State of Wisconsin Investment Board (SWIB) in a private transaction. (Bauer 3/3/05 Dep., 187:6-188:2, 192:2-193:23, 199:9-21.)

-8-

On September 11, 2000, Bauer attended a special meeting of HGI's Board. (9/11/00 Special Meeting of the HGI Board of Directors Minutes, HAI 66366-71.)  At this meeting, Beste advised that portfolio loans stood at $11.7 million in the Short Duration Fund and $11.8 million in the High Yield Fund.  (*Id.,* HAI 66367.)  He reported that the Funds had experienced outflows of money since August of 1999 and that the Short Duration Fund had an outflow of $66 million ($30 million in 2000), while the High Yield Fund had a net outflow of $22 million ($10 million in 2000).  (*Id.,* HAI 66367-68.)

On September 18, 2000, Clark sent an e-mail to Nasgovitz, copying Beste and Bauer, expressing doubts about the strategy they were pursuing.  (Email from Clark to Nasgovitz, copying Beste, Eric Miller and Bauer (September 18, 2000 3:42 PM CST), HAI 031033.)  Clark mentioned that as he and Beste "dig deeper into the situation" through conversations with "distressed muni players, other muni funds, to multiple retail and institutional brokerage firms," they were finding interest to be very limited.  (*Id.*)  He stated that the only firm bids received were at levels "down 30-50% from current levels," from players [who] are vulture types."  (*Id.*)  With the possibility of an increase in redemptions, he again urges the formation of a contingency plan, including the sale of the Funds or partnering with another investor. (*Id.*)

Bauer testified that it had been explained to her that portfolio managers did not automatically recommend carrying prices based on bids received, but considered various factors, including the source of the bid and the size of the transaction.  (Bauer 8/15/01 Dep., 361:22-362:7.)  Bauer was aware that Conlin disagreed with Clark and Beste's actions.  (*Id.*, 340:4-13.)  Conlin had copied her on a September 19, 2000, e-mail he sent to Beste expressing his objections to efforts to mark down bonds for quick sale at prices that he believed were not

in the interest of shareholders and to Beste making other portfolio management decisions without consulting him.  (Email from Conlin to Beste, copying Nasgovitz and Bauer (September 19, 2000 4:46 PM CST), HAI 0144850.)

On September 20, 2000, Bauer called a special meeting of the Pricing Committee, which was held jointly with the Credit Committee, for the express purpose of discussing the carrying values because of recent informal discussions concerning some of the credits and conversations with Muller concerning their valuations.   (9/20/00 Meeting of the Pricing Committee Minutes, JH 00377.)  Bauer, Beste, Clark, Conlin, E. Miller, and K. Della were present, with Pawlak and Winston.  (*Id.*)  Beste reviewed his work analyzing prices from three other sources, and stated his belief that Muller's values remained appropriate.  (*Id.*)  They also discussed the possibility of a price reduction as a result of work Muller was doing and information known to the Committee.  (*Id.*)  Conlin again expressed disagreement with the use of a "bid wanted" strategy to sell bonds.  (*Id.,* JH 00378.)  Pawlak stated that he felt the competitors had greater abilities to monitor credits, yet believed that the Committee had discussed all known information on credit issues.  (*Id.*)  No actions were taken on any security prices. (*Id.*)

On September 25, 2000, Bauer sent an e-mail, with subject heading "Muni update," to Beste, Nasgovitz, and Clark regarding her unsuccessful effort to find a buyer for the Funds.  (Email from Bauer to Beste, Nasgovitz, and Clark (September 25, 2000 5:02 PM CST), HAI 031032.)  On September 27, 2000, Bauer sent an e-mail to HAI customer services representatives advising how to respond to expected questions from the Funds' shareholders. (Email from Bauer to Kim O'Connor (Schneider) and John Merrell (September 27, 2000 7:35 PM CST), HAI 000085-000086.)

-10-

## The SWIB Transaction

In 2000 the Funds owned a group of non-performing securities, referred to as the "Heritage bonds." (9/11/00 Special Meeting of the HGI Board of Directors Minutes, HAI 66366-67.) At the September 11, 2000, special meeting of the Funds' Board, Beste advised that HAI was negotiating to sell a package of defaulted bonds, including the Heritage bonds, to the State of Wisconsin Investment Board (SWIB). (*Id.,* HAI 66370.) SWIB also would obtain a put from HAI's parent company, giving it the right to sell the bonds to that company after two years with a negotiated profit to SWIB. (*Id.,* HAI 66371.) Beste stated the sale would be at the current value of the securities as determined by Muller on the date of the sale. (*Id.,* HAI 6670-71.) The Board unanimously approved the sale. (*Id.,* HAI 66371.) SWIB did not negotiate the bonds that would be included in the sale. (Beste 9/14/05 Dep., 140:23-25. ) Beste testified that he, Nasgovitz and Conlin decided which securities they wanted to place in the SWIB transaction with the goal of removing the defaulted non-performing bonds from the Funds. (*Id.,*141:1-25.)

HAI had purchased and sold securities in private transactions on previous occasions, so Bauer did not perceive such a transaction to be unusual. (Bauer 3/3/05 Dep., 188:10-190:12.) She was not involved in finding a buyer, selecting the bonds to be sold or negotiating the price or other terms of the transaction. (Bauer 3/3/05 Dep., 192:1-9, 192:23-193:23; Bauer Decl., ¶ 17.) Shortly before closing, Bauer learned that SWIB had asked Nasgovitz to personally guarantee the put. (Bauer 3/3/05 Dep., 194:25-195:4.) The transaction closed on September 29, 2000, using carrying values Bauer understood to have been provided by Muller on September 28, 2000. (*Id.*, 198:12-199:7.)

At a special meeting of HGI's Board on September 28, 2000, Nasgovitz told the Board that "the Adviser now knew the extent of the problem and had a plan for dealing with it."

-11-

(9/28/00 Special Meeting of the HGI Board of Directors Minutes, HAI 66372.) Nasgovitz advised that HAI was discontinuing the special distribution subsidy to the Funds and Beste stated that he believed it would not be needed because most of the non-performing bonds were being sold to SWIB. (*Id.,* HAI 66373.) On September 28, 2000, HAI issued a press release announcing that Conlin had resigned and Fiskow had joined the firm to lead the ". . . already talented fixed income team which will continue to focus on delivering high quality service and competitive investment results to your clients and fund shareholders." (Press Release, HAI, Philip J. Fiskow Joins Heartland Advisors as Senior Vice President and Director of Fixed Income (September 28, 2000), EDL 0000584-85.)

