UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

SECURITIES AND EXCHANGE
COMMISSION,

                                   Plaintiff,

              v.

HEARTLAND ADVISORS, INC., et al.,                    Case No. 03-C-1427

                                   Defendants.

---

**DEFENDANT BAUER'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR ENTRY OF FINAL JUDGMENT
OF PERMANENT INJUNCTION AND OTHER RELIEF**

---

This case is about a judgment made eleven years ago by then-General Counsel of

Heartland Advisors, Inc., defendant Jilaine Bauer.  This judgment was to lift a restriction she

previously imposed on employee trading in shares of the Heartland Short Duration High-Yield

Municipal Fund (the "Fund") until after the public announcement of the resignation of the Fund's

lead portfolio manager , and then to redeem her interest in the Fund five days later.  No other

conduct is implicated here.  Indeed, this past September the SEC voluntarily dismissed with

prejudice all of its other claims against Ms. Bauer; the SEC's only remaining claim "relat[es]

solely to insider trading," and that claim is presently before the Court on the question of remedy.[1]

(Dkt 460, ¶ 3.)

       When Ms. Bauer informed the Fund's board (including all of its independent directors),

the Fund's President, and other Fund officers at a board meeting attended by the Fund's outside

legal counsel that she would be lifting the trading restriction, no one questioned or counseled

against that course of action.  This is not surprising, given that removing the trading restriction

---

[1]    The Court denied Ms. Bauer's motion for summary judgment on the insider trading charges, and granted the
SEC's cross-motion.  (Dkt 447, 453.)

also took place <u>after</u> a significant drop in the Short Duration Fund's net asset value, or share price. This negative event was covered extensively in the financial press. Five days later, in anticipation of a job change that might require her to cover expenses to move her family to San Francisco, Ms. Bauer redeemed her Fund shares– selling those shares back to the Fund itself.

What Ms. Bauer did not know – and what no one could have known at the time – was that ten days later, Heartland's portfolio managers and pricing committee would reject the prices for the municipal bonds owned by the Fund that were provided by an independent pricing service and, for the first time ever, would determine securities' values by applying an across-the-board haircut to estimates of current market values. This haircut - which was not endorsed by the portfolio managers and was derived from estimates of future values determined by individuals who were not municipal bond professionals - caused a significant decrease in the Fund's net asset value. It represented a novel pricing method that the SEC found in related administrative actions resulted in the price of the Fund being artificially <u>low</u>.

With the full benefit of hindsight, the SEC has claimed – and the Court has summarily determined – that Ms. Bauer's judgment in lifting the trading restriction on September 28, 2000 and redeeming her shares on October 3, 2000 was not only flawed, but fraudulent. If Ms. Bauer's judgment to lift the trading ban was sound (and we believe it was), then her decision to redeem her shares in the Heartland Short Duration Fund would have been deemed appropriate, and this case would not be before the Court.

As it now stands, however, the judgment of liability in this case stands as the only stain upon Ms. Bauer's otherwise exemplary career in the securities industry, which has already been derailed by the pendency of this litigation. This lawsuit, filed in 2003, followed after she left Heartland in November 2002. Since that time, Ms. Bauer has been either unemployed or

under-employed. (11/18/2011 Declaration of Jilaine H. Bauer (hereafter "Bauer Decl.") at ¶ 4.). For several of the intervening years between then and now (2003-2008), Ms. Bauer worked as a contract consultant to Northwestern Mutual Life Insurance Company advising the company on compliance and governance matters involving, among other things, the company's investment products and services. (Bauer Decl. ¶ 3.) The amount of work she did varied from one day per week to full-time consulting. (*Id.*) However, she was unable to find employment in the mutual fund industry or the investment management field (in Wisconsin or elsewhere) with this lawsuit hanging over her head. (*Id.* at ¶ 4.) She was thus deprived of the security and benefits of traditional employment, including group health insurance. (*Id.* at ¶¶ 3-5.) Since her consulting contract with Northwestern Mutual ended in 2008, Ms. Bauer has been doing other consulting work, but has been unable to generate sufficient income to cover her living expenses, which have included significant medical expenses related to her husband's multiple sclerosis condition. (*Id.* at ¶ 5.) And this does not even include legal expenses incurred in this litigation. Ms. Bauer's savings are substantially depleted and she is now making withdrawals from her retirement accounts to pay defense costs. (*Id.* at ¶ 6.) This is no small concern given the reality of living each day with her husband's diagnosis of multiple sclerosis.[2]

