# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

September 13, 2013

To:    Jon W. Sanfilippo
UNITED STATES DISTRICT COURT
Eastern District of Wisconsin
Milwaukee , WI 53202-0000

|  |  |
|---|---|
| No.: 12-2860 | SECURITIES AND EXCHANGE COMMISSION, <br> Plaintiff - Appellee <br><br> v. <br><br> JILAINE H. BAUER, <br> Defendant - Appellant |

| Originating Case Information: |
|---|
| District Court No: 2:03-cv-01427-CNC <br> Eastern District of Wisconsin <br> District Judge Charles N. Clevert |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

AMOUNT OF BILL OF COSTS (do not include the $):

279.00

DATE OF MANDATE OR AGENCY CLOSING LETTER ISSUANCE:

07/22/2013

RECORD ON APPEAL STATUS:          Entire record returned consisting of

Transcripts:                                          2

**NOTE TO COUNSEL:**

If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                                    **Received by:**

        9/13/13                                    /s/ Lisa M. Teran
_____          _____

form name: **c7_Mandate**(form ID: **135**)



| | |
|---|---|
| Everett McKinley Dirksen United States Courthouse<br>Room 2722 - 219 S. Dearborn Street<br>Chicago, Illinois 60604 | Office of the Clerk<br>Phone: (312) 435-5850<br>www.ca7.uscourts.gov |

# BILL OF COSTS

September 13, 2013

Taxed in Favor of: **Appellant Jilaine H. Bauer**

| | |
|---|---|
| No.: 12-2860 | SECURITIES AND EXCHANGE COMMISSION,<br>Plaintiff - Appellee<br><br>v.<br><br>JILAINE H. BAUER,<br>Defendant - Appellant |
| **Originating Case Information:** | |
| District Court No: 2:03-cv-01427-CNC<br>Eastern District of Wisconsin<br>District Judge Charles N. Clevert | |

The mandate or agency closing letter issued in this cause on July 22, 2013.

BILL OF COSTS issued in the amount of: $279.00.

| | | Cost of<br>Each Item | Total Cost<br>Each Item |
|---|---|---|---|
| 1. | For docketing a case on appeal or review or docketing any other proceeding:<br>_____ | _____ | _____ |
| 2. | For reproduction of any record or paper, per page: _____ | _____ | _____ |
| 3. | For reproduction of briefs:<br>_____ | _____ | $279.00 |
| | | TOTAL: | $279.00 |

form name: **c7_BillOfCosts**(form ID: **140**)

CERTIFIED COPY



A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

# In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 12-2860

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

*v.*

JILAINE H. BAUER,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:03-cv-01427—**Charles N. Clevert, Jr.**, *Judge*

---

ARGUED FEBRUARY 12, 2013—DECIDED JULY 22, 2013

---

Before RIPPLE and TINDER, *Circuit Judges,* and ZAGEL, *District Judge.*[*]

ZAGEL, *District Judge.* The Securities and Exchange Commission ("SEC" or the "Commission") charged Jilaine

---

[*] The Honorable James B. Zagel, United States District Court for the Northern District of Illinois, Eastern Division, sitting by designation.

H. Bauer ("Bauer") with insider trading in connection with a mutual fund redemption she made in October of 2000. The district court for the Eastern District of Wisconsin (the "district court") granted summary judgment to the SEC and Bauer appealed. This case is unusual—it is one of few instances in which the SEC has brought insider trading claims in connection with a mutual fund redemption. No federal court has opined on the applicability of insider trading prohibitions to the trade of mutual fund shares. The parties did not adequately alert the district court to the novelty of the claims involved in this case, and as such the district court did not consider several of the threshold legal questions that are now before us. We decline to rule on these issues in the first instance absent a ruling from the district court. We reverse the order entering summary judgment and remand so that the district court can 1) rule on whether Bauer's alleged conduct properly fits under the misappropriation theory of insider trading; 2) dismiss the insider trading claims against Bauer if it determines the answer to this question is "no," and hold a trial if it determines the answer is "yes."

## I.

There is a long story that underlies this result. Heartland Advisors, Inc. ("HAI") is an investment adviser and a broker-dealer. In 2000, HAI managed the mutual fund portfolio series of Heartland Group, Inc. ("HGI"), an open-end management investment company. HAI acted as the principal underwriter and distributor

of shares of HGI's mutual funds, which included the Short Duration Fund and the High Yield Fund (collectively, the "municipal bond funds" or the "Funds"). Bauer was the general counsel and chief compliance officer of HAI from 1998 to 2002. From March through the end of 2000, Bauer served as a senior vice president and secretary of HAI, and as a vice president of HGI. She was elected secretary of HGI in August 2000. Bauer also served as chairperson of HAI's Pricing Committee in 2000. As chief compliance officer, Bauer implemented HAI's policy against insider trading, which prohibited HAI employees from trading on nonpublic information regarding the securities held in the Funds' portfolios, as well as nonpublic information about the Funds themselves. HAI and HGI were both based in Milwaukee, Wisconsin.

"A mutual fund is a pool of assets, consisting primarily of a portfolio of securities, and belonging to the individual investors holding shares in the fund." *Jones v. Harris Associates L.P.*, 130 S.Ct. 1418, 1422 (2012). Mutual funds are typically managed by an investment adviser, a separate entity that "selects the fund's directors, manages the fund's investments, and provides other services." *Id*. Mutual funds that allow their investors to purchase or redeem shares at any time are called "open-end" funds. Open-end funds are subject to a series of federal regulations designed to ensure that redeeming, purchasing, and existing investors are all treated alike. 15 U.S.C. § 80a-5(a)(1). Important to this end are pricing requirements for mutual fund shares. 15 U.S.C. § 80a-22(a) provides that mutual fund shares must be sold and redeemed at a price that:

will bear such relation to the current net asset value of such security computed as of such time as the rules may prescribe . . . for the purpose of eliminating or reducing . . . any dilution of the value of other outstanding securities of such company or other result of such purchase, redemption or sale which is unfair to holders of such other outstanding securities.

A mutual fund's net asset value ("NAV") is calculated by valuing each asset owned by the fund, adding the asset values together, subtracting any liabilities, and then dividing the net value of the portfolio by the number of shares outstanding. The value of securities in the fund's portfolio is defined as follows:

> (i) with respect to securities for which market quotations are readily available, the market value of such securities; and (ii) with respect to other securities and assets, fair value as determined in good faith by the board of directors.