<u>The September 28, 2000, Markdown</u>

The carrying values on September 28, 2000, were substantially lower than carrying values from the previous day, causing the NAV's of the Short Duration Fund and the High-yield Fund to decline by approximately 2% and 8%, respectively. (*Id.*, 200:3-201:5.) Individual bonds were marked down by as much as 50%. (*Id.*, 200:22-201:5.) The markdown by Muller on September 28 was not unexpected and did not cause Bauer to question the carrying values for other bonds owned by the Funds. (*Id.*, 201:7-203:8.) On September 28, Beste told the Pricing Committee that he had asked Muller if the markdowns they anticipated making that day would be representative of markdowns of other securities with similar characteristics and that Muller had said that they expected they would be. (Bauer 3/3/05 Dep., 202:5-14; 9/28/00 Meeting of the Pricing Committee Minutes, HAI 015790.)

On September 29, 2000, while out of the office, Bauer returned a call from Thomas Kirk (Kirk), the Assistant Regional Director of the SEC's Chicago Office, to answer his questions about the Funds' markdowns on the previous day. (Bauer 3/3/05 Dep.,

120:18-121:19.) The following Monday, October 2, 2000, she faxed two letters to Kirk confirming their telephone conversation, and providing more detailed information about the Funds' pricing, securities sales, holdings, loan balances and financial condition. (Letter from Bauer to Kirk (October 2, 2000), HAI 0000371-372; Letter from Bauer to Kirk (October 2, 2000), HAI 0000373-379.) HAI employee Kate Vebber sent Bauer an email on October 2, 2000, mentioning that Bauer was "looking for any price declines in the watch list securities since 6/30. The files attached below list the significant price changes in the securities listed on the Watch List as of 9/27." (Email from Kate Vebber to Bauer, copying Nicole Best (October 2, 2000 2:37 PM CST), HAI 000081-000083.) The emailed list included the defaulted and watch list securities in the Funds as of that date. (*Id.*)

The 10/3/00 Redemption

Bauer observed that the Short Duration Fund's NAV had declined by thirty-nine cents from June 30 through the end of September, including nineteen cents in September alone. (Bauer Decl., ¶ 32; Bauer 1/17/01 Dep., 171:18-2.) According to Bauer by early October, she no longer was comfortable with the Fund's price volatility. (*Id.,* 124:6-14, 128:2-129:19, 173:12-174:20.) The Short Duration Fund's NAV, which is published daily, had declined sharply in 2000. (Bauer Decl., ¶ 33.) The NAV was $9.27 on Jun 30, and $9.18 on August 30, 2000. (*Id.;* HGI Short Duration High-Yield Municipal Fund Historical Quotes by LexisNexis for 6/30/00 and 8/30/00.) On September 27, 28 and 29, 2000, it dropped from $9.10 to $8.91, then to $8.88. (Bauer Decl., ¶ 33; HGI Short Duration High-Yield Municipal Fund Historical Quotes by LexisNexis for 9/27/00, 9/28/00 and 9/29/00.) The Short Duration Fund's assets had shrunk as redemptions exceeded purchases ("net redemptions"). (HGI's 7/1/00 Semi-Annual Value Report, HAI 70169, HAI 70177.) The published six-month report showed that during the six

-13-

month period ending June 30, 2000, the Fund's net assets shrunk by almost 8.2% to approximately $100 million, compared to $122 million as of December 31, 1999. (*Id.,* HAI 70169.) Shares issued during this period (excluding dividend reinvestment) were approximately 2.9 million, while shares redeemed exceeded 5.1 million. (*Id.,* HAI 70177.) By the end of September 2000, the Short Duration Fund's investments in defaulted securities, discussed in the prospectus, had declined from 6.2% to 4.1% of net assets (HGI's 6/9/00 Supplemental Prospectus, IM 00297; 9/22/00 Short Duration Municipal Bond Fund Watch List, HAI 082623; 9/30/00 Short Duration High-Yield Municipal Fund Watch List, JH 01849; Bauer Decl., ¶ 37.) The Fund's illiquid securities as a percentage of assets declined from 10.89% on September 27, 2000, to 8.53% on September 30, 2000. (HGI's Summary of Illiquid Securities as of September 27, 2000, HAI 014708; HGI's Summary of Illiquid Securities as of September 30, 2000, LS 01913.) This was well below the 15% limit for illiquid securities objective mentioned in the prospectus. (HGI's 6/9/00 Supplemental Prospectus, IM 00325; Bauer Decl., ¶ 38.)

At 7:00 a.m. on October 3, 2000, Bauer placed a telephone order on a tape recorded line requesting that her account with the Short Duration Fund be closed, and that all of her shares (4,976.156) redeemed. (Bauer Decl., ¶ 40; Bauer 1/17/01 Dep., 119:4-17, 122:25-124:3.) Consequently, Bauer's shares were redeemed at the NAV for that day, her receipt of $44,267.15. (Bauer Decl., ¶ 40.)

Early October 2000

On October 4, 2000, Bauer sent an email to certain individuals regarding an "UPDATED MUNI Q&A Draft" intended to respond to questions HAI had been receiving from the Funds' shareholders. (Email from Bauer to John Merrell, Doug Lucas, Kim O'Connor (Schneider), Beste, Scott Powell, Ted Dryden, Aaron Picard and Nasgovitz, copying Winston

-14-

Fiskow and Pawlak (October 4, 2000 1:01 PM CST), HAI 031273-031281.)  On October 6, 2000, Bauer sent an email with proposed changes to a draft shareholders letter explaining the Funds' recent performance, i.e. the September 28, 2000 devaluation.  (Email from Bauer to Doug Lucas, John Merrell, Ted Dryden, copying Beste, Fiskow, Nasgovitz, Kim O'Connor (Schneider), Scott Powell, Pawlak and Winston (October 6, 2000 2:03 PM CST), HAI 031282-284.)  In an October 13, 2000, letter, Bauer informed Nasgovitz of a similar October 10, 2000, letter to the Funds' shareholders.  (Letter from Bauer to Nasgovitz (October 13, 2000), HAI 18957.)  The October 10, 2000, letter included HAI's explanation for the September 28, 2000, devaluation and attached a list of the Fund's portfolio as of September 30, 2000.  (Letter from Nasgovitz to Valued Shareholder (October 10, 2000), HAI 018958-962.)