Despite the punitive effect this litigation has had on Ms. Bauer's life already, and even though this case involves but one incident of judgment questioned during an otherwise long and exemplary career of an individual with a reputation for honesty, integrity, sound judgment and good faith compliance with the law, the SEC asks the Court for imposition of the maximum penalties in its arsenal: (1) an order permanently enjoining Ms. Bauer against any violation of

---

[2] Multiple sclerosis (often known as "MS") is a chronic, often disabling disease that attacks the central nervous system and can lead to considerable impairment, including paralysis or loss of vision. The progress, severity, and specific symptoms of MS are unpredictable and vary from one person to another. *See* www.nationalmssociety.org.

the fraud provisions in Securities Act §17(a), Securities Exchange Act §10(b) and Rule 10b-5, and Investment Company Act §36(a); (2) an order that she pay disgorgement of $20,033.25, which the SEC calculates as her insider trading "loss avoided," with pre-judgment and post-judgment interest; and (3) the maximum treble civil penalty allowed for insider trading, which the SEC calculates as $60,099.75.  For the reasons below, Ms. Bauer asks the Court to deny these requests.

I.    **The Facts And Circumstances Show No Reasonable Likelihood Of Future Securities Violations, And So The SEC Cannot Satisfy The Requirements To Support The "Drastic Remedy" Of A Permanent Injunction.**

As Chief Justice Burger once observed, a permanent injunction in an SEC case is "a drastic remedy, not a mild prophylactic." *Aaron v. S.E.C.*, 446 U.S. 680, 703 (1980) (Burger, C.J. concurring).  *Accord S.E.C. v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992) (citation omitted) (injunction is "'drastic remedy'" that "should not be granted lightly, especially when the conduct has ceased").  The "collateral consequences of an injunction can be very grave." *S.E.C. v. Commonwealth Chem. Sec., Inc.,* 574 F.2d 90, 99 (2d Cir.1978).  Such collateral consequences in the present case will likely include an application by the SEC staff for a summary administrative order, under Securities Exchange Act §15(b)(6), barring Ms. Bauer from any association with the securities industry for the rest of her life.  *See S.E.C. v. Jones*, 476 F. Supp. 2d 374, 385 (S.D.N.Y. 2007) ("permanent injunction would provide authority for the [SEC] to seek to permanently bar Defendants").

As the SEC acknowledges, to obtain such an injunction, it must prove that there is "a reasonable likelihood of future violations." *S.E.C. v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982).  However, "determining the likelihood of future violations is almost always a fact-specific inquiry." *S.E.C. v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011).  The SEC "'cannot obtain relief without positive proof of a reasonable likelihood that past wrong-doing will recur,'"

*Commonwealth Chem. Sec., Inc.*, 574 F.2d at 100 (citation omitted), and a general statement that defendant "'used his position . . . to engage in misconduct' . . . . can in no way justify the prediction that future misconduct will occur," *S.E.C. v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995).

Courts finding insider trading and other securities violations will decline to order injunctive relief where the particular facts and circumstances do not support that "drastic remedy." *See, e.g. S.E.C. v. Sargent*, 329 F.3d 34, 39 (1st Cir. 2003) (no injunction where the insider trading was a "first-time violation" and current occupation made violations unlikely); *S.E.C. v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993) (no injunction where, though conduct "clearly negligent, and probably reckless, there has been no showing that [defendant] intended to defraud investors"); *S.E.C. v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir. 1980) (citation omitted) (no injunction where no "'continuing menace to the public'"); *S.E.C. v. Bausch & Lomb, Inc.*, 565 F.2d 8, 19 (2d Cir. 1977) (no injunction where the insider trading was "merely one instance of misconduct not likely to recur").[3]

As noted earlier and below, we have here a single incident over a decade ago involving a first-time defendant who has already been severely punished by this protracted litigation. Applying the particular factors for injunctive relief identified by the Seventh Circuit, there is not the "likelihood of future violations" that would counsel for an injunction here.