15 U.S.C. § 80a-2(a)(41)(B). Mutual funds must calculate their NAV at least once daily and sell and redeem all shares at a price based on the NAV next computed after receipt of an order. 17 C.F.R. § 270.22c-1(a), (b). Redemption prices must be paid to investors within seven days after tender. 15 U.S.C. § 80a-22(e).

The Funds were opened on January 2, 1997. Both the Short Duration and the High Yield Funds invested primarily in medium and lower quality municipal bonds, sought to produce a "high level of federally tax-exempt current income," and shared the same portfolio managers. The Short Duration Fund's average portfolio duration

No. 12-2860                                                      5

was "three years or less," while the High Yield Fund's average duration was "greater than five years."

Municipal bonds are difficult to price. They are traded less frequently than most securities, and the issuers of municipal bonds are not subject to the same federal registration and disclosure requirements as corporations, which makes it difficult for investors to assess risk. HGI's board established a set of pricing procedures to deal with the challenge of accurately pricing municipal bonds. The pricing procedures relied heavily on valuations published by an independent pricing service that specialized in evaluating U.S. municipal bonds, Muller Financial Corporation ("Muller"). If an HAI portfolio manager believed that prices furnished by Muller did not represent fair value, the manager was required to challenge the valuation and submit the security to HAI's Pricing Committee. The Pricing Committee would then make its own fair value determination based on a predetermined list of pricing factors. The pricing factors were based entirely on characteristics of the Fund's underlying portfolio securities and did not relate to information about the Fund itself, such as loan balances or projected redemption activity.

HAI encouraged its senior management to personally invest in HGI mutual funds. On June 18, 1998, Bauer invested in the Fund as a "back up" to savings in a money market fund. On December 22, 1998, Bauer redeemed $10,932.67 worth of shares in the Fund. She made no further redemptions until October 3, 2000.

It is important for mutual funds to maintain a high degree of liquidity in order to meet redemption demands

within seven days and manage other exigencies that may arise. *See Restricted Securities*, Investment Company Act Release No. 5847, 35 Fed. Reg. 19,989, 19,991 (Dec. 31, 1970). To achieve this, mutual funds must limit the number of illiquid securities contained in their portfolios. *Id.* The SEC has advised that a prudent limit on mutual fund holdings of illiquid securities is no more than 15 percent of net assets. *See Revisions of Guidelines to Form N-1A*, Investment Company Act Release No. 18612, 57 Fed. Reg. 9828 (Mar. 20, 1992). The Funds' prospectus stated that "[n]o fund will invest more than 15% of its net assets in illiquid securities," which was defined as a security "that may not be sold or disposed of in the ordinary course of business within seven days at a price approximating the value at which the security is carried."

Beginning in 1999 and continuing through August 2000, the Funds experienced substantial net redemptions, meaning investors were redeeming more shares than they were purchasing. Consequently, net assets shrank by approximately $21.5 million in the Short Duration Fund during the first six months of 2000, and illiquid security levels rose from 5.75% to 7.22% of net assets. During the same period, the High Yield Fund suffered a $7.6 million decrease in net assets, and an increase in illiquid securities from 17.98% to 21.93% of net assets. This created a liquidity problem. In addition to net redemptions, HAI had difficulty selling off the Funds' portfolio securities at carrying prices because a growing percentage consisted of bonds that had defaulted or were placed on a "watch list" for potential default. To generate the cash required to meet redemption demands, HGI began selling off securities at discounted prices.

On August 10, 2000, Bauer attended a meeting of HGI's board of directors, in which several problems with the municipal bond funds were discussed, including credit issues, liquidity risks, and other challenges posed by ongoing net redemptions. Over the next several days, Bauer exchanged emails with senior HGI personnel that highlight the scope of the problems with the municipal bond funds, particularly the High Yield Fund. On August 16, 2000, Bauer emailed William Nasgovitz, president of HAI and HGI, and others to discuss "contingency plans" for the municipal bond funds "in the event redemptions continue to be a problem." In the email, Bauer opined that the Funds "may be left with a liquidation as [the] only option" because it was "extremely [unlikely] that our problems will be solved thru sales efforts alone." On August 18, 2000, Thomas Conlin, who co-managed the municipal bond funds, tendered his resignation. Bauer, Nasgovitz, and Paul Beste, a vice president and chief operating officer of HAI, convinced Conlin to defer his resignation until mid-September so that HAI could develop a transition plan. Bauer then imposed trading restrictions on HAI personnel aware of Conlin's plans to leave HAI. By August 31, 2000, illiquid securities made up 7.99% of Short Duration Fund net assets and 23.12% of High Yield Fund net assets. Between June 30 and August 30, 2000, the Short Duration Fund's NAV declined from $9.27 to $9.18.

In order to generate emergency liquidity and reduce the percentage of non-performing bonds in the Funds, HAI contacted the State of Wisconsin Investment Board ("SWIB") to negotiate a deal. SWIB agreed to purchase

a package of non-performing bonds from the municipal bond funds on the terms that HGI could choose any bonds it wished to include in the package. However, SWIB would obtain a "put" that would allow it to sell the bonds back to HAI after two years at a guaranteed 20% annual return. Bauer was not involved with negotiating the SWIB transaction. The deal was formally approved at an HGI board of directors meeting on September 11, 2000, which Bauer attended.

The Funds' liquidity and redemption problems continued into September 2000. The Funds remained unsuccessful in finding purchasers willing to buy securities at carrying prices, which led to internal speculation that valuations furnished by Muller were inaccurate. Attempts were made to compare Muller valuations to other pricing sources, which revealed "a wide difference of opinion" as to bond prices. On September 11, 2000, Beste wrote to Bauer and others that they had raised $4.2 million in bonds from the Short Duration Fund but nothing in the High Yield Fund, and would "continue to adjust prices" downward. On September 18, 2000, Kevin Clark, HAI's senior vice president of trading, sent an email to Bauer and others that stated: "as we dig deeper into the situation the prospects for liquidity are not good," and that the only "firm indications of interest" were coming from "vulture types" looking to purchase portfolio bonds at 30-50% markdowns.