The 10/13/00 Markdown

A special Board meeting was called to discuss the expansion of the illiquid and watch lists.  (*Id.,* 81:1-18; HGI's 10/12/00 Special Meeting of Board of Directors Minutes, HAI 66376-384.)  Bauer submits that she saw the new list of illiquid securities for the first time at the special Board meeting convened on October 12, 2000.  (*Id.,* 81:19-83:7; Bauer Decl., ¶ 41.)  During the special Board meeting, Fiskow described the events of the week, including the sale of a High-Yield Fund bond on October 11, changes to the Watch List and changes to the list of illiquid securities.  (HGI's 10/12/00 Special Meeting of Board of Directors Minutes, HAI 66378-79.)  Fiskow characterized the Funds' securities market as illiquid. (*Id.*)  On the other hand, Bauer informed the Board that the Pricing Committee was concerned that the NAV might be too high, but was confronted with difficulties in determining a fair value for the Funds' securities.  (*Id.,* HAI 66381.)  Additionally, Fiskow informed the Board that the Funds' securities may be worth in a range of 70% of their carrying value.  (*Id.,* HAI 66382.)  The Board requested that the

-15-

SEC be contacted and directed the Pricing Committee to establish a fair value for the Funds' portfolio securities. (*Id.,* HAI 66384.)

That afternoon, following the daily pricing feed, the Pricing Committee met with the portfolio managers to consider whether the Muller valuations for the Funds' securities, totaling more than 100 bonds, represented fair values in light of the developments discussed with the Board of Directors. (HGI's 10/12/00 Special Meeting of Pricing Committee Minutes, HAI 015763; Beste 8/29/01 Dep., 89:17-92:17.) After discussing Commission pricing guidance, the Pricing Procedures, various factors and approaches to fair value pricing, and the portfolio managers' assessments of value, the Pricing Committee determined unanimously that there was not enough information to conclude that Muller's valuations did not represent fair values, and that Muller's valuations should be used that day. (HGI's 10/12/00 Special Meeting of Pricing Committee Minutes, HAI 015763; Bauer 8/14/01 Dep., 222:1-223:15.)

The next day, October 13, 2000, the Board convened at 7:30 a.m. (HGI's 10/13/00 Continuation of Adjourned Special Meeting of Board of Directors Minutes, HAI 66385.) It authorized Fund management to fair value the bonds based on the Pricing Committee's determination under the Pricing Procedures or to suspend redemptions and call a special meeting for the purpose of liquidating the Funds. (*Id.,* HAI 66391.)

The Pricing Committee met without Bauer on October 13, 2000,[6] although she entered momentarily to review the Pricing Procedures - the definition of "fair value" and the factors that should be considered in determining fair value. (10/13/00 Meeting of Pricing

---

[6] Bauer did not participate in devising the "haircut", nor vote on its use. (10/13/00 Meeting of Pricing Committee Minutes, HAI 015759-61; Bauer 3/3/05 Dep., 227:9-229:6.) She was on calls and in meetings with Fund counsel, HAI's outside counsel and the Commission most of the day. (Bauer Decl., 42; Beste 8/29/01 Dep., 89:13-16.)

-16-

Committee Minutes, HAI 015759; Beste 8/29/01 Dep., 89:1-16; Bauer 3/3/05 Dep., 227:9-23.) First, the Committee set "fair values" for each security using Muller values and other criteria consistent with the Pricing Procedures and the advice of the portfolio managers. (10/13/00 Meeting of Pricing Committee Minutes, HAI 015759; Bauer 3/3/05 Dep., 227:9-229:6.) Additional, across-the-board "haircuts" of approximately 50% (High-Yield Fund) and approximately 33% (Short Duration Fund) were applied to all the bonds of the Funds. (10/13/00 Meeting of Pricing Committee Minutes, HAI 015760; Bauer 3/3/05 Dep., 227:9-229:6.) The portfolio managers asked whether the "haircut" was consistent with Bauer's instructions and the Committee responded by making upward adjustments to the fair value determinations using the haircut for some securities. (*Id.*; Fiskow 4/15/05 Dep., 199:5-24, 208:5-209:15.)

The haircut was adopted notwithstanding concerns that were expressed by portfolio managers. (10/13/00 Meeting of Pricing Committee Minutes, HAI 015760.) To Bauer's knowledge, this approach had never been used by these Funds or any other mutual fund. (Bauer Decl., ¶ 44.)

GOVERNING LAW

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "Material facts" are those that under the applicable substantive law "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could

-17-

return a verdict for the nonmoving party." *Id.* In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. *Hicks v. Midwest Transit, Inc.*, 479 F.3d 468, 470 (7th Cir.2007). On cross motions, the court construes "all facts and inferences therefrom 'in favor of the party against whom the motion under consideration is made.'" *In re United Air Lines Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) (quoting *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005)).

Pending cross motions ask the court to enter summary judgment in favor of each side on insider trading issues. These issues arise under Sections 17(a) of the Securities Act , 10(b) of the Exchange Act and SEC Rule 10b-5.

Section 17(a) of the Securities Act prohibits fraud in the offer or sale of a security. *See* 15 U.S.C. § 77q (a). This statute provides that it is unlawful for anyone

> in the offer or sale of any securities...by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q (a).

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit fraud in connection with the purchase or sale of a security. *See* 15 U.S.C. § 78j (b) and 17 C.F.R. § 240.10b-5. Specifically, Section 10(b) makes it is unlawful to use

> any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange...[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so

> registered...any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j (b). Pursuant to this statute, the SEC has promulgated Rule 10b-5 which provides that it is unlawful to use

> any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange...[t]o employ any device, scheme, or artifice to defraud...[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or...[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Section 10(b) and Rule 10b-5 impose on corporate insiders an obligation, arising from a fiduciary duty to disclose material, nonpublic information relating to their company's securities or to abstain from trading in them. *See Dirks v. Securities & Exchange Comm'n*, 463 U.S. 646, 653-54 (1983). In a discussion regarding tippee liability, the Seventh Circuit has noted the following about insider trading,

> ...the Supreme Court pointed out that insider trading is a crime because of the relation between the insider and the corporation. For this purpose, insiders include corporate officers, directors, or controlling stockholders, all of whom have a fiduciary relation with the corporation. An insider violates Rule 10b-5 when two elements are established: "(i) the existence of a relationship affording access to inside information intended to be available only for a corporate purpose, and (ii) the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure." In Chiarella, the Court had concluded "that there is no general duty to disclose before trading on material nonpublic information, and held that 'a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information.'" Instead, the duty arises from the combination of a fiduciary duty and some kind of manipulation or deception. As an alternative, the insider always has the option of refraining from trading.

-19-

*U.S. v. Evans*, 486 F.3d 315, 321 (7th Cir. 2007) (citations omitted).