**A.     The Finding Of An Isolated Securities Violation Does Not Establish A Likelihood Of Future Violations.**

A key factor in determining likelihood of future violations is the amount of time that has passed without incident since the conduct in question.  Thus, in *Monetta Financial Services, Inc.*

---

[3] *See also S.E.C. v. Berlacher*, No. CIV A 07-3800, 2010 WL 3566790, at *13-14 (E.D. Pa. Sept. 13, 2010) (no injunction for single insider trading where defendant no longer involved in fraudulent PIPEs transactions); *S.E.C. v. 800america.com, Inc.*, No. 02 CIV 9046, 2006 WL 3422670, at *11 (S.D.N.Y. Nov. 28, 2006) (no injunction where "isolated incident"); *S.E.C. v. Snyder*, No. CIVAH-03-04658, 2006 WL 6508273, at *6 (S.D. Tex. Aug. 22, 2006) (no injunction based on "isolated nature" of conduct).

*v. S.E.C.*, 390 F.3d 952, 957-58 (7th Cir. 2004), the Seventh Circuit noted that the conduct there "took place a decade ago, for an eight-month period, making it a fairly isolated occurrence and suggesting that the likelihood of a future violation is slight." The Seventh Circuit cited two D.C. Circuit cases, *WHX Corp. v. S.E.C.*, 362 F.3d 854, 861 (D.C. Cir. 2004) (noting isolated nature of violation in finding sanction excessive); and *Johnson v. S.E.C.*, 87 F.3d 484, 490 n.9 (D.C. Cir. 1996) (five-year delay in instituting proceedings suggested lack of concern about future violations). *Monetta*, 390 F.3d at 957-58. *See also S.E.C. v. DiBella*, No. 3:04CV1342, 2008 WL 6965807, at *14 (D. Conn. Mar. 13, 2008), *aff'd on other grounds*, 587 F.3d 553 (2d Cir. 2009) ("the drastic nature of a permanent injunction, the single violation, the passage of 10 years since the misconduct, and the lack of evidence, apart from DiBella's continued assertions of no wrongdoing, that could indicate a likelihood of future violations, lead this Court to deny the SEC's request for a permanent injunction"); *Jones*, 476 F. Supp. 2d at 384 (no injunction where "several years have passed since Defendants' alleged misconduct apparently without incident").

In the present case, over 11 years have passed without incident since the conduct in question – a judgment to lift a trading restriction followed by the decision five days later to sell mutual fund shares on the morning of October 3, 2000. Eight years have passed since the SEC filed this case. Never did the SEC seek preliminary injunctive relief against Ms. Bauer. And after eight years of litigation, on September 19, 2011, the SEC voluntarily dismissed with prejudice all but its insider trading charge. (Dkt ¶¶ 460, 461.) If Ms. Bauer has not been a threat for the last 11 years, it is highly unlikely that she will commit a future violation.

The fact is Ms. Bauer's record prior to this incident over a decade ago was spotless, and it has been spotless since. (Bauer Decl. ¶ 2.) In this regard, we would also invite the Court to consider the statements concerning Ms. Bauer's character that have been furnished by

individuals, some of whom work in the securities and mutual fund industry, and have otherwise known her over many years and in different contexts. (Bauer Decl. ¶ 1, and exhibits.)[4]

One of the witnesses, who is general counsel to an investment management firm and has known Ms. Bauer in a professional context for 30 years, states she is "absolutely certain of [Ms. Bauer's] honesty, integrity and good faith compliance with the law." She also states that in her years working with Ms. Bauer while she was at another investment management firm, "Ms. Bauer worked every day to advise her client on how to conduct its operations in a way that complied with both the letter and the spirit of the laws to which it was subject, including the securities laws." (*Id.* at Ex. A.) Another witness, who is currently an independent director of a publicly traded company that offers global investment management services and who previously was managing director, president and chief operating officer of a an independent investment research firm that set the global standard for analyst-driven mutual fund ratings, has known Ms. Bauer for approximately seventeen years. Ms. Bauer worked for him directly for more than five years. He states "I found Jilaine to have the highest ethical standards and to be the strongest voice for taking actions that were both legal and in the interest of fund shareholders. She was extremely knowledgeable about securities laws and was extremely vigilant to insure we operated at a high level of compliance with those laws." (*Id.* at Ex. B.)