On September 20, 2000, Bauer called a special meeting of the Pricing Committee to review the Muller valuations. The committee "concluded that they did not have

sufficient information to justify an override of any specific security, absent a recommendation from the portfolio managers." Also discussed at the meeting was "the possibility of a reduction in portfolio security valuations across the board." It was also noted that Muller "was working down their list [of bonds], but it was too early to tell if [Muller] would make any adjustments that would impact the overall market." On September 21, 2000, the Short Duration Fund NAV dropped by 4 cents, and the High Yield Fund NAV dropped by 11 cents. On September 27, 2000, illiquid securities in the SDF topped out at 10.89% of net assets.

On September 27, 2000, Bauer sent HAI customer service representatives her comments on proposed responses to questions that HAI expected to receive from its investors regarding the recent NAV declines. One such question was "What are you doing to fix the portfolio?" The proposed answer stated that "mitigating the price volatility and . . . improv[ing] investment returns are our most pressing priority." Bauer inserted comments on this answer: "Not sure I like this but you can think about it—its difficult to take proactive steps to restructure portfolio if all cash raised is used to pay out redemptions but we cant say that."

On the morning of September 28, 2000, Nasgovitz sent an internal email to HAI employees, announcing the closing of the SWIB transaction. The email stated: "The trade will be done and we need to communicate to all when and what it means for our balanced accounts. This should remove a big cloud over these accounts but

it does entail lower prices for the securities and will result in losses for the accounts and Funds." Later that day HAI issued a press release announcing Conlin's departure and the hiring of a replacement portfolio manager, Phil Fiskow. That afternoon, Bauer attended a special meeting of the Pricing Committee. The minutes of the meeting provide:

> On 9/28, Muller advised Heartland that they expected to adjust valuations of certain portfolio securities downward. Discussions ensued in which P. Beste asked Muller if the markdowns were representative of markdowns of other securities Muller valued with similar characteristics, and Muller said they expected they would be . . . After further discussion, J. Bauer asked the members of the Committee if they had reason to believe that any of the Muller valuations did not represent fair value, and should be overridden by the Committee . . . but no one took exception to the Muller valuations.

Shortly after the Pricing Committee meeting, Bauer sent an email to other HAI executives advising them to "only keep those records that you are required to maintain, and eliminate on a regular basis any other material in your files." After the close of business, Bauer lifted the trading restrictions that she had placed on HAI employees in August 2000 who had knowledge of Conlin's impending resignation. She informed the HGI's board, HGI's independent counsel, as well as Mr. Nasgovitz and Mr. Beste of her decision to lift the restrictions. The same day, the Short Duration Fund's

No. 12-2860                                                    11

NAV declined by roughly 2% from $9.10 to $8.91, while the High Yield Fund's NAV declined by about 8%, from $8.75 to $8.03.[1] On September 29, 2000, SEC personnel contacted Bauer with questions regarding the Funds' previous day's markdowns. That same day, the Short Duration Fund's NAV dropped from $8.91 to $8.88.

At 7:00 am on October 3, 2000, Bauer placed an order by phone to redeem all of her shares (roughly 5,000) in the Short Duration Fund. She received $44,627.15 in proceeds. The written record of this call identifies Bauer by name and notes that she is an HAI employee.

On October 4, 2000, Bauer sent an email to HAI personnel regarding an "updated Q&A" that HAI planned to release to investors to explain the September 28 NAV decline. In the email Bauer states:

> We need to do this because this info is non-public, could be material and can be shared but not selectively. Knowing all [shareholders] would be interested,

_____

[1] The record is unclear on what exactly caused the September 28 NAV markdown. The First Amended Complaint alleges it was due to an arbitrary price reduction that HAI made to the non-performing bonds sold to SWIB in order to complete the transaction, but the district court made no such finding. We are therefore uncertain of the extent to which the SWIB sale impacted Muller's valuations that day. Bauer's knowledge on this point is potentially relevant to both materiality and scienter because it goes to whether she could have, in good faith, believed that the valuations provided by Muller on and after September 28 reflected fair market valuation.

we think the best way to make it public is thru a
mailing—we believe we should do more than post
this info on our web site.

On October 10, 2000, HAI sent a letter to its shareholders
that included an explanation for the September 28,
2000, devaluation as well as a list of the Fund's portfolio
as of September 30, 2000.

The Funds problems continued for the next few days
until a special board meeting was called on October 12,
2000. We quote from the district court's opinion to
describe the events of that day, as well as the critical
events of the following day, October 13, 2000:

> During the special Board meeting [on October 12,
> 2000], Fiskow described the events of the week, in-
> cluding the sale of a High-Yield Fund bond on
> October 11, changes to the Watch List and changes to
> the list of illiquid securities. Fiskow characterized
> the Funds' securities market as illiquid . . . Bauer
> informed the Board that the Pricing Committee
> was concerned that the NAV might be too high, but
> was confronted with difficulties in determining a fair
> value for the Funds' securities. Additionally, Fiskow
> informed the Board that the Funds' securities may
> be worth in a range of 70% of their carrying value.
> The Board requested that the SEC be contacted and
> directed the Pricing Committee to establish a fair
> value for the Funds' portfolio securities.
>
> That afternoon . . . the Pricing Committee met with the
> portfolio managers to consider whether the Muller
> valuations . . . represented fair values in light of the

developments discussed with the Board of Directors . . . the Pricing Committee determined unanimously that there was not enough information to conclude that Muller's valuations did not represent fair values, and that Muller's valuations should be used that day.

The next day, October 13, 2000, the Board convened at 7:30 am. It authorized Fund management to fair value the bonds based on the Pricing Committee's determination under the Pricing Procedures or to suspend redemptions and call a special meeting for the purpose of liquidating the Funds.

The Pricing Committee met without Bauer on October 13, 2000, although she entered momentarily to review the Pricing Procedures – the definition of "fair value" and the factors that should be considered in determining fair value. First, the Committee set "fair values" for each security using Muller values and other criteria consistent with the Pricing Procedures and the advice of the portfolio managers. Additional, across-the-board "haircuts" of approximately 50% (High-Yield Fund) and approximately 33% (Short Duration Fund) were applied to all the bonds of the Funds. The portfolio managers asked whether the "haircut" was consistent with Bauer's instructions and the Committee responded by making upward adjustments to the fair value determinations using the haircut for some securities.

The haircut was adopted notwithstanding the concerns that were expressed by portfolio managers.

To Bauer's knowledge, this approach had never been used by these Funds or any other mutual fund.