For the SEC to prove a violation of Section 10(b) and Rule 10b-5, it must establish that Bauer: "(1) made a material misrepresentation or material omission as to which [s]he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *Securities & Exchange Comm'n v. Lyon*, 529 F.Supp.2d 444, 450 (S.D.N.Y. Jan. 2, 2008) (citing *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2nd Cir. 1999)). Insider trading encompasses the use of a deceptive device under Section 10(b). *See U.S. v. O'Hagan*, 521 U.S. 642, 652 (1997). Ordinarily, the elements of an insider trading claim that are at issue are whether: 1) the defendant is an insider; 2) the information communicated or omitted is material; 3) the information is nonpublic; and 4) the defendant acted with the requisite scienter. See *Securities & Exchange Comm'n v. Ingram*, 694 F.Supp. 1437, 1439 (C.D. Cal. May 3, 1988). Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Aaron v. Securities & Exchange Comm'n*, 446 U.S. 680, 686 n.5 (1980).[7]

The Supreme Court has explained the materiality requirement stating: "an omitted fact is material if there is a substantial likelihood that a reasonable share holder would consider it important in deciding" whether to purchase or sell a security and that "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc., v. Levinson*, 485 U.S. 224, 231-32 (1988) (citations omitted). With respect to contingent or speculative information, "materiality will depend at any given time upon a

_____

[7] Section 10 (b), Rule 10b-5 and Section 17 (a)(1) all require the SEC to show that the defendant acted with scienter, however, Sections 17 (a)(2) and (3) do not. *See Aaron*, 446 U.S. at 695-97.

balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Id.* at 238 (citation and quotation marks omitted). The Seventh Circuit has stated that things other than "statements concerning the value of a security can be 'material' for purposes of federal securities law," and that "[t]he definition of 'materiality'...covers whatever is important enough to reasonable participants in an investment decision to alter their behavior. Usually price (or facts that influence price) is all that matters to securities transactions, but Rule 10b-5 does not foreclose the possibility that the participants will deem other facts vital." *Securities & Exchange Comm'n v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998) (internal citations omitted).

As mentioned above, the Section 10(b) and Rule 10b-5 prohibitions apply to acts committed in connection with the purchase or sale of securities, and Section 17(a) prohibits acts committed in connection with the offer or sale of securities. For the purposes of these cross motions, analysis of the prohibitions is substantially the same inasmuch as the SEC contends that Bauer engaged in insider trading when selling her shares of the Short Duration Fund on October 3, 2000. Hence, the court will treat these sections together. *See Maio*, 51 F.3d at 631.

DISCUSSION

The Cross Motions

Bauer argues that the evidence shows that any information she may have possessed at the time she sold her shares of the Short Duration Fund on October 3, 2000, was not material. Indeed, she maintains that the SEC has no evidence to prove its claim of insider trading, which is predicated on a theory that she knew the Short Duration Fund was overpriced when she redeemed her shares. Furthermore, Bauer asserts that she had a legitimate reason for selling her shares that sanitizes any inference of trading for an illegal purpose.

-21-

The SEC contends there is evidence that Bauer was in possession of material information regarding the Fund's price, sales, liquidity and redemption issues, and possible sale or merger. It points to various pieces of evidence as establishing the extent of Bauer's knowledge, use of material information and scienter.

Undisputed Elements

As an initial matter, the parties agree that Bauer was an insider at the time of her trade. *See* Bauer Decl., ¶ 1; Bauer Admissions, Req. 14, 17, 18, 19; Bauer 3/5/05 Dep., 31:25-32:5. Second, she was in possession of nonpublic information on October 3, 2000. *See* Bauer 3/3/05 Dep., 260:25-261:6; Bauer Admissions, Req. 69. Third, Bauer sold her securities on October 3, 2000. *See* Bauer Decl., ¶ 40; Bauer 1/17/01 Dep., 119:4-17, 122:25-124:3.

Disputed Elements

**Materiality**

The main dispute is whether the nonpublic information Bauer possessed at the time of her redemption was material. Materiality can be characterized as a mixed question of law and fact. *See TSC Industries, Inc., v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (stating that the issue involves "the application of a legal standard to a particular set of facts." ). The Supreme Court has advised that because

> [t]he determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inference to him. . . . Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment.

-22-

*Id.* Hence, the court reviews the evidence in this case cognizant that it must consider whether any omitted information would have significantly altered the total mix of information available to a reasonable investor. *See id.* at 449; *Basic*, 485 U.S. at 231-32.

As of October 3, 2000, Bauer was in possession of the following categories of nonpublic information respecting the Short Duration Fund: 1) the Fund was experiencing liquidity problems; 2) HGI and HAI had concerns regarding credit; 3) there was concern/dispute over whether HAI should sell securities in the Funds at distressed prices; 4) redemptions were worrisome; 5) she knew details of the SWIB transaction; 6) she was aware of the securities on the defaulted and watch list securities lists for the Short Duration Fund; 7) she knew that sale or merger of the Funds was contemplated.

At the August 10, 2000, Board of Directors meeting, Bauer was informed that the Short Duration Fund was experiencing credit difficulties. *See* HAI 00709-10. During the meeting, she reviewed a list of the Short Duration Fund's defaulted and watch list securities. *See* HAI 000710. Moreover, concerns about redemptions were discussed. *See* HAI 000720. At the September 11, 2000, Special Board of Directors meeting, Bauer again reviewed a list of the defaulted and watch list securities in the Short Duration Fund. *See* HAI 66366. The Short Duration Fund's loans and cash outflows were addressed as well. *See* HAI 66367-68. Also, the Board discussed and approved the sale of bonds by the High Yield Fund and the Short Duration Fund to SWIB. *See* HAI 66370-71.

At the September 28, 2000, Board of Directors meeting, Bauer heard Nasgovitz's update regarding efforts to dispose of securities in the Short Duration Fund and credit work respecting certain defaulted securities. *See* HAI 66372. Addtionally, she was in the midst of conversation about redemptions and the possibility of limiting or suspending redemptions. *See*

-23-

HAI 66373, 66375. The effects of the SWIB transaction was addressed as well. *See* HAI 66374-75. These matters, gleaned from board minutes show Bauer's intimate knowledge of the Funds' credit, liquidity and redemption issues. They also establish that Bauer was privy to details regarding defaulted and watch list securities and the sale of securities to SWIB.

Pricing Committee minutes are similarly revealing. That committee's September 20, 2000, minutes reference discussions concerning Fund liquidity. *See* JH-00377-78. Beste and Clark indicated that the initial bids they had received were at significant discounts. *See* JH-000378. On the other hand, Pawlak expressed concern regarding the resources available and the effect on HAI's ability to monitor credits. *See id.* The September 20, 2000, minutes further illuminate Bauer's knowledge of the Funds' liquidity and credit issues and underscore the evidence gleaned from board minutes that she was aware that securities held by the Funds may need to be discounted in order to be sold.