---

[4] Ms. Bauer submits with her declaration four letters to the Court from: (a) Janet D. Olsen, Managing Director and General Counsel of Artisan Partners, an investment management firm (Exhibit A); (b) Timothy K. Armour, an independent director with Janus Capital Group, Inc., chairman of the board of AQR Mutual Funds, director of AARP Services Inc. (an operating subsidiary of the American Association of Retired Persons (AARP) that develops, manages and markets AARP investment products and services), and retired executive from Morningstar Inc. where he held the positions of Managing Director, President, and Chief Operating Officer (Exhibit B); (c) Shailaja Reddy, Senior Vice President and Associate General Counsel at Associated Banc-Corp (Exhibit C); and (d) Pastor Deborah A. Block (Exhibit D).

**B. The Lack Of Regulatory Guidance And Novel Application Of Insider Trading Laws To The Mutual Fund Context Militates Against A Permanent Injunction.**

Another key consideration in determining likelihood of future violations is the egregiousness of past conduct. In this regard, the Seventh Circuit has observed that conduct is "not particularly egregious" where "no rules expressly" cover a situation. *Monetta,* 390 F.3d at 957, citing *WHX Corp.*, 362 F.3d at 860 (vacating sanction order where no rule or formal Commission precedent prohibited the behavior at issue).

In the present case, the conduct charged by the SEC reflects a substantially new interpretation of the duties of corporate insiders. (*See, e.g.* Dkt 401 at 28-29.) To the knowledge of counsel on both sides of this case, this is the first time any federal court has ruled that a person commits insider trading by selling a public mutual fund's shares back to the mutual fund itself.[5] On the insider trading claim, the Court found that Ms. Bauer possessed material nonpublic information about the Short Duration Fund when she sold back to the Short Duration Fund itself (or "redeemed") the shares she held in the Short Duration Fund.

When an insider sells stock to a buyer who already has the inside information, there is no deception, and the insider has not violated what the Supreme Court has called the insider's "duty to disclose or abstain from trading." *United States. v. O'Hagan*, 521 U.S. 642 (1997), citing *Chiarella v. United States,* 445 U.S. 222, 228-229 (1980). Ms. Bauer's motion papers urged that

---

[5] An SEC administrative law judge issued a ruling finding insider trading in mutual funds in a case where the defendant appeared without an attorney and where the ALJ's opinion contains no indication that either side alerted him to the novelty of the position being asserted. *In re Baldt*, SEC Release No. 418, 2011 WL 1506757 (Apr. 21, 2011). In another matter, the SEC and a defendant reached a no-admission settlement in a case that charged insider trading in mutual fund shares, but there is no indication in the SEC's release that it advised the court entering the no-admission consent decree without briefing of its novelty. *S.E.C. v. Marquardt*, SEC Litig. Release No. 21383, 2010 WL 191749 (Jan. 20, 2010).

she (as seller) had no duty to disclose because the Short Duration Fund (as buyer) already had the information about itself in question.[6]

The securities laws date to the 1930s, and insider trading enforcement began in 1961, with *In re Cady, Roberts & Co.*, SEC Release No. 6668, 40 S.E.C. 907, 1961 WL 60638 (Nov. 8, 1961). Yet this is the first time the SEC has sought entry of judgment that a mutual fund insider committed insider trading by selling mutual fund shares back to the mutual fund itself. Absent prior notice at the time of the conduct 11 years ago that such conduct would be considered violative, such conduct should not presently be deemed "egregious."[7]