The across-the-board "haircuts" instituted on October 13, 2000, caused the Short Duration Fund's NAV to drop by 44.02%, from $8.70 to $4.87, and also caused the High Yield Fund's NAV to drop by 69.41%, from $8.01 to $2.45. Five months later, both funds entered receivership.

On December 11, 2003, the SEC filed suit against HAI, Bauer, Nasgovitz, Beste, Conlin and several other senior HAI personnel, alleging insider trading as well as several violations of the Investment Company Act and the Investment Advisers Act. All defendants except Bauer ultimately entered into settlement agreements with the SEC. On May 25, 2011, the district court granted summary judgment to the SEC on the insider trading charges against Bauer. The entry of summary judgment was premised on: (1) the parties' stipulation that Bauer was an insider who possessed nonpublic information at the time she sold her Short Duration Fund shares, and (2) the district court's findings that there were no genuine issues of material fact that the information Bauer possessed was material and that she acted with scienter. On September 20, 2011, the district court dismissed the remaining, non-insider trading claims against Bauer. This appeal followed.

## II.

The insider trading claims in this case were brought under Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and SEC Rule 10b-5. Section 17(a)

No. 12-2860                                                    15

prohibits fraud in the offer or sale of a security. In perti-
nent part, Section 17(a) provides:

> "It shall be unlawful for any person in the offer or sale
> of any securities . . . by the use of any means or instru-
> ments of transportation or communication in inter-
> state commerce or by use of the mails, directly or
> indirectly—
>
> > (1) to employ any device, scheme, or artifice to
> > defraud, or
> >
> > (2) to obtain money or property by means of
> > any untrue statement of a material fact or any
> > omission to state a material fact necessary in
> > order to make the statements made, in light of
> > the circumstances under which they were made,
> > not misleading; or
> >
> > (3) to engage in any transaction, practice, or course
> > of business which operates or would operate as
> > a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). Subsection (a)(1) of the statute thus
proscribes (1) the employment of any device, scheme, or
artifice to defraud (2) in the offer or sale of any securities.

Section 10(b) prohibits fraud in connection with the
purchase or sale of a security. The statute, in relevant
part, provides:

> "It shall be unlawful for any person, directly or indi-
> rectly, by the use of any means or instrumentality
> of interstate commerce, or of the mails or of any facility
> of any national securities exchange—

. . . .

> "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

15 U.S.C. § 78j(b). Section 10(b) thus prohibits (1) using any manipulative or deceptive device in contravention of rules prescribed by the SEC (2) in connection with the purchase or sale of securities. *See U.S. v. O'Hagan*, 117 S.Ct. 2199, 2206–2207 (1997).

Pursuant to its § 10(b) rulemaking authority, the SEC adopted Rule 10b-5, which provides in relevant part:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

> "(a) To employ any device, scheme, or artifice to defraud, [or]

> . . . .

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

> in connection with the purchase or sale of any security."

No. 12-2860                                    17

17 C.F.R. § 240.10-5 (2013). Liability under Rule 10b-5 "does not extend beyond conduct encompassed by § 10(b)'s prohibition." *O'Hagan*, 117 S.Ct. at 2207.

The primary distinction between these laws is that "§ 10(b) and Rule 10b-5 applies to acts committed in connection with a *purchase or sale of* securities while § 17(a) applies to acts committed in connection with an *offer or sale* of securities." *SEC v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995). Because the insider trading charges against Bauer relate solely to the redemption, or sale, of her Short Duration Fund shares, the district court properly treated the proscriptions contained in § 17(a), § 10(b) and Rule 10b-5 as "substantially the same."[2] *Id*. We do the same, and for the sake of simplicity use "§ 10(b)" throughout this opinion as a reference to all three laws.

To prove a violation of § 10(b) the SEC must establish that Bauer: "(1) made a material misrepresentation or a material omission as to which [s]he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). There are two general theories to explain how insider trading violates § 10(b). Under the "traditional" or "classical theory," § 10(b) is violated "when a corporate insider trades in the securities of his corporation on the

---

[2] The exception to this, as the district court noted, is that § 10(b), Rule 10b-5 and § 17(a)(1) have a scienter requirement, while § 17(a)(2) and (a)(3) (Count II in this case) do not. *Aaron v. SEC*, 100 S.Ct. 1945, 1955–56 (1980).

basis of material, nonpublic information." *O'Hagan*, 117 S.Ct. at 2207. Trading on such information qualifies as a "deceptive device" because it breaches the "relationship of trust and confidence between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position within that corporation." *Chiarella v. United States*, 100 S.Ct. 1108, 1115 (1980). This relationship gives rise to an affirmative duty to disclose to the trading counterparty or abstain from trading, which ensures that corporate insiders do not gain an unfair advantage over uninformed purchasers or sellers of the company's stock. *Id*. The classical theory "targets a corporate insider's breach of duty to shareholders with whom the insider transacts." *O'Hagan*, 117 S.Ct. at 2207.

Under the "misappropriation theory" of insider trading § 10(b) is violated when a corporate outsider "misappropriates confidential information for securities trading purposes in breach of a duty owed to the source of the information." *O'Hagan*, 117 S.Ct. at 2208. This qualifies as a "deceptive device" because the outsider trades on confidential information entrusted to him for non-trading purposes, and thereby "defrauds the principal of the exclusive use of that information." *Id*. Under the misappropriation theory, the disclosure obligation "runs to the source of the information" rather than the trading counterparty—an outsider entrusted with confidential information must either refrain from trading or disclose to the principal that he plans to trade on the information. *Id*. at 2208-09 n. 6. The misappropriation theory is "designed to protect the integrity of

No. 12-2860                                              19

the security markets against abuses by 'outsiders' to a corporation who have access to confidential information that will affect the corporation's security price when revealed, but who owe no fiduciary or other duty to the corporation's shareholders." *Id*. at 2207-08.