Bauer's August 16, 2000, email to Nasgovitz, Beste, Conlin, Winston states that the Board was advised that they would "evaluate contingency plans in the event redemptions continue to be a problem. . . ." This shows that Bauer was attentive to the redemption issue. Email from Bauer to Nasgovitz, Beste, Conlin and Winston (8/16/00 12:40 CST), HAI 031286. Her statement that "[i]ts also possible that we may conclude that both funds' s/h [sic] will have to approve the merger and the surving [sic] fund's s/h [sic] may not want to do it if it causes their portfolio quality to further deteriorate," indicates that she and HAI contemplated merging the Funds. *Id.*

The September 7, 2000, email from Nasgovitz entitled "Munis-a couple of my thoughts & things which need to be addressed," provides further evidence that Bauer knew of the Funds' financial standing. *See* Email from Nasgovitz to Beste, Conlin, Winston, Pawlak,

-24-

copying Eric Miller, Bauer, Clark and Dave Fondrie (9/7/00 9:25 AM CST), HAI 74305. In it, Nasgovitz states "[i]t has been mentioned by each of the team that we are doing catch up research on the portfolios. I would like to know which bonds in the 3 high yield funds are not up to date. This would help all in ascertaining potential problems ahead." *Id.*

Beste sent an email titled "Muni Recap," on September 11, 2000, and copied Bauer. This communication shows that she possessed information that HAI acknowledged discounted pricing may be necessary to meet its goals for selling bonds. *See* Email from Beste to Conlin, Winston, Pawlak, Nasgovitz, Clark, copying Bauer (9/11/00 8:02 AM CST), HAI 015380. Beste wrote that "[a]dditional mark downs on our pricing...will be given so we can accomplish our objective" of selling $4 to $8 million in bonds in each fund. *Id.*

In mid-September, Bauer was aware of HAI's ongoing concern about liquidity, credit and redemptions. She was also knowledgeable of the internal dispute regarding whether bonds held by the Funds should be discounted to stimulate sales. Bauer received a September 18, 2000, email from Clark stating that "the prospects for liquidity are not that good," and that "[w]e have received some indications of levels where we could move a few positions but they are down 30-50% from current level. These players are vulture types but are the only ones we have received firm indications of interest." Email from Clark to Nasgovitz, copying Beste, Eric Miller, Bauer (9/18/00 3:42 PM CST), HAI 031033. Clark advised that he "still feel[s] we need to come up with a contingency plan just in case we have a run on the funds and cannot payout redemptions." *Id.*

Bauer also received two emails from Nasgovitz and Beste regarding confrontation of Conlin. *See* Email from Nasgovitz to Bauer, copying Beste (9/19/00 6:20 PM CST), HAI 74605 and Email from Beste to Nasgovtiz, copying Bauer (9/20/00 7:00 AM CST), HAI 74605.

-25-

Nasgovitz's email discusses concerns about need to create liquidity in the Short Duration and High-Yield Funds, hitting the loan limit, the need to repay loans and getting the Funds on "sound footing." *See id.* Beste's email states that Conlin "does not agree with the discount required to sell non-rated bonds in todays [sic] market." *Id.*

On September 25, 2000, Bauer sent an email reiterating her statement in a letter to Kirk that HAI had explored and was continuing to explore the option of selling the Funds. *See* Email from Bauer to Beste, Nasgovtiz, Clark (9/25/00 5:02 PM CST), HAI 031032. She mentions that calls were made to several companies inquiring about interest in purchasing the Funds.[8]

Bauer's knowledge regarding the redemption problem is further evidenced by her September 27, 2000, email providing comments on new points pertaining to a recent downward NAV adjustment in the Funds. *See* Email from Bauer to Kim O'Connor (Schneider), John Merrell (9/27/00 7:35 PM CST), HAI 000085-86. Bauer states: "(COMMENT: Not sure I like this but you can think about it – its [sic] difficult to take proactive steps to restructure portfolio if all cash raised is used to pay out redemptions but we cant [sic] say that)." *Id.*

Bauer's knowledge of the securities on the defaulted and watch list for the Short Duration Fund is further evidenced by the Board of Director minutes and an October 2, 2000, email written by Kate Vebber to Bauer. *See* Email from Kate Vebber to Bauer, copying Nicole Best (10/2/00 2:37 PM CST), HAI 000081-83. Vebber indicates that Bauer is "looking for any price declines in the watch list securities since 6/30." *Id.* at HAI 000081. Also, she states that

---

[8] The court notes that this information is contradicted by Bauer's testimony that HAI wasn't actively trying to find a buyer for the Funds in late September. See Bauer 3/3/05 Dep., 262:2-24.

she is attaching a list of the significant price changes (since 6/30/00) in the securities listed on the watch list as of 9/27/00. *Id.* at HAI 000081-83.

Significantly, the day after Bauer redeemed her Short Duration Fund shares, she sent an email circulating a draft of an updated Q&A response to inquiries HAI had been receiving about the downward change in the NAV on 9/28/00. *See* Email from Bauer to John Merrell, Doug Lucas, Kim O'Connor (Schneider), Beste, Scott Powell, Ted Dryden, Aaron Picard and Nasgovitz, copying Winston, Fiskow, Pawlak (10/4/00 1:01 PM CST), HAI 031273-81. Bauer notes that "the Q&A refers to plans to send s/h [sic] a special rpt [sic] including a schedule of investments and dflt % [sic] and a more detailed explanation of the price change on 9/28/00 the wk [sic] of 10/9. We need to do this because this info [sic] is non-public, *could be material* and can be shared but not selectively. *Knowing all s/h [sic] would be interested*, we think the best way to make it public is thru [sic] a mailing-we believe we should do more than post this info [sic] on our web site." *Id.* at HAI 031273 (emphasis added).

The Q&A contains answers showing the material relevance of the lists of defaulted and watch lists securities Bauer saw prior to her redemption, information about the SWIB sale Bauer possessed before her redemption and specific details regarding the Short Duration Fund's financial situation she knew on the date she redeemed shares. Specifically, the answers to shareholders' requests for more information about the sale of securities that "[a]lthough Heartland Funds publish a schedule of investments semi-annually as well as other periodic communications...it typically does not comment on the purchase and sale of individual portfolio securities for at least two reasons. . . . And second, such information *could be viewed as material* information which, if we chose to disclose, would need to disclosed in a manner that ensured it was made public and broadly available to investors." *Id.* at HAI 031276-77 (emphasis

added).  "*[I]n light of the recent share price volatility and other developments, we recognize that many shareholders have high level of interest in updated portfolio information at this time.* As a result., we have decided to issue a special report to investors of both Funds that will include...a schedule of investments as of 9/30 that will show those securities in payment default as of that date. . . ."  *Id.* at HAI 031277.  Respecting the financial solvency of Heartland, the Q&A states that "Heartland is not a public company so it does not disclose its financials. However, Heartland is a registered broker-dealer and as such is required to meet certain net capital requirements under SEC rules.  It meets those requirements."  *Id.* at HAI 031281.  Thus, it is apparent that Bauer possessed information on the financial health of the Funds and the financial concerns of the Board.