**C. This Court's Finding Of Scienter To Support Liability Should Not Dictate The Remedy As Well.**

Yet another factor bearing on injunctive relief is the degree of a defendant's scienter. For scienter, the Seventh Circuit requires a showing of recklessness, which it defines as:

> "'[A] highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either

---

[6] The SEC has issued an administrative order publicly admitting that the management of the Short Duration Fund (the buyer) already knew the same information about the Short Duration Fund that the Court found Ms. Bauer (the seller) also possessed. *In re Hammes*, SEC Release No. 33-8346, 81 SEC Docket 2467, 2003 WL 22926836, at *2-*7 (Dec. 11, 2003) (Section C). The particular information the SEC thus found that fund management already knew parallels the information that this Court found Ms. Bauer "was in possession of ... respecting the Short Duration Fund: 1) the Fund was experiencing liquidity problems; 2) HGI and HAI had concerns regarding credit; 3) there was concern / dispute over whether HAI should sell securities in the Funds at distressed prices; 4) redemptions were worrisome; 5) she knew details of the SWIB transaction; 6) she was aware of the securities on the defaulted and watch list securities lists for the Short Duration Fund; 7) she knew that sale or merger of the Funds was contemplated." (Dkt 453, p. 23.)

[7] Additionally, all or most of the information was already in the public domain. For example, on the day Ms. Bauer sold her Short Duration Fund shares to the Short Duration Fund, October 3, 2000, the Bond Buyer, the daily public finance newspaper, published a veritable catalogue of the then already publicly-known risks of investing in the Short Duration Fund, including that (i) its performance "ranks at the bottom among firms followed by Morningstar"; (ii) its situation "highlights the difficult nature of managing high-yield funds – especially ones with a high percentage of health care investments"; (iii) its price drop was "not such a surprise" because "pricing such issues is difficult since borrowers have hard-to-quantify credit strengths and risks that analysts, pricing agencies, and portfolio managers may evaluate differently"; (iv) prices for the Fund's high-yield securities "fluctuate more greatly based on market conditions – such as the number of buyers in the market"; (v) it simply adopted prices set by independent pricing agencies; and (vi) it was "buried" by its own poor investment selections. (Dkt 428, Supp. Tab EE.)

known to the defendant or is so obvious that the actor must have been aware of it.'"

*Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir. 1977) (citation omitted). *Accord S.E.C. v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008); *McConville v. S.E.C.*, 465 F.3d 780, 788 (7th Cir. 2006); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588, 600 (7th Cir. 2006), *vacated on other grounds*, 551 U.S. 308 (2007).

This case involves the Supreme Court's "disclose or abstain from trading" standard for corporate insiders selling their stock. Thus, in assessing Ms. Bauer's scienter, the question is whether in selling Short Duration Fund Shares to the Short Duration Fund, her failure to disclose to the fund certain information about the fund was, in the Seventh Circuit's words in *Sunstrand*, "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading [the Short Duration Fund] that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sundstrand*, 553 F.2d at 1045.

While mindful of the Court's ruling, we respectfully disagree with the Court's conclusion and submit that Ms. Bauer's non-disclosure to the fund of information the fund already knew was not "a highly unreasonable omission." The record evidence cited in our summary judgment and reconsideration papers affirmatively shows that Ms. Bauer acted reasonably in selling her shares back to the fund: (i) five days <u>after</u> a significant decline in the prices the fund used to buy and sell its own shares, and at a time when nonpublic information pointed to improving performance (Dkt 400, ¶¶ 83-84, 88-92, 114-18); (ii) after hearing the fund's portfolio managers opine that these prices, set by an independent pricing service, were fair (Dkt 426, ¶¶ 220, 248, 258); (iii) after hearing from investment professionals that extensive comparative pricing analysis and due diligence validated these prices (Dkt 400, ¶¶ 50-51); and (iv) five days after the

board and outside counsel were advised that the trading restriction that had been in place for the Fund's insiders was being lifted (Dkt 400, ¶ 96).