The threshold issue in this case is whether, and to what extent, the insider trading theories apply to mutual fund redemptions. No federal court has directly opined on this question, largely because the SEC has never brought a § 10(b) claim in the mutual fund context.[3]

––––––––––––––––––––

[3] This is not surprising—mutual fund shares are traded very differently than other securities, with less opportunity for unfair gain based on nonpublic information. First, open-end mutual fund shares are not traded on an open market. Instead, they are issued and redeemed by the fund itself. There is no secondary market for mutual fund shares, so in all instances the fund is the only allowable counterparty. Because of this, there is less reason for concern about unfair informational disparity between trading parties. If a mutual fund insider has gained access to material, nonpublic information as a result of his position, presumably the fund itself is also in possession of that information and cannot be "deceived" by nondisclosure. Second, a mutual fund's net asset valuation is derived from the value of the underlying securities held in the fund's portfolio, not information about the fund itself. Thus, nonpublic information about the internal operations of a mutual fund is less likely to be 'material' to investors because it does not affect how the NAV is calculated. Cf. *S.E.C. v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998) ("Usually price (or facts that influence price) is all that matters to securities

(continued...)

No. 12-2860

The SEC argues on appeal that Bauer's alleged conduct properly fits under the misappropriation theory of insider trading. Specifically, the SEC contends that as an officer of HGI, Bauer stood in a fiduciary relationship both to the Funds and to the Funds' shareholders, which prevented her from using material nonpublic information to promote her personal interests at the expense of HGI shareholders. The SEC also argues that as an officer and employee of HAI, Bauer stood in an independent fiduciary relationship to HGI as its client. According to the SEC, both relationships imposed upon Bauer an affirmative duty to disclose to the principal—HGI—her intentions to trade based on confidential information with which she had been entrusted. Her failure to do so, the SEC urges, operated as a fraud upon HGI.

The problem with the SEC's argument is that it never presented the misappropriation theory to the district court. Rather, the Commission argued below that Bauer was a "traditional insider" trading in the shares

---

[3] (...continued)
transactions"). Finally, NAV price is set daily in accordance with strict federal pricing and sales rules and is therefore not subject to the same information-sensitive price fluctuations as securities traded on open markets. If these pricing and sales rules are adhered to, it is very difficult for anyone to exploit nonpublic information to his or her advantage by purchasing or redeeming mutual fund shares. *See* Mercer E. Bullard, *Insider Trading in Mutual Funds*, 84 Ore. L. Rev. 821, 823-25 (2005).

No. 12-2860                                                    21

of her own fund—an obvious invocation of the classical theory.[4] The district court also appears to have relied

---------------------------------------

[4] At oral argument the SEC claimed that it "did not decide definitively between one theory or the other" in the district court, and that it adequately put Bauer on notice that she could be held liable under either the classical or misappropriation theory of insider trading. We disagree. Although the First Amended Complaint alleges fraud generally without choosing between theories, the SEC's brief in support of its cross motion for summary judgment on the insider trading charges contains the following passage:

> Under the classical theory of insider trading, *traditional insiders* of an issuer, such as *officers*, directors and employees, in possession of material, non-public information have a fiduciary duty to the issuer and its shareholders to publicly disclose such information to abstain from trading in the issuer's securities . . . Under the misappropriation theory of insider trading, a person violates the antifraud provisions of the federal securities laws when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information . . . Ms. Bauer was a *traditional insider*. As an *officer* of Heartland Group, Ms. Bauer had a fiduciary duty not to use material, non-public information for improper purposes. (emphasis added).

The only fair interpretation of the SEC's description of Bauer as a "traditional insider" is that it sought summary judgment under the classical theory of insider trading. As we explained in *SEC v. Maio*:

> The relationship between the corporation whose stock is traded and the person who breaches a fiduciary duty by

(continued...)

on the classical theory, as it noted that "the parties agree that Bauer was an insider at the time of her trade." The district court did not, however, weigh the novelty of the SEC's claims in the mutual fund context. As such, it did not explain how, exactly, a mutual fund redemption could fit under the classical theory of insider trading. The district court's omission is perhaps under-standable in light of the fact that Bauer did not argue below that mutual fund redemptions cannot, as a matter of law, entail deception under the classical the-ory. Rather, she conceded that insider trading liability could attach to mutual fund redemptions if it could be shown that she knew the NAV was priced incorrectly. Thus, the district court was not directly called upon to explain how Bauer's alleged conduct may fit under either theory of insider trading.

---

[4] (...continued)

> trading or tipping determines which theory is applied. Classical theory applies to trading by *insiders* (or their tippees) in the *stocks of their own corporations*. Misappro-priation theory extends the reach of Rule 10b-5 to *outsiders* [or their tippees] who would *not ordinarily* be deemed *fiduciaries of the corporate entities in whose stock they trade*.

51 F.3d 623, 631 (7th Cir. 1995) (emphasis in original) (quoting *SEC v. Cherif*, 933 F.2d 403, 408-09 (7th Cir. 1991). Even if the SEC did not *intend* to limit its case to the classical theory by describing Bauer as a "traditional insider," we reject the SEC's argument that Bauer had fair notice of her potential liability under the misappropriation theory.

No. 12-2860                                                 23

On appeal, Bauer argues that mutual fund redemptions cannot entail the type of deception targeted by the classical theory because the counterparty to the transaction, the mutual fund itself, is always fully informed and cannot be duped through nondisclosure. The SEC, apparently recognizing some merit to this argument, has declined to defend the classical theory on appeal and advances only the misappropriation theory as a basis for sustaining the insider trading claims. The upshot is that we are asked to affirm summary judgment based on a theory of deception that was not adequately raised in the district court, and an opinion that does not consider that a mutual fund redemption has never been recognized to fit under either theory.

The SEC points out that we may affirm summary judgment on any ground that finds support in the record. *See Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 723 (7th Cir. 2011). But to affirm on alternative legal grounds we generally require that the argument "[be] adequately presented in the trial court so that the non-moving party had an opportunity to submit affidavits or other evidence and contest the issue," *Smurfit Newsprint Corp. v. Southeast Paper Manuf. Co.*, 368 F.3d 944, 954 (7th Cir. 2004) (quoting *Box v. A&P Tea Co.*, 772 F.2d 1372, 1376 (7th Cir. 1985). That did not occur here. Bauer did not challenge the element of deception because (1) she was not on notice of her potential liability under the misappropriation theory; and (2) the parties glossed over the element of deception under the classical theory (or conflated deception with materiality).

The question now is whether we should determine the extent to which Bauer's alleged conduct constitutes deception under the insider trading theories or remand the question for the district court to consider. To begin, we decline to consider the applicability of the classical theory given the SEC's failure to brief the issue to this Court. We deem the SEC to have abandoned and forfeited the classical theory as a basis for liability in this case. As for the misappropriation theory, Bauer has put forth two arguments in her reply briefing as to why her October 3, 2000 redemption cannot be fairly viewed as a deceptive breach of her duty of loyalty and confidentiality to HGI: (1) the HGI board approved the September 28, 2000, opening of the trade window for HAI employees, which constituted authorization to trade; and (2) Bauer identified herself as an HAI employee when placing the call to redeem her shares, which constituted disclosure to the principal. Cf. *O'Hagan*, 117 S.Ct. at 2211 n. 9.