Bauer's letter to Kirk, written the day before she redeemed her shares of the Short Duration Fund further illuminates the scope of her knowledge.  Letter from Bauer to Kirk (October 2, 2000), HAI 0000373-379.  She briefly mentions the redemption issue and discusses the Funds' distressed bonds liquidity and borrowing.  *See id.* at HAI 000373-74.  She states that HAI "also acknowledged that the Funds might be required to sell securities at distressed prices [if] redemptions accelerated more rapidly than anticipated."  *Id.* at HAI 000377.  In writing about the September 28, 2000, Board of Directors meeting, she notes that

> [t]he Board asked about the options available to the Funds in view of the circumstances. A discussion ensued involving the implications of keeping the Funds open and selling securities at distressed prices, suspending redemptions with SEC approval to allow for a more orderly transition, redemptions in kind, efforts to look for buyers for all or large blocks of securities in the Funds' portfolios, a well as discussions with other fund sponsors that might have an interest in acquiring the Funds to merge into larger funds with compatible portfolios or means to put cash into the Funds. Heartland explained that it had explored and was continuing to explore all of these options, and also had discussed them with Fund

-28-

counsel and the Washington office of Morgan Lewis & Bockius,
outside counsel for Heartland.

*Id*. Bauer also addresses the SWIB sale and its effect on the Funds' defaulted securities and NAV. *See id.* at HAI 000378.

Further, Bauer knew that a person within HAI who was opposed to selling at discounted prices would be leaving the firm soon. *See* Bauer 1/17/01 Dep., 163:25-164:14. She also knew it was possible that Conlin was resistant to discounted prices for personal reasons. *See* Email from Nasgovitz to Bauer, copying Beste (9/19/00 6:20 PM CST), HAI 74605 and Email from Beste to Nasgovtiz, copying Bauer (9/20/00 7:00 AM CST), HAI 74605. Moreover, Bauer was cognizant that the Board and HAI were concerned that sales objectives were not being met. *See* Email from Beste to Conlin, Winston, Pawlak, Nasgovitz, Clark, copying Bauer (9/11/00 8:02 AM CST), HAI 015380. Additionally, she knew the effect that selling at distressed prices could impact the future sale of the Funds and the Funds' bonds. *See* Email from Nasgovitz to Bauer, copying Beste (9/19/00 6:20 PM CST), HAI 74605; Email from Beste to Nasgovtiz, copying Bauer (9/20/00 7:00 AM CST), HAI 74605; Conlin 4/7/05 Dep., 113:5-22; Email from Conlin to Beste, copying Nasgovitz, Bauer (9/19/00 4:46 PM CST), HAI 0144850.[9]

Although Bauer maintains that she possessed positive information on October 3, 2000, when she sold her shares of the Short Duration Fund, the test for materiality does not require that the information be adverse. The test for materiality is whether it is substantially likely that the omitted information would have been viewed by a reasonable investor to have

---

[9] It is unclear from Conlin's 9/19/00 email whether he is referring to the High-Yield or Short Duration Fund. However, even if he is stating that the discounted sale is "guaranteeing the demise of the [High Yield] fund," Bauer could have (and should have) inferred that the sale of bonds at distressed prices from the Short Duration Fund would have a similar effect.

significantly altered the total mix of information available. *See Basic*, 485 U.S. at 231-32. The court doubts that reasonable minds could disagree whether the information Bauer possessed was material. Notably, Bauer and HAI addressed the defaulted/watch list securities and the SWIB transaction information stating that this information "could be viewed as material" and that "we recognize that many shareholders have high level of interest in updated portfolio information" in the Q&A circulated the day after her redemption. *See* Email from Bauer to John Merrell, Doug Lucas, Kim O'Connor (Schneider), Beste, Scott Powell, Ted Dryden, Aaron Picard and Nasgovitz, copying Winston, Fiskow, Pawlak (10/4/00 1:01 PM CST), HAI 031273, 031276-77. Hence, the company and Bauer recognized the substantial likelihood that a reasonable investor would have found information concerning the defaulted/watch list securities and HAI's sale of securities (i.e. the SWIB transaction) that Bauer possessed at the time of her redemption significant to his/her investment decision.

As stated above, information does need to relate to price to be material. Other information can be "important enough to reasonable participants in an investment decision to alter their behavior." *Jakubowski*, 150 F.3d at 681. Information relating to the possible sale of bonds at discounted prices and the Short Duration Fund's liquidity, credit and redemption issues, as well as the details about the defaulted/watch list securities and the SWIB transaction, viewed together is important enough to alter a reasonable investor's behavior. Therefore, the record clearly establishes that Bauer possessed material, nonpublic information about the Short Duration Fund on October 3, 2000.

**Scienter**

Scienter must be established to sustain an insider trading claim brought under Sections 10(b) and 17(a), as well as Rule 10b-5. *Aaron*, 446 U.S. at 695-97. To do so, direct

-30-

and circumstantial evidence may be utilized. *See Herman v. Maclean*, 459 U.S. 375, 391 n.30 (1983). Moreover, demonstrating that a defendant acted recklessly is enough to support a finding of liability under Section 10(b) and Rule 10b-5. *See Securities & Exchange Comm'n v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008); *Jakubowski*, 150 F.3d at 681; *Securities & Exchange Comm'n v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985). Recklessness, in this context, "is an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Lyttle,* 538 F.3d at 603.

Here, there is strong evidence that Bauer acted with such recklessness that the court concludes that she acted with scienter. *See In re Chavin*, 150 F.3d 726, 728-30 (7th Cir. 1998) (discussing the circumstances under which it is appropriate for a district court to take a question of fact such as intent to defraud from the jury and decide the issue at the summary judgment stage). Bauer has a significant background in securities law and had worked in the field for over twenty years. See Bauer, Decl., ¶¶ 1-; Bauer 1/17/01 Dep., 41:12-44:25, 49:13-50:2, 75:21-80:25. Also, she was employed as General Counsel and Chief Compliance Officer for HAI as well as Stein, Roe and Farnham. *See id.* Bauer was aware of HAI's policy on insider trading, which followed the applicable securities law. Bauer 8/15/01 Dep., 353:22-354:18. The company's insider trading policy stated:

> 1) General Prohibition. Any Heartland employee who becomes aware of material nonpublic information should not (without first discussing with Heartland's Compliance Officer):
> -     trade for a personal or client's account
> -     recommend transactions in the security, or
> -     disclose (tip) the information to others.
> 2) What is Material? Information is material if it has market significance - info a reasonable investor would want to know before making an investment decision. Examples:

-31-

- earnings estimates, changes in dividends, stock splits and other financial projections
- major new discoveries or advances
- acquisitions, mergers and tender offers
- sales of substantial assets
- changes in debt ratings
- significant write-downs or additions to reserves

. . .