### D.  Ms. Bauer's Present Consulting Work Does Not Support Imposition Of An Injunction.

The SEC is mistaken in their unsupported conclusion that, absent an injunction, Ms. Bauer's present activities "likely will present opportunities for future violations of the securities laws." (SEC Mem. 5.)  Ms. Bauer's career was derailed, and despite grit and courage, her future is unclear.  After graduating from Loyola University Law School in Chicago, she became a staff attorney at the investment management firm, Stein Roe & Farnham, where she enjoyed a successful career for some 18 years, the last two as its general counsel and a member of the executive committee.  (*See* Dkt 400, ¶¶ 1-7.)  In 1998, she was recruited by Heartland Advisors in Milwaukee to perform similar duties as their general counsel until 2002 when her position was one of many eliminated in the months and years following the October 2000 markdown.  (Dkt 400 ¶ 1; Bauer Decl. ¶ 4.)  Since that time, her sole work has been as a self-employed consultant focused on helping  people *comply* with the law.  (SEC Mem. Ex. A; Bauer Decl. ¶ 3.)

The SEC argues that Ms. Bauer is "in her fifties and, thus, relatively young."  (SEC Mem. at 2.)  Although relatively young for retirement, anyone that age – including those at professional firms with mandatory retirement at 60 or 65 – will know that "in your fifties" often means "and thus too old to get hired."  Ms. Bauer is actually 56.  (Bauer Decl. ¶ 2.)

Notwithstanding the limitations this litigation has placed on her future employment prospects, Ms. Bauer is in no position to retire.  Indeed, she likely will have to postpone retirement in an effort to replenish her retirement savings and  provide for her family.

11

Ms. Bauer's husband is disabled from multiple sclerosis, and his condition has worsened over time. (Bauer Decl. ¶ 5.)

**E.      Securities Enforcement Defendants Should Not Be Punished For Contesting The Charges Against Them, As The SEC Urges In This Case.**

For the reasons stated during the summary judgment briefing, Ms. Bauer's counsel will respectfully seek appellate review of the grant of summary judgment to the SEC. If the Seventh Circuit determines to reverse and remand, there will be a jury trial that Ms. Bauer will have to defend.

For this reason, it is unreasonable for the SEC to demand at this point an admission of "wrongdoing" and "contrition" from Ms. Bauer. (SEC Mem. 6.) As the D.C. Circuit has concluded:

> "The securities laws do not require defendants to behave like Uriah Heep in order to avoid [imposition of remedies]. They are not to be punished because they vigorously contest the government's accusations. We think 'lack of remorse' is relevant only where defendants have previously violated court orders, or otherwise indicate that they did not feel bound by the law."

*S.E.C. v. First City Fin. Corp.,* 890 F.2d 1215, 1229 (D.C. Cir. 1989). *Accord S.E.C. v. Todd*, No. 03CV2230, 2007 WL 1574756, at *17 (S.D. Cal. May 30, 2007) (citation omitted), *aff'd in part and rev'd in part on other grounds*, 642 F.3d 1207 (9th Cir. 2011) (injunction denied where "Defendants have not 'recognized the wrongfulness of their conduct' in the sense that they argue that they did not in fact commit a fraud. This is a wholly appropriate position during the pendency of Rule 50 and Rule 59 motions . . . ."); *S.E.C. v. Brethen*, No. C-3-90-071, 1992 WL 420867, at *24 (S.D. Ohio Oct. 15, 1992) (defendant may "exercise his right to contest th[e] litigation . . . under our system of justice" and doing so does not justify the imposition of a securities remedy).

That said, Ms. Bauer sincerely regrets her decision to sell her Short Duration Fund shares to the Short Duration Fund on the morning of October 3, 2000.  It has subjected her to over a decade of investigation and complex securities litigation.  It ruined her career.  Over the last 11 years she has been keenly aware of this, and it certainly has caused and will cause her to be extremely careful and circumspect in any securities transactions.  (Bauer Decl. ¶ 7.)

For all the reasons set forth above, there is not the required "reasonable likelihood of future violations" for injunctive relief.  *Holschuh*, 694 F.2d at 144.