We do not comment on the merits of these arguments. It would be fundamentally unfair to limit Bauer's defense against the misappropriation theory to a few pages of reply briefing in this Court, rather than allow her a full opportunity to develop these arguments before the district court. *Brokaw v. Weaver*, 305 F.3d 660, 671 n.8 (7th Cir. 2002). The district court is fully familiar with the facts of this case, and it is at least possible that Bauer will seek to introduce new evidence to rebut the misappropriation theory. Even if no new evidence is offered the opinion of the district judge ought to be known and considered before we determine the applicability of the misappropriation theory.

Remand is also warranted because we think the SEC's briefing to this court on the applicability of the misappropriation theory may overlook certain structural realities of a mutual fund. For example, the Commission might unravel for the district court how an officer at a mutual fund investment adviser can be fairly considered a corporate "outsider" given the investment adviser's deeply entwined role as sponsor and external manager of the fund. *See generally Jones v. Harris Associates L.P.*, 130 S.Ct. 1418, 1422 (2008).

The application of insider trading theories to mutual fund redemptions is uncharted territory, and the approaches fashioned in other areas may not be appropriate analytical models in the mutual fund context. We certainly do not rule out the applicability of § 10(b) to the mutual fund industry; we simply emphasize the need for conceptual clarity to explain how the core elements of insider trading might arise in the trade of mutual fund shares. It is the SEC's task to develop a sound application of the misappropriation theory to the facts of this case.[5]

---

[5] The Supreme Court has emphasized the need to construe § 10(b)'s antifraud provision "not technically and restrictively, but flexibly to effectuate its remedial purposes." *Affilate Ute Citizens of Utah v. United States*, 92 S.Ct. 1456, 1471 (1972). If the SEC's position is that the misappropriation theory needs to be adjusted or expanded to "effectuate" § 10(b)'s remedial purposes in the mutual fund context, it should present that argument to the district court.

We remand to the district court to consider these issues in the first instance.

### III.

Next, we examine the district court's findings as to materiality. For purposes of § 10(b), nonpublic information is considered 'material' if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 108 S.Ct. 978, 983 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 96 S.Ct. 2126, 2132 (1976)). This determination "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Industries*, 96 S.Ct. at 2133. "Only if the established omissions are so obviously important to an investor that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law." *Id*. (internal quotations omitted).

The district court found that Bauer was in possession of seven "categories" of nonpublic information on October 3, 2000 when she redeemed her Short Duration Fund shares:

> 1) the Fund was experiencing liquidity problems;
> 2) HGI and HAI had concerns regarding credit; 3) there was concern/dispute over whether HAI should sell

securities in the Funds at distressed prices; 4) redemp-
tions were worrisome; 5) she knew details of the
SWIB transaction; 6) she was aware of the securities
on the defaulted and watch list securities lists for the
Short Duration Fund; 7) she knew that sale or
merger of the Funds was contemplated.

Bauer does not challenge the finding that she *possessed*
this nonpublic information on October 3, 2000. Bauer
claims that she is entitled to a trial because a reasonable
jury could find that the information does not meet the
§ 10(b) standard of materiality.

The seven categories of nonpublic information that
the district court identified are different facets of one
underlying problem that HGI faced in the fall of 2001: the
Short Duration Fund was at risk of insolvency due to
net redemptions and an inability to generate liquidity.
While the Pricing Committee continued to set the NAV
according to valuations provided by Muller, Bauer knew
that HGI could not find buyers for the underlying bonds
at those prices. Thus, Bauer understood that HGI essen-
tially had three options to deal with its net redemption
problem: (1) freeze redemptions; (2) sell off portfolio
securities at discounted prices to generate cash; or
(3) sell or merge the Funds.[6]

We agree with the district court that much of this
information, standing alone, would be "so obviously

---

[6] This understanding is reflected in the letter that Bauer sent
to a colleague on October 2, 2000, the day before she
redeemed her shares (discussed on pages 28-29 of the district
court's opinion).

important to an investor that reasonable minds cannot differ on the question of materiality." *TSC Indus., Inc.*, 96 S.Ct. at 2133. Bauer's knowledge, for example, that portfolio securities could not be sold at carrying values *does*, in this case, relate directly to the value of the Short Duration Fund. In the highly illiquid municipal bond market, the fact that a carrying-price purchaser cannot be found at any given moment typically is not proof of wrongful valuation and not automatically material. But Bauer also knew that portfolio securities would likely have to be sold despite the lack of carrying-price purchasers in order to generate emergency liquidity to meet redemption demands. That would mean selling off portfolio securities at significant markdowns, which would translate directly into an NAV decline. We think it safe to say that this information, in isolation, is material as a matter of law. Further, while the possibility of a redemption freeze would not factor into the Short Duration Fund's NAV, it would obviously change the perceived value of the fund to a reasonable investor. One of the primary appeals of an open end mutual fund is its liquid nature—investors can convert their shares to cash anytime they wish. Because a redemption freeze would subvert this core feature of the open end investment, we think, as a general matter, the district court was correct in determining that information pointing to a substantial risk of an impending redemption freeze qualifies as material as a matter of law.

The primary difficulty we have with the district court's analysis is that it did not weigh the significance of the

nonpublic information that Bauer possessed against the considerable publicly available information regarding the Funds' poor performance. This was error—it is impossible to determine the extent to which nonpublic information may alter the 'total mix' without first examining the information that was already in the market. The record reflects that the September 28, 2000 NAV decline attracted fairly substantial negative news coverage that touched upon many of the categories of information that the district court found to be material as a matter of law. For example, on September 29, 2000, Bloomberg News published an article entitled "Heartland Muni Funds Serve as Reminder: High Yield = High Risk," which contained the following passage:

> Heartland, a Milwaukee-based manager of stocks and bond funds, said yesterday it's reviewing bonds in two of its high-yield funds, concerned the prices of the bonds may be overstated . . . Heartland became aware of the sinking bond values for at least the past three months and has been try to sell some of them, at times having to mark down prices . . . "No one can say for sure that there's not going to be a further net asset value declines" in the funds, [Heartland spokesman Doug] Lucas said.