4) How does a Heartland person's duty not to use the info arise? Any Heartland person who obtains material nonpublic information is subject to the prohibitions described in 1) above.

HAI's Policy Against Insider Trading (September 10, 1996), TH 0002. Bauer acknowledges that she informed employees that the policy applied to "information [known] about publically traded companies that we were investing in our mutual fund portfolios, but also about the mutual funds themselves." Bauer 8/15/01 Dep., 354:1-4.

The statements that Bauer made regarding the motivation underlying the redemption of her shares also supports a finding of scienter. Bauer stated "[t]he primary reason I redeemed the shares is I was no longer comfortable with the volatility of that fund. The price volatility. . . . And I was concerned about protecting these assets. The volatility in the month of September had been, the price, the NAV had dropped by as much as half of what it had done for the entire year." Bauer 1/17/01 Dep. 128:9-19. Afterward, she engaged in the following exchange:

> Q: You didn't have any, you didn't think, you didn't have any feeling one way or another when you sold your shares if you thought it was going to go up or down?
> A: Well, the feeling I had was there was lots of uncertainty. And it wasn't performing the way that I had expected it to.
> Q: When you say there was lots of uncertainty, what do you mean by that?
> A: I mean there was, I had a lot of uncertainty as to whether it would go up or down. But what I did note was it had, it had been more volatile than what I was comfortable with. And particularly in the last month.

-32-

*Id.*, 129:8-19.  Finally, Bauer's email regarding destruction of non-pertinent information is circumstantial evidence of knowledge that selling her shares of the Short Duration Funds was in violation of the law and an attempt to deceive through the destruction of evidence proving her inside knowledge.  *See* Email from Bauer to Pawlak, Winston, Clark, Beste, Nasgovitz (September 28, 2000 3:23 PM CST), HAI 080172.

Bauer's insider trading can create an inference of scienter.[10]  "[T]he strength of an inference depends on how closely it follows from a fact.  Without more, an executive's sale of stock does not lead to the conclusion that he engaged in fraud.  The sale must be suspicious in scope or timing to support an inference of scienter."  *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 715 (N.D. Ill. 2005).

Bauer maintains that she purchased her shares of the Short Duration Fund as a short-term investment and a supplement for needs like her children's school tuition and tax payments that caused her to redeem some of her shares at the end of 1998.  Def.'s Mem. in Supp. of Mot. for Summ. J. 39-40.  She states that she did not need to redeem any shares in 1999 because she had sold her interest in HAI and had cash available from that transaction.  *Id.* at 40.  Bauer asserts that she sold her Short Duration Fund shares in October 2000, because she expected to leave HGI for new employment in San Francisco and that she would need additional money for moving expenses and the anticipated loss of her annual bonus.  *Id.*  As noted earlier, Bauer also states that she was concerned about the recent volatility in the Short Duration Fund share price.  *Id.*

---

[10]  *See In re Career Educ. Corp. Sec. Litig.*, 2007 U.S. Dist. LEXIS 23635, *31 (N.D. Ill. Mar. 29, 2007) (stating that to use insider trading to create an inference plaintiffs must show that the sale was "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.") (citations omitted).

Bauer cites *Freeman v. Decio*, 584 F.2d 186 (7th Cir. 1978), in support of her contention that because there is evidence that she had a legitimate purpose to redeem her shares of the Short Duration Fund on October 3, 2000, the insider trading claim against her must fail. *See* Def.'s Mem. in Supp. of Mot. for Summ. J. 39-41. On the other hand, the SEC cites *Securities & Exchange Comm'n v. Lipson*, 278 F.3d 656 (7th Cir. 2002), for the proposition that possession of material, nonpublic information creates an inference of use. *See* Pl.'s Br. in Supp. of Its Cross Mot. for Summ. J. 31-33. The SEC notes that the Seventh Circuit has "held that the mere existence of an alternative legitimate purpose for selling securities does not serve as a defense to allegations of a defendant's illegal sale," and that because of "Bauer's actual knowledge of material, non-public information prior to her sale it cannot be seriously argued that she did not violate the prohibition against insider trading. . . ." *Id.* at 32-33.

In *Freeman,* the Seventh Circuit affirmed the trial court's grant of summary judgment in favor of the defendants because it found that the court considered the defendants' past pattern of stock sales and their motivation for making the sales in question. The Appeals Court stated:

> When it is shown that an insider made a sudden sale of a significant portion of his holdings of his corporation's stock and that subsequently, material adverse information became public concerning the corporation which led to a significant drop in the price of the stock, an inference arises that the insider was "bailing out" on the basis of material inside information. However, this inference can be nullified by a showing that sales in question were consistent in timing and amount with a past pattern of sales or that other circumstances might reasonably account for their occurrence.

*Id.,* 584 F.2d at 197 n. 44. Bauer submits that she has rebutted any inference of improper insider trading by showing that she has a past pattern of redeeming shares for large annual

-34-

expenditures and that "other circumstances" - a new job across the country - reasonably account for her redemption.

However, as pointed out above, Bauer testified that the "primary reason" she redeemed her shares was her discomfort with the price volatility of the Short Duration Fund given the nature of her investment. Bauer stated:

> [t]he primary reason I redeemed the shares is I was no longer comfortable with the volatility of that fund. The price volatility. And these were assets that were, in my mind, assets that I wanted to have relatively liquid and available to me to meet certain types of expense. And I was concerned that they might not be available to me if I got locked up again and I needed access to them. And I was concerned about protecting these assets. The volatility in the month of September had been, the price, the NAV had dropped by as mush as half of what it had done for the entire year. And this had been a fund, over the longer term, the volatility had been relatively stable with a penny here, two pennies there, nothing of the magnitude that we saw in the month of September.