## II.    The SEC Has Failed To Meet Its Burden For Disgorgement Because It Has Not Established That The Price Of The Fund Was Inflated On October 3rd, And Has Failed To Establish That The Price On October 13th Can Be Used To Calculate Disgorgement.

In awarding disgorgement in an SEC case, a "court may exercise its equitable power only over property causally related to" a violation of the federal securities laws.  *First City Fin. Corp.*, 890 F.2d at 1231; *S.E.C. v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978); *Jones*, 476 F. Supp. 2d at 386 (no disgorgement where the SEC was "unable to set forth any evidence of specific profits subject to disgorgement"); *S.E.C. v. Cohen,* No. 4:05CV371-DJJ, 2007 WL 1192438, at *21 (E.D. Mo. April 19, 2007) (no disgorgement where the SEC had "not shown that defendant obtained any ill-gotten gains or unjust enrichment from his actions . . . .").

In the present case, the SEC has demanded the sum of $20,033.25 in disgorgement, representing its view of the "loss avoided" by Ms. Bauer, as well as prejudgment and postjudgment interest.  (SEC Mem. at 8.)  The SEC calculates the disgorgement amount by comparing the price on the day Ms. Bauer actually sold her shares back to the Short Duration Fund, October 3, 2000, with the lower price for the shares 10 days later on October 13, 2000.

The SEC neglects to tell the Court, however, that it has  made a formal finding that the October 13, 2000 price for fund shares was incorrect and in fact *too* low.  In its December 11,

2003 administrative order settling fraud charges against certain Heartland directors, the SEC found that the October 13th repricing was "arbitrary" and "improper." The SEC said that the directors acted fraudulently by "permitting and not rectifying the haircut Heartland Advisors applied to the Funds on October 13, which . . . resulted in prices that did not represent the fair values of the bonds" in fund portfolios. *In re Hammes*, 2003 WL 22926836, at *7-*8. From the very outset of the present litigation, the SEC has taken the same position in its pleadings, and indeed has told the Court that this fraudulently low October 13th price was set improperly low in order to allow the fund to meet redemption requests. (Dkt 1, ¶¶ 69-73.)

Having publicly made the finding that the October 13th share price was fraudulently low, the SEC should not now use that price to calculate the disgorgement it now claims from Ms. Bauer. As described above and in our summary judgment and reconsideration papers, the fund fairly priced its shares on October 3rd, the day Ms. Bauer sold her shares back to the fund. Hence, there is no basis for any disgorgement, and in any event no basis for disgorgement calculated on the basis of pricing ten days later on October 13th when the SEC has found the fund's prices were fraudulently low.

## III.  Imposition Of A Civil Penalty Is Not Appropriate.

In addition to disgorgement, the SEC has also asked the Court to impose "the maximum amount of civil penalty against Bauer, $60,099.75, which equals three times the loss she avoided in her unlawful sale of Short Duration Fund shares." (SEC Mem. at 8-9.) While Securities Exchange Act §21A allows a treble penalty, the SEC's only citation for such relief is *Securities and Exchange Commission v. Lipson*, 278 F.3d 656, 665 (7th Cir. 2002) (approving treble penalty where the court was "told without contradiction that [defendant] has a net worth of some $100 million . . . ."). (SEC Mem. 9.)

14

Section 21A says that penalties for insider trading "shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided as a result of" the sale or purchase. 15 U.S.C. § 78u-1(a)(2). As discussed above, the Short Duration Fund used a fair price in buying back Ms. Bauer's shares on October 3, 2000, and there is no "loss avoided" to use as the predicate for computing a penalty.[8]

However, even if there were an actual "loss avoided" to use as the basis for a penalty calculation, the "facts and circumstances" of this case, as described above in the injunction section, should not support a penalty here. *E.g. Sargent*, 329 F.3d at 39 (no penalty for insider trading where "first-time violation" and no likelihood of future violation); *Berlacher*, 2010 WL 3566790, at *13-14 (no penalty for insider trading where no likelihood of future violation).