The report goes on to explain the substantial risks of investing in mutual funds specializing in high-yield municipal bonds, and the difficulty of accurately pricing such bonds.

Also on September 29, 2000, Morningstar—an independent provider of investment news and research—published

an article entitled "Heartland Manager Leaves, Muni Fund Tanks." The item stated that the Funds had been hurt "by the overall poor performance of municipal high-yield debt in 2000" and that "[n]onrated securities, which make up a large portion of both Heartland high-yield funds, have been hammered this year." The piece closes by stating, "[n]ot surprisingly, after [the September 28 NAV decline], both of [the high-yield] funds rank dead last in their respective categories for the year to date through September 28."

Added to this negative press coverage are the Funds' June 2000 prospectus and semi-annual report, which contained information concerning the net redemption problem. Specifically, these reports revealed that during the first six months of 2000: (1) the Short Duration Fund's assets had shrunk as redemptions exceeded purchases; (2) the Fund's net assets declined by roughly $22 million, or 8.2%; (c) investors redeemed over 5.1 million shares and purchased only 2.9 million. While these reports did not cover the three months leading up to Bauer's redemption, we think a reasonable investor on October 3, 2000, would have reason to know that these trends had continued given the press coverage described above.

The SEC agrees that a great deal of negative information regarding the Funds' performance and prospects was publicly available on October 3, 2000, but maintains that "none of these articles reflected the breadth of nonpublic information known to Bauer as to . . . the liquidity crisis." That may be, but we are less concerned

No. 12-2860                                                      31

with the "breadth" of nonpublic information available
to Bauer than its relative significance in light of informa-
tion that was publicly available on October 3, 2000. It is
a close question, but we think an assessment of the mar-
ginal impact that negative nonpublic information
would have on an already highly pessimistic public
forecast is "peculiarly" one for the trier of fact. *TSC Indus-
tries*, 96 S.Ct. at 2133.

   The second difficulty we have with the district court's
materiality findings is that it did not distinguish
between the Short Duration Fund, in which Bauer was
invested, and the High Yield Fund, in which she held
no shares. This is troubling because the record suggests
that the High Yield Fund was in considerably worse
shape than the Short Duration Fund throughout the
relevant time period. Prior to Bauer's redemption it is
apparent that illiquid securities in the Short Duration
Fund never rose above 10.89% of net assets. By contrast,
illiquid securities comprised as much as 23.12% of net
assets in the High Yield Fund in late August 2000. Inves-
tors were on notice that either fund could invest up to
15% of its net assets in illiquid securities, so we think it is
wrong to say that Bauer's insider knowledge of defaulted
and watchlist securities in the Short Duration Fund is
material as a matter of law. It also calls into question the
materiality of the SWIB transaction. Even if SWIB had
exercised its "put" option, it is not clear that illiquid
security amounts would have ever risen above 15% in
the Short Duration Fund. Finally, there is record evidence
that the Short Duration Fund's liquidity problems
were less severe than the High Yield Fund's. Beste's

No. 12-2860

September 11, 2000 email, for example, reports that HAI
was able to generate $4.2 million in Short Duration
Fund bond sales, but none from the sale of High Yield
Fund bonds. The SEC has not adequately explained
how information concerning the High Yield Fund would
be directly material to investors trading in the Short
Duration Fund alone. We think a fact finder needs to
sort through that question.


## IV

The district court also concluded as a matter of law that
Bauer acted with scienter. Scienter is the § 10(b) mental
state requirement, and it embraces an "intent to deceive,
manipulate, or defraud" *Aaron v. SEC*, 100 S.Ct. 1945
(1980); *Ernst & Ernst v. Hochfelder*, 96 S.Ct. 1375 (1976); as
well as reckless disregard of the truth. *SEC v. Lyttle*,
538 F.3d 601, 603-04 (7th Cir. 2008); *Sunstrand Corp. v.
Sun Chemical Corp.*, 553 F.2d 1033, 1044-45 (7th Cir. 1977).

The district court found, on the summary judgment
record, that in redeeming her Short Fund Duration
shares Bauer acted with a level of recklessness amounting
to scienter. The district court's determination was based
on the following evidence: (1) Bauer was an attorney
with over 20 years of experience in securities law; (2) Bauer
gave deposition testimony in which she stated that her
primary motivation for redeeming her shares was "price
volatility"; (3) Bauer's redemption was suspicious in
terms of scope and timing in that it did not match past
trading practices and occurred ten days before a sub-
stantial NAV decline; and (4) on September 28, 2000,

No. 12-2860                                                    33

Bauer sent an email to HAI executives advising them to "eliminate on a regular basis" any materials in their files that they were not required to maintain.

Bauer's extensive experience in securities law does tend to undercut any inference of simple negligence. *See generally SEC v. Jakubowski*, 150 F.3d 676, 681–82 (7th Cir. 1998). And even more so than the September 28, 2000 email, we think the comments Bauer provided in response to proposed talking points to expected shareholder questions evidences guilty knowledge. Nevertheless, the district court failed to grant Bauer several favorable inferences to which she was entitled at the summary judgment stage. These inferences give rise to genuine issues of material fact as to scienter that will have to be resolved by trial.

First, we fundamentally disagree that Bauer's testimony regarding her concern over price volatility necessarily gives rise to an inference of scienter. The relevant passage from Bauer's December 2001 deposition is as follows:

> The primary reason I redeemed the shares is I was no longer comfortable with the volatility of that fund. The price volatility. And these were assets that were, in my mind, assets that I wanted to have relatively liquid and available to me to meet certain types of expenses. And I was concerned that they might not be available to me if I got locked up again and needed access to them . . . And I was concerned about protecting these assets. The volatility in the month of September had been, the price, the NAV had dropped by as much as half of what it had done

for the entire year. And this had been a fund, over the longer term, the volatility had been relatively stable with a penny here, two pennies there, nothing of the magnitude that we saw in the month of September . . . And again, this was short term assets for me.

The district court also noted the following exchange between Bauer and an SEC attorney:

Q: You didn't have any, you didn't think, you didn't have any feeling one way or another when you sold your shares if you thought it was going to go up or down?

A: Well, the feeling I had was there was lots of uncertainty. And it wasn't performing the way that I had expected it to.

Q: When you say there was lots of uncertainty, what do you mean by that?

A: I mean there was, I had a lot uncertainty as to whether it would go up or down. But what I did note was it had, it had been more volatile that what I was comfortable with. And particularly in the last month.

The district court apparently believed that no reasonable jury could determine that Bauer's concern over price volatility was based entirely on NAV declines that occurred prior to her October 3, 2000 redemption, as well as publicly understood risks of future uncertainty. We think that conclusion was wrong. This case is seems unusual in that Bauer is charged with insider trading for a sale that took place *after* a series of price declines. This muddies the scienter analysis because insiders are

permitted to make rational investment choices based on information available in the market; § 10(b) certainly does not require an insider to go down with the company ship when the public knows just as well that it is sinking. The relevant question is whether Bauer acted with scienter in abandoning ship—whether she knew or recklessly disregarded the fact that she was unfairly avoiding losses based on her access to nonpublic information. That is a *permissible* inference, but not a mandatory one. The price volatility and general poor performance of the fund alone raises a triable issue of fact as to Bauer's state of mind.

Second, and closely related, our ruling in the insider trading case of *SEC v. Lipson*, 278 F.3d 656 (7th Cir. 2002) regarding the distinction between "possession" versus "use" of material nonpublic information is misapplied. In *Lipson* we considered a challenge to a jury instruction that stated if the jury found the defendant to have been in possession of material, nonpublic information, it could infer that the defendant traded on the basis of that information. 278 F.3d at 660. The instruction further stated that the inference could be rebutted by evidence that the material nonpublic information was not a causal factor in the trade. In other words, the defendant could avoid liability if he could show that he would have made the exact same trade whether or not he possessed material nonpublic information. *Id*. We upheld the instruction as in line with the general weight of authority that the SEC has the burden to prove that inside informa-

tion played a causal role in the trade.[7] *Id.* (citing *SEC v. Adler*, 137 F.3d 1325, 1340 (11th Cir. 1998); *United States v. Smith*, 155 F.3d 1051, 1066-69 (9th Cir. 1998)). In so doing, we rejected an alternative instruction offered by the defendant, which provided that if the jury found that the defendant had a legitimate, alternative purpose for trading, the jury would have to find in his favor. *Id.* 661. We characterized this proposed instruction as "absurd" because it would effectively allow a defendant to avoid insider trading liability if he could show that he was motivated both by a legitimate and an illegitimate purpose, or that his unlawful activity served a legitimate end. *Id.*

The district court interpreted *Lipson* to mean that Bauer had to prove *at the summary judgment stage* that material nonpublic information played no causal role in her trade. That was incorrect. *Lipson* makes clear that a defendant can avoid judgment as a matter of law on insider trading charges by presenting *some* credible rebuttal evidence of a legitimate purpose for the trade. *Id.* If the defendant can satisfy her burden of production, the issue must go to the jury "to decide whether to infer

---

[7] In 2000 the SEC promulgated rule 10b5-1, which formally equates possession (or "awareness") of material nonpublic information with use (save for limited exceptions), which, as written, effectively renders the trader's motivation irrelevant. 17 C.F.R. 240.10b5-(1). We need not comment on the validity of that rule at this time because it does not apply to this case—the rule took effect October 23, 2000, nearly three weeks after Bauer's redemption.

from the insider information and the timing of the trades whether [the insider's] decision on when and how much to sell was indeed influenced by the information." *Id.*

   We find that Bauer has met her burden of production by advancing credible evidence of two legitimate purposes for her trade. The first, as mentioned above, is the poor performance of the fund itself. The "bailing out" inference has been sufficiently rebutted because the September 28th NAV decline, as well as the general uncertainty surrounding the fund's performance, "might reasonably [and legitimately] account" for the sale. *See Freeman v. Decio*, 584 F.2d 186, 197 n.44 (7th Cir. 1978). To prove scienter in this case the SEC must control for the poor performance of the Short Duration Fund by demonstrating that Bauer (1) knew or recklessly disregarded the possibility that Short Duration Fund shares remained overpriced despite the September 28 markdown, or (2) knew or recklessly disregarded that she possessed other nonpublic information that remained material despite the September 28th markdown and the information that became public in its wake.

   Bauer has also presented sufficient evidence for a jury to hear her claim that she cashed out in anticipation of a job change and relocation to San Francisco. Bauer was well along in the interview process with a mutual fund company in San Francisco, and had even traveled to San Francisco to meet with a real estate agent and interview with the fund's CEO. The fact that Bauer did not have "a firm offer of employment" is not enough to keep this alternative explanation from going to a jury.

Finally, we do not perceive how it is possible to grant summary judgment on scienter given the nature of the October 13, 2000 NAV decline. The losses that Bauer is charged with unlawfully avoiding stem from a completely unorthodox shift in the manner in which the pricing committee set the NAV. The district court found that Bauer "did not participate in devising the haircut, nor vote on its use," and there is no evidence that she possessed specific information regarding impending across-the-board devaluations at the time she redeemed her shares. Further, the Short Duration Fund's NAV is a derivative valuation of a portfolio of municipal bonds that are notoriously difficult to price. The NAV at which Bauer redeemed was based on valuations furnished by an independent pricing agency that, nine days *after* her redemption, the Pricing Committee still could not definitively override. To take the scienter determination away from a jury under these circumstances was, we think, improper.

The judgment of the district court is reversed and the case is remanded for proceedings consistent with this opinion.

REVERSED AND REMANDED.

7-22-13

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**CERTIFIED COPY**
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

**FINAL JUDGMENT**

July 22, 2013

Before:     KENNETH F. RIPPLE, *Circuit Judge*
            JOHN DANIEL TINDER, *Circuit Judge*
            JAMES B. ZAGEL, *District Judge**

| No.: 12-2860 | SECURITIES AND EXCHANGE COMMISSION, *Plaintiff - Appellee* <br><br> v. <br><br> JILAINE H. BAUER, *Defendant - Appellant* |
|---|---|
| **Originating Case Information:** | |
| District Court No: 2:03-cv-01427-CNC <br> Eastern District of Wisconsin <br> District Judge Charles N. Clevert, Jr. | |

The judgment of the District Court is REVERSED, with costs, and the case is REMANDED for proceedings, in accordance with the decision of this court entered on this date.

_____
* Of the Northern District of Illinois, sitting by designation.