Bauer 1/17/01 Dep., 128:9-22. Notably, Bauer further testified that she had another reason for her redemption, a possible move to San Francisco because of a job. *Id.,* 130:19. She stated that she had one interview in San Francisco with a new company (Loomis Sales), had discussions regarding a compensation package and had plans for two other trips - on to Boston to meet with people from the legal department and another trip to San Francisco. *Id.,* 131:6-133:11, 137:9-138:11. However, Bauer acknowledged that she did not have a firm offer of employment when she redeemed her shares of the Short Duration Fund in October 2000. Id., 133:4-11, 137:1-140:9. The following exchange took place:

> Q: So you never really had an offer. Is that correct? I mean, they didn't say we want you to work for us and you can start on such a , I mean, there wasn't actually an offer that you could accept and start working?
> A: I did not have any written offer.
> Q: Did you have a verbal offer?

-35-

. . .

Q: That's fair.  What was you understanding during your second conversation with this woman in San Francisco in September of 2000 of the status of your prospective employment at this new job?
A: this woman and I had known each other for a number of years.  And it was my understanding that this was her decision as the general counsel and that all the feedback had been positive in the interview and that it was her decision.  And I expected that this would reach a successful conclusion.  We'd even talked about the new organization of the parent company early on.  In fact, and she did not foresee at that time that that would interfere with being able to move forward.  So in my view, I was optimistic, very optimistic that I would be resigning shortly from Heartland and accepting a job with their firm.
Q: Okay. What is you understanding of the legal significance of an offer used as a term of -
A: An offer and an acceptance make a contract.
Q: Okay.  In that sense of the term offer, during your second conversation with this woman in San Francisco in September, did she make you an offer for the new job?
A: I would not, as I said, I was very optimistic that I would receive an offer and be accepting it shortly and be resigning from Heartland.  So in the legal sense, I would not regard our discussions, I don't think it would be fair to regard them as an offer that would be enforceable.

*Id.*, 138:16-140:9.  Regardless, Bauer continued to interview for jobs after receiving what she perceived to be the job offer from Loomis.  *See id.*, 194:13-18 (stating that she was in Chicago interviewing for jobs on September 29, 2000).  Considering the strength of the inference arising from the sale of Bauer's shares, coupled with her admission that the primary reason for her redemption was the volatility of the Short Duration Fund 's price, her preferred reason for the redemption does not sanitize her action.

As for Bauer's past trading practices, the court finds that her October 3, 2000, redemption is out of line with her prior actions and that the timing of the redemption is suspicious.  Bauer states that she redeemed shares of the Short Duration Fund at the end of 1998, but did not redeem any shares in 1999 because she had sold her interest in HAI in

-36-

September.  *See* Bauer Decl., ¶ 23.  *See also* 12/31/98 Account Summary, HAI 88058 and

12/31/99 Account Summary, HAI 75883.  Her prior trading practice shows that she redeemed

her shares in the last weeks of the year, not in early October.  *See* 12/31/98 Account Summary,

HAI 88058.  Additionally, the scope of Bauer's redemption, that resulted in the closure of her

account, establishes that she knew that the Short Duration Fund was experiencing severe

problems.  Moreover, given the information she possessed, redemption of her shares only five

days after derestricting activity on the Funds and the dramatic decrease in the Short Duration

Fund's NAV ten days after that redemption, the timing of the transaction raises a red flag.  While

Bauer may not have had knowledge that the NAV of the Fund would fall so significantly, her

inside knowledge of the Short Duration Fund's troubles at the time she sold her shares

demonstrates that she breached her fiduciary duty and was aware or should have been aware

that she was violating Sections 10(b) and 17(a) and Rule 10b-5.

   In *Lipson*, the Seventh Circuit upheld the trial court entry of judgment in favor of

the SEC after a jury verdict finding that the defendant had engaged in insider trading.  The Court

of Appeals in *Lipson* discusses that the SEC has the burden of persuasion to establish that the

plaintiff's trades were influenced by the inside information he possessed, that the information

played a causal role in his decision to sell the number of share when he did.  *Lipson*, 278 F.3d

at 660.  It upheld the portion of the jury instruction that allowed the jury to infer that if Lipson

possessed inside information, his trades were influenced by the information.  *Id.* at 661.  The

court then stated that this "inference is sufficiently compelling to shift to a defendant in Lipson's

situation the burden of production, that is the burden of presenting some rebuttal evidence, on

pain of suffering an adverse judgment as a matter of law if he does not."  *Id.*  The court rejected

Lipson's jury instruction because "[t]he existence of the legitimate purpose would not sanitize

the illegitimate one," and "[o]nly if the illegitimate purpose had no causal efficacy because the legitimate one would have caused him to sell the shares when he did and in the amount he did would the existence of the legitimate purpose be a defense. . . ." *Id.*

A complete reading of the precedent reveals that, although an inference of insider trading arises in this case – where a significant sale occurred while Bauer was in possession of material, nonpublic information – the inference can be nullified if Bauer can demonstrate one of two things: 1) the "sales in question were consistent in timing and amount with a past pattern of sales," *Freeman,* 584 F.2d at 197 n. 44.; or 2) "other circumstances might reasonably account for their occurrence." *Id.*; *see also Lipson*, 278 F.3d at 661 (holding that only a showing that the inside information played no causal role because the defendant would have sold the share when and in the amount he did due to the legitimate reason would defeat the inference of use of inside information violating securities law). However, Bauer has failed to nullify the inference of insider trading despite claiming that her redemption fit a pattern and was dictated by personal circumstances.

<u>The SEC's Requested Remedy</u>

Section 36(a) of the Investment Company Act provides that the SEC may bring an action alleging that a person serving or acting as an officer of an investment adviser to a registered investment company has engaged in any conduct or practice constituting a breach of fiduciary duty involving personal misconduct respecting the registered investment company. *See* 15 U.S.C. § 80(a)-35(a). If the SEC is successful, the court may enjoin the defendant from acting in any or all such capacities and award injunctive or other relief. *See id.*

Here, the SEC is seeking to permanently enjoin Bauer from acting in any fiduciary capacity and disgorgement of profits resulting from her insider trading. *See* Pl.'s Br. in Supp.

of Its Cross Mot. for Summ. J. 35-36. The SEC asks the court to impose the maximum civil penalty of three times the loss avoided in the illegal sale of Bauer's shares of the Short Duration Fund, or $60,000.00. *See* Pl.'s Br. in Supp. of Its Cross Mot. for Summ. J. 36-37, citing *Lipson*, 278 F.3d at 664 (defendant's insistence of innocence in the face of overwhelming evidence of illegal insider trading justified imposition of the maximum civil penalty). However, the court is not inclined to resolve this case piecemeal, as the resolution of the remaining claims may have an affect on the remedies at issue here.

For the reasons stated above, the court has denied in part and granted in part the parties' cross motions for summary judgment.

Dated at Milwaukee, Wisconsin, this 25th day of May, 2011.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U.S. DISTRICT JUDGE

-39-