## IV. Ms. Bauer Requests That The Court Stay Enforcement Of The Judgment Pending Her Appeal.

This Court has the discretion to stay the enforcement of a judgment imposing any of the remedies that the SEC seeks in this case while Ms. Bauer pursues an appeal. *See* Fed. R. Civ. P. 62(c) (stay of injunction pending appeal); *Id*. at sub. (d) and (f) (stay of money judgment). For example, in determining whether to stay injunctive relief pending an appeal, which is the most difficult standard to meet under Rule 62, the court should consider four factors: (1) whether the appellant has demonstrated a likelihood of irreparable harm if a stay is not granted; (2) whether a stay would substantially harm other parties to the litigation; (3) the public interest; and (4) whether the appellant has shown a likelihood of success on appeal. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (Rehnquist, C.J.) (vacating the judgment of a court of appeals denying

---

[8] The statute also defines "loss avoided" as the decline in the value of the security resulting from the "public dissemination of the nonpublic information." 15 U.S.C. § 78u-1(f). Here the change in value of the Fund between October 3rd and October 13th was not caused by any public dissemination of information; rather, it caused by the imposition of a valuation method by Heartland that included an unforeseeable valuation "haircut" that the SEC has expressly and publicly found to be fraudulent.

an application for a stay pending appeal); *Indianapolis Colts v. Mayor & City Council of Baltimore*, 733 F.2d 484, 486 (7th Cir. 1984) (a stay pending appeal was granted in part to allow parallel litigation to proceed and denied in part to allow a professional football team to prepare to play in a new city).

All of these factors support a stay in this case. First, Ms. Bauer will be irreparably harmed if any injunction is not stayed. As set forth above, a permanent injunction would likely be utilized by the SEC to obtain a summary order barring Ms. Bauer from any association with the securities industry. This could potentially interfere with her current consulting work, and limit or eliminate her ability to provide for her family.

Second, a stay would not substantially harm the SEC, the only other party to this case. Notably, the SEC never sought preliminary injunctive relief. If the SEC has not been harmed during the past eight years that this litigation has been pending, it cannot seriously contend that it would be substantially harmed by staying the imposition of any remedy for another six to nine months while the appeal is litigated.

Third, the public interest is not served by imposing an injunction that could have the drastic effect of eliminating Ms. Bauer's ability to earn a living. She should not have to face this prospect while there is a very real potential for the Court's summary judgment decision to be over-turned on appeal. Moreover, as discussed above, Ms. Bauer's record in the securities industry prior to this incident and in the eleven years since – as attested to by those in and out of the industry that know her well – shows that a stay would not expose the public to any risk of securities violations while the appeal is pending.

Fourth, we respectfully submit that, for the reasons set forth in the extensive summary judgment briefing and Ms. Bauer's motion to reconsider, that there is a likelihood of success on

appeal. The SEC's novel application of the insider trading doctrine to the mutual fund context –

and in particular within the factual circumstances of this case – is unsupported by the law and

likely will not be upheld. Moreover, even if the appellate court does not determine that the

SEC's insider trading theory is legally deficient, there are several genuine issues of material fact

and competing inferences to which Ms. Bauer should have been entitled that relate to dispositive

issues of materiality, scienter, and whether Ms. Bauer traded based on any non-public

information.

## CONCLUSION

For the reasons above and in the full summary judgment record before the Court, the

SEC's requested remedies should be denied.

| | |
|---|---|
| Reinhart Boerner Van Deuren s.c. | s/ Ryan S. Stippich         |
| 1000 North Water Street, Suite 2100 | |
| Milwaukee, WI 53202 | Mark A. Cameli |
| Telephone: 414-298-1000 | mcameli@reinhartlaw.com |
| Facsimile: 414-298-8097 | Ryan S. Stippich |
| | rstippic@reinhartlaw.com |
| Dated: November 18, 2011 | Attorneys for Defendant, Jilaine H. Bauer |

Of Counsel:
Stephen J. Crimmins
K&L Gates LLP
1601 K Street NW
Washington, DC 20006
Advising on a *Pro Bono* Basis

REINHART\8